DAVID C. WEISS
Special Counsel
LEO J. WISE
Principal Senior Assistant Special Counsel
DEREK E. HINES
Senior Assistant Special Counsel
SEAN F. MULRYNE
CHRISTOPHER M. RIGALI
Assistant Special Counsels
     950 Pennsylvania Avenue NW, Room B-200
     Washington, D.C. 20530
     Telephone:   (771) 217-6091
     E-mail:  Leo.Wise@USDOJ.GOV, DEH@USDOJ.GOV
     Attorneys for the United States

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 2:24-cr-00091-ODW |
| Plaintiff, | |
| v. | GOVERNMENT'S APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S BAIL ORDER; MEMORANDUM OF POINTS AND AUTHORITIES; EXHIBITS |
| ALEXANDER SMIRNOV, | |
| Defendant. | |

     Plaintiff United States of America, by and through its counsel of record, the Office of Special Counsel David C. Weiss, hereby applies to Honorable Judge Otis D. Wright for review of the February 20, 2024, order of bail release upon conditions issued by the Honorable Magistrate Judge Daniel J. Albregts, of the United States District Court for the District of Nevada.  The government moved Magistrate Judge Albregts to stay his order, which he denied.

//

The government continues to seek detention. In support of its continued request for detention, the government proffers (1) the contents of the Pre-Trial Services Report but not its conclusion; (2) the indictment, charging defendant with making a false statement to law enforcement, in violation of 18 U.S.C. § 1001 and causing the creation of a false and fictitious record in a federal investigation, in violation of 18 U.S.C. § 1519; (3) the attached memorandum of points and authorities; (4) the exhibits to that memorandum of points and authorities; and (5) such further argument or evidence as may be requested by the Court at the hearing on this matter.

Dated: February 21, 2024

Respectfully submitted,

DAVID C. WEISS
Special Counsel

LEO J. WISE
Principal Senior Assistant Special
Counsel

DEREK E. HINES
Senior Assistant Special Counsel

SEAN F. MULRYNE
CHRISTOPHER M. RIGALI
Assistant Special Counsels

United States Department of Justice

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

I.   <u>INTRODUCTION</u>

No condition or combination of conditions will reasonably assure the appearance of the defendant Alexander Smirnov as required.  *See* 18 U.S.C. § 3142 (e)(1); *see also United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008). As discussed in more detail below, the nature and circumstances of the offense, weight of the evidence, and the fact that Smirnov's ties to the community are weak establish that Smirnov should be detained.  But, in addition, there are four indisputable facts related to the characteristics of Smirnov that compel detention.

First, he claims to have contacts with multiple foreign intelligence agencies and had plans to leave the United States two days after he was arrested last week for a months-long, multi-country foreign trip.  During this trip, the defendant claimed to be meeting with foreign intelligence contacts.  Those foreign intelligence agencies could resettle Smirnov outside the United States if he were released.

Second, he has access to over $6 million in liquid funds—more than enough money for him to live comfortably overseas for the rest of his life.

Third, Smirnov did not disclose to Pretrial Services his access to these funds.  He told Pretrial Services he only had $1,500 in cash-on-hand and $5,000 in a personal checking account.  *See* Exhibit 11 at page 2.  As the attached bank statements make clear, as of the end-of-December, Smirnov has access to more than $2.9 million, *see* Exhibit 4 (under seal) and his wife/girlfriend (he refers to her both ways) (hereafter "DL") has access to more than $3.8 million, *see* Exhibit 7 (under seal).  The latter's funds are available to him because most

of the money in DL's account originated with Smirnov and she pays his personal expenses out of her account; in other words, these appear to be shared funds or funds controlled by Smirnov, regardless of whose name is on the bank account.  The fact that Smirnov misrepresented his assets alone should cause Smirnov to be detained because it shows that, at the first opportunity, he did not provide true and complete information to Pretrial Services.

Fourth, as an Israeli citizen, Smirnov can obtain a new passport at any time by visiting an Israeli consulate.  The closest Israeli consulate is approximately 5 hours away in Los Angeles, California. Thus, even if he turns in his U.S. and Israeli passports, Pretrial Services has no way to prevent him from obtaining a new Israeli passport and leaving the United States using it at any time.

II.  <u>STATEMENT OF FACTS AND PROCEDURAL HISTORY</u>

Smirnov was a confidential human source ("CHS") with the Federal Bureau of Investigation ("FBI").  Indictment ¶ 2.  As a CHS, Smirnov was assigned a handling agent (hereafter "the Handler") who was a special agent on an FBI squad that investigated violations of federal criminal law.  *Id*.

Despite repeated admonishments that he must provide truthful information to the FBI and that he must not fabricate evidence, Smirnov provided false derogatory information to the FBI about Public Official 1, an elected official in the Obama-Biden Administration who left office in January 2017, and Businessperson 1, the son of Public Official 1, in 2020, after Public Official 1 became a candidate for President of the United States of America.  *Id*. at ¶ 6.

In March 2017, Smirnov reported to the Handler that he had had a phone call with the owner of Ukrainian industrial conglomerate Burisma Holdings, Limited (hereafter "Burisma Official 1") concerning Burisma's interest in acquiring a U.S. company and making an initial public offering ("IPO") on a U.S.-based stock exchange. *Id.* at ¶ 6(a). In reporting that conversation to the Handler, Smirnov also noted that Businessperson 1, Public Official 1's son, was a member of Burisma's Board, a fact that was publicly known. *Id.*

Three years later, in June 2020, Smirnov reported, for the first time, two meetings in 2015 and/or 2016, during the Obama-Biden Administration, in which he claimed executives associated with Burisma, including Burisma Official 1, admitted to him that they hired Businessperson 1 to "protect us, through his dad, from all kinds of problems," and later that they had specifically paid $5 million each to Public Official 1 and Businessperson 1, when Public Official 1 was still in office, so that "[Businessperson 1] will take care of all those issues through his dad," referring to a criminal investigation being conducted by the then-Ukrainian Prosecutor General into Burisma and to "deal with [the then-Ukrainian Prosecutor General]." *Id.* at ¶ 6(b).

Smirnov also reported two purported phone calls between himself and Burisma Official 1 wherein Burisma Official 1 stated that he had been forced to pay Public Official 1 and Businessperson 1 and that it would take investigators 10 years to find records of illicit payments to Public Official 1. *Id.* at ¶ 6(c).

The events Smirnov first reported to the Handler in June 2020 were fabrications.  *Id.* at ¶ 6(d).  In truth and fact, Smirnov had contact with executives from Burisma in 2017, after the end of the Obama-Biden Administration and after the then-Ukrainian Prosecutor General had been fired in February 2016, in other words, when Public Official 1 had no ability to influence U.S. policy and when the Prosecutor General was no longer in office.  *Id.*  In short, Smirnov transformed his routine and unextraordinary business contacts with Burisma in 2017 and later into bribery allegations against Public Official 1, the presumptive nominee of one of the two major political parties for President, after expressing bias against Public Official 1 and his candidacy.  *Id.*

When he was interviewed by FBI agents in September 2023, Smirnov repeated some of his false claims, changed his story as to other of his claims, and promoted a new false narrative after he said he met with Russian officials.  *Id.* at ¶ 6(e).

On February 14, 2024, a federal grand jury in the Central District of California returned a two-count indictment charging Smirnov with one count of making false statements to federal law enforcement, in violation of 18 U.S.C. § 1001 (Count One) and; one count of fabricating information in a federal investigation, in violation of 18 U.S.C. § 1519 (Count Two).  *United States v. Smirnov*, Cr. No. 2:24-cr-00091-ODW (C.D. Cal. Feb. 14, 2024, ECF 1).

That same day, Smirnov was arrested in the District of Nevada as he returned to the United States on an international flight.  Smirnov

was scheduled to leave the United States two days later, on February 16, 2024, for a months-long, multi-country trip that, by his own description, involved meetings with officials of foreign intelligence agencies and governments.  During his custodial interview on February 14, Smirnov admitted that officials associated with Russian intelligence were involved in passing a story about Businessperson 1.

On February 15, 2024, Smirnov had an initial appearance in the District of Nevada.  At that time the government moved for detention pursuant to 18 U.S.C. § 3142(f)(2)(a) and (b) on the basis that Smirnov posed a serious risk of flight and a serious risk of obstruction of justice.  The Government requested a three (3) day continuance of the detention hearing, pursuant to 18 U.S.C. § 3142(f)(2).

A detention hearing was held scheduled in his matter on February 20, 2024, before United States Magistrate Judge Daniel J. Albregts of the United States District Court for the District of Nevada.  At that hearing, United States Magistrate Judge Albregts found the government had proven that the defendant posed a serious risk of flight by a preponderance of the evidence but that the government had not proven by a preponderance of the evidence that no condition or combination of conditions could reasonably assure his appearance.  United States Magistrate Judge Albregts ordered Smirnov released on a personal recognizance bond and conditions.

## III.   APPLICABLE LAW

### A. Standard of Review

A de novo standard of review, not a deferential standard, is

applied to a district court's review of a magistrate's bail order. *United States v. Koenig,* 912 F.2d 1190, 1192-93 (9th Cir. 1990). The court in *Koenig* made clear that the district court's review is independent and that the district court may also hold an evidentiary hearing:

> [In reviewing a magistrate judge's bail order, the district court] should review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference. If the performance of that function makes it necessary or desirable for the district judge to hold additional evidentiary hearings, it may do so, and its power to do so is not limited to occasions when evidence is offered that was not presented to the magistrate.

*Id.* at 1193.

B. The Bail Reform Act

The Bail Reform Act of 1984 ("the Act") permits pretrial detention of a defendant without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985); *United States v. Kouyoumdjian*, 601 F. Supp. 1506, 1508-10 (C.D. Cal. 1985). A finding that a defendant

Title 18, United States Code, Section 3142 (hereafter the "Bail Reform Act") specifically provides, in relevant part, that "the judicial officer shall, in determining whether there are conditions

of release that will reasonably assure the appearance of the person

as required" consider the following factors:

> (1) the nature and circumstances of the offense charged …;

> (2) the weight of the evidence against the person;

> (3) the history and characteristics of the person, including—

>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; …

18 U.S.C. § 3142(g); *United States v. Santos-Flores*, 794 F.3d

1088, 1091 (9th Cir. 2015).  A finding that that there are no

conditions that will reasonably assure a Smirnov's appearance

need only be established by a preponderance of the evidence.

*Santos-Flores*, 794 F.3d at 1090; *United States v. Gebro*, 948

F.2d 1118, 1121 (9th Cir.1991); *United States v. Motamedi*, 767

F.2d 1403, 1407 (9th Cir. 1985).  "More finely put, this means

that the Government must demonstrate that it is more likely than

not that there is a serious risk that the Smirnov will flee, not

that that it is more likely than not that the Smirnov will flee.

*United States v. Figueroa-Alvarez*, No. 4:23-CR-00171-DCN, 2023

WL 4485312, at *5 (D. Idaho July 10, 2023); *see United States v.

Duarte-Vela*, No. 2:23-cr-00009-TOR-1, Amended Order Following

Status Hearing Regarding Detention and Detention Hearing at 7

(Dkt. 32) (E.D. Wa. Jan. 25, 2023); *Alvarenga-Canan*, No. 1:23-

cr-00042-BLW, Tr. at 7 (Dkt. 26) ("It's got to be 51 percent of a serious risk.").

IV. THE DEFENDANT POSES A SERIOUS RISK OF FLIGHT AND THERE ARE NO CONDITIONS THAT CAN REASONABLY ASSURE HIS APPEARANCE

A.  Smirnov is charged with lying to law enforcement and fabricating evidence.

The nature and circumstances of the offense make clear that there are no conditions of release that will reasonably assure the appearance of Smirnov.  Pretrial supervision is, at its core, based on trust. Pretrial Services must trust a defendant to abide by the conditions the court imposes and to accurately report information requested by Pretrial Services as they attempt to police those conditions.  The circumstances of the offenses charged—that Smirnov lied to his FBI Handler after a 10-year relationship where the two spoke nearly every day—means that Smirnov cannot be trusted to provide truthful information to Pretrial Services.  Critically, Smirnov lied to his FBI Handler after repeated admonishments that the information he provided to the FBI must be truthful.  And the false information he provided was not trivial.  It targeted the presumptive nominee of one of the two major political parties in the United States.  The effects of Smirnov's false statements and fabricated information continue to be felt to this day.  Now the personal stakes for Smirnov are even higher. His freedom is on the line.  If he could not be trusted to report truthful information to his FBI Handler, he cannot be trusted to report truthful information to Pretrial Services.

B.   <u>The weight of the evidence against Smirnov is strong.</u>

As described in the indictment, the evidence against Smirnov is strong.

In sum, Smirnov's own travel records, emails and messages with his Handler, along with emails and travel records of the individuals who Smirnov claimed to have attended the two meetings with him, will all be used as evidence against him.   Further, the individuals who participated in these meetings and phone calls will refute that there was ever any discussion of Public Official 1 or Businessperson 1 in those meetings or any phone calls at all.

C.   <u>The history and characteristics of Smirnov make clear that no conditions can reasonably assure his appearance.</u>

Smirnov's personal history and characteristics also weigh in favor of detention. Smirnov has very weak ties to the community in Las Vegas. He has only lived in Las Vegas since 2022.   Exhibit 11 at 1.   The condominium where he lives is owned by DL, a fact about which he lied, as will be addressed below.   Exhibit 1 (under seal).   He has no family in Las Vegas.   To the contrary, he reports that his mother, father, and sister all reside in Israel.   *Id.*   Smirnov lived in Israel from 1992 to 2006, longer than he has lived in the United States.   *Id.*   He does not report any employment that is located in Las Vegas.   Instead, he claims to have a "security business," that is registered in California, where he used to live.   *See* Exhibit 11 at 2.   DL, with whom he lives, does not appear to even know what he does.   *Id.*   Nor do his bank records reflect that he is in the "security business," as he claims.   *Id.*   Instead, the statements for the accounts he controls show large wire transfers from what appear to be venture capital firms and

individuals.  *See* Exhibit 4 (under seal).

1.  Smirnov claims to have contact with foreign intelligence
    agencies.

While Smirnov has no ties to the community in Las Vegas, what he does have is extensive foreign ties, including, most troublingly and by his own account, contact with foreign intelligence services, including Russian intelligence agencies, and has had such contacts recently.  Smirnov could use these contacts to resettle outside the United States.

As noted, law enforcement knows about Smirnov's contact with officials affiliated with Russian intelligence because Smirnov himself reported on a number of those contacts to his FBI Handler.  As described below, these contacts are extensive and extremely recent, and Smirnov had the intention of meeting with one of these officials on his upcoming planned overseas travel.

Of particular note, Smirnov has reported numerous contacts with Russian Official 1, who has been described by Smirnov in a number of ways, including as the son of a former high-ranking Russian government official, someone who purportedly controls two groups of individuals tasked with carrying out assassination efforts in a third-party country, a Russian representative to another country, and as someone with ties to a particular Russian intelligence service.  This latter fact was reported by Smirnov in October, 2023.

In December 2023, Smirnov reported to his Handler about a recent overseas trip, where Smirnov attended a meeting with Russian Official 2, who Smirnov has described as a high-ranking member of a specific Russian foreign intelligence service.  According to Smirnov, the purpose of the meeting was to discuss a potential resolution to

Russia's war against Ukraine.  During this same trip, Smirnov apparently attended a separate meeting with Russian Official 1, the individual who controls groups that are engaged in overseas assassination efforts.  During this meeting with Russian Official 1, Russian Official 1 claimed that another individual, Russian Official 4, the head of a particular unit of a Russian Intelligence Service, ran an intelligence operation at a "club" located at a particular hotel.  Smirnov told the FBI Handler that the Russian Intelligence Service intercepted cell phone calls made by guests at the hotel.  The Russian Intelligence Service intercepted several calls placed by prominent U.S. persons the Russian government may use as "kompromat" in the 2024 election, depending on who the candidates will be.  As described below, this story, which again was relayed by Smirnov to his Handler in/about December, 2023, appears to mirror the story that Smirnov was pushing on investigators and prosecutors during their meeting with him in September, 2023 (in which Smirnov pushed investigators to look into whether Businessperson 1 had been recorded in a foreign hotel).

Most recently, Smirnov has reported:

- Meetings in or about December 2023, outside the United States, between top officials of another country and Russian officials;

- Contact with a Russian official on November 27, 2023, where the Russian official provided Smirnov with information on his knowledge of certain Russian military operations in a third country; and

- Contact with a Russian intelligence service operative and top Russian representative to a third country on November 8, 2023.

11

Exhibit 2.

The following is a declassified summary of additional contacts that predate the contacts referenced above and in Exhibit 2. This summary was prepared by the FBI and taken from several reports he made to the FBI:

1. (U//FOUO) (Document 1)
    a. (U//FOUO) In or about October 2023, SMIRNOV reported the following:
        i. (U//FOUO) SMIRNOV was invited to and planned to attend the birthday party of an identified individual in the Middle East, COUNTRY A, which would include activities on a mega yacht owned by a high-ranking member of Russia's largest steel and mining company. SMIRNOV provided the names of individuals who might attend the birthday activities, including RUSSIAN OFFICIAL 1, who he identified as the son of a high-ranking former Russian government official, and RUSSIAN INDIVIDUAL 1, a high-ranking member of a Russia state-owned defense conglomerate.

2. (U//FOUO) (Document 2)
    a. (U//FOUO) In or about January 2023, SMIRNOV reported the following:
        i. (U//FOUO) In December 2022, SMIRNOV learned from a Russian Foreign Intelligence official the whereabouts of a particular Russian Foreign Intelligence officer living outside of Russia.
        ii. (U//FOUO) In or about January 2023, SMIRNOV spoke to another Russian Foreign Intelligence officer who provided the first name of the Russian Foreign Intelligence officer living outside of Russia.

3. (U//FOUO) (Document 3)
    a. (U//FOUO) On or about August 2023, SMIRNOV reported the following:
        i. (U//FOUO) SMIRNOV had been introduced to RUSSIAN INDIVIDUAL 2, a high-ranking member of a Russian steel company. RUSSIAN INDIVIDUAL 2 was organizing a birthday party for another person on RUSSIAN INDIVIDUAL 2's mega yacht. RUSSIAN INDIVIDUAL 2 mentioned that two of the oligarchs who would be attending the party have "connections" or "business ties" to a high-ranking member of a Russian Foreign

Intelligence Service, RUSSIAN OFFICIAL 2. Because of the language used by RUSSIAN INDIVIDUAL 2, SMIRNOV was not clear about the precise nature of the relationship between the identified Russian oligarchs and RUSSIAN OFFICIAL 2, a high-ranking member of a Russian Foreign Intelligence Service.

4. (U//FOUO) (Document 4)
   a. (U//FOUO) In or about October 2023, SMIRNOV reported the following information (this information was provided to supplement Document 1):
      i. (U//FOUO) The planned COUNTRY A birthday party may be attended by RUSSIAN OFFICIAL 1, the son of a former high-ranking Russian government official.  An associate of SMIRNOV provided SMIRNOV with a copy of RUSSIAN OFFICIAL 1's passport.

5. (U//FOUO) (Document 5)
   a. (U//FOUO) In or about November 2023, SMIRNOV reported the following information:
      i. (U//FOUO) SMIRNOV learned from RUSSIAN OFFICIAL 1 himself, that RUSSIAN OFFICIAL 1 has direct access to the highest levels of the Russian government. Although RUSSIAN OFFICIAL 1's father was a former high-ranking government official in Russia, RUSSIAN OFFICIAL 1's access to the highest levels of the Russian government is direct, and not through his father.
      ii. (U//FOUO) RUSSIAN OFFICIAL 1 is a top, unofficial representative of Russia to COUNTRY B.
      iii. (U//FOUO) SMIRNOV provided a photograph of RUSSIAN OFFICIAL 1 taken in or about November 2023, during RUSSIAN OFFICIAL 1's visit to COUNTRY A.

6. (U//FOUO) (Document 6)
   a. (U//FOUO) In or about November 2023, SMIRNOV reported the following information:
      i. (U//FOUO) SMIRNOV learned from sources, including RUSSIAN OFFICIAL 1, that a particular individual, RUSSIAN OFFICIAL 3, is the representative of the former head of a particular unit of a Russian Intelligence Service, RUSSIAN OFFICIAL 4.
      ii. (U//FOUO) SMIRNOV provided information about RUSSIAN OFFICIAL 4's chain of command.  SMIRNOV named three individuals who have direct, immediate access to the highest levels of the Russian government, including the father of RUSSIAN OFFICIAL 1.

7. (U//FOUO) (Document 7)
   a. (U//FOUO) In or about December 2023, SMIRNOV reported the following information (which is also reported in Document 6).
      i. (U//FOUO) SMIRNOV learned from sources, including RUSSIAN OFFICIAL 1, that a particular individual, RUSSIAN OFFICIAL 3, is the representative of the former head of a particular unit of a Russian Intelligence Service, RUSSIAN OFFICIAL 4.

8. (U//FOUO) (Document 8)
   a. (U//FOUO) In or about November 2023, SMIRNOV reported the following information:
      i. (U//FOUO) In October 2023, SMIRNOV had in-person conversations with RUSSIAN OFFICIAL 1 overseas.  During these conversations, RUSSIAN OFFICIAL 1 discussed his knowledge and seeming control of two groups of Russian operatives who were previously tasked with the assassination of a high-ranking official of COUNTRY C.  RUSSIAN OFFICIAL 1 offered to stop the assassination efforts in exchange for certain things, including an agreement by COUNTRY C to stop targeting civilian-family-members of certain Russian officials living in Moscow.
     ii. (U//FOUO) RUSSIAN OFFICIAL 1 also provided SMIRNOV with specific information about Russia's military resources for a winter attack in COUNTRY C. RUSSIAN OFFICIAL 1 also told SMIRNOV about the Russian government's intentions for their war in Ukraine.

9. (U//FOUO) (Document 9)
   a. (U//FOUO) In or about December 2023, SMIRNOV reported the following information:
      i. (U//FOUO) SMIRNOV attended a meeting in COUNTRY A in December 2023 that was attended by RUSSIAN OFFICIAL 2, a high-ranking member of a Russian Foreign Intelligence Service. The primary purpose of the meeting was to discuss a potential resolution to the Russia-Ukraine war.
     ii. (U//FOUO) On this same trip, SMIRNOV attended another meeting with, among others, RUSSIAN OFFICIAL 1.
    iii. (U//FOUO) Unrelated to the above, SMIRNOV had a separate conversation with RUSSIAN OFFICIAL 1, wherein RUSSIAN OFFICIAL 1 claimed that RUSSIAN OFFICIAL 4, the head of a particular unit of a Russian Intelligence Service, ran an intelligence

14

operation at a "club" located on a particular floor of HOTEL 1, which is in COUNTRY C. SMIRNOV stated the Russian Intelligence Service intercepted cell phone calls made by guests at the hotel. The Russian Intelligence Service intercepted several calls placed by prominent US persons the Russian government may use as "kompromat" in the 2024 election, depending on who the candidates will be.

    iv. (U//FOUO) SMIRNOV later had a meeting with another COUNTRY C government official, who stated it was common knowledge that the Russian Intelligence Service did, in fact, run such intelligence operations at HOTEL 1.

10. (U//FOUO) <u>(Document 10)</u>

   a. (U//FOUO) In or about February 2022, SMIRNOV provided the following information:

     i. (U//FOUO) When SMIRNOV was working in COUNTRY D circa 2002, he conducted a joint operation to recruit two individuals: 1) RUSSIAN OFFICIAL 5, Russian consular to COUNTRY D, who was caught spying; and, 2) a COUNTRY E consular to COUNTRY D.

    ii. (U//FOUO) SMIRNOV first met RUSSIAN OFFICIAL 5 at an event/party COUNTRY D put on for foreign officials. Thereafter, SMIRNOV spent numerous months developing a "friendship" with RUSSIAN OFFICIAL 5. After some time, SMIRNOV was asked by COUNTRY D to contact RUSSIAN OFFICIAL 5 and tell them that COUNTRY D had info that RUSSIAN OFFICIAL 5 was spying. Rather than arresting/PNGing RUSSIAN OFFICIAL 5, COUNTRY D told RUSSIAN OFFICIAL 5 had to leave within 48 hours or there would be "adverse consequences", but that RUSSIAN OFFICIAL 5 should keep in touch with COUNTRY D and SMIRNOV. Thereafter, RUSSIAN OFFICIAL 5 would occasionally provide SMIRNOV with information. RUSSIAN OFFICIAL 5 never provided information that was "adverse" to Russia.

    iii. (U//FOUO) Approximately three years before the time of this reporting, possibly in 2019, SMIRNOV traveled to Russia and met with RUSSIAN OFFICIAL 5. They had a very careful, coded conversation about what Russia might look like under different leadership. For background, SMIRNOV understood that RUSSIAN OFFICIAL 5's spouse is somehow related to RUSSIAN OFFICIAL 6, a former high-ranking member of a Russian Intelligence Service. SMIRNOV has never met RUSSIAN OFFICIAL 6, however SMIRNOV once called RUSSIAN OFFICIAL 5 who was in the car at the time

15

with RUSSIAN OFFICIAL 6, who spoke very briefly to SMIRNOV over speaker phone.

iv. (U//FOUO) During a subsequent meeting two days later, SMIRNOV and RUSSIAN OFFICIAL 5 spoke again about matters pertaining to Russia. RUSSIAN OFFICIAL 5 indicated that RUSSIAN OFFICIAL 6 was not happy with Russian leadership, and that RUSSIAN OFFICIAL 6 was also close friends/associates with RUSSIAN OFFICIAL 2, a high-ranking member of a Russian Foreign Intelligence Service.

v. (U//FOUO) First call with RUSSIAN OFFICIAL 2 (High-ranking member of a Russian Foreign Intelligence Service): Prior to a recent overseas trip, SMIRNOV contacted RUSSIAN OFFICIAL 5 to see if he could arrange to have RUSSIAN OFFICIAL 2, speak to a high-ranking official of COUNTRY C. SMIRNOV contacted RUSSIAN OFFICIAL 5 and provided him with a proposed date and time for RUSSIAN OFFICIAL 2 to call. SMIRNOV obtained a "throw-phone" and foreign SIM card and provided RUSSIAN OFFICIAL 5 with the number. SMIRNOV indicated that a call subsequently took place between RUSSIAN OFFICIAL 2 and a high-ranking official COUNTRY C, the subject matter of which SMIRNOV was aware.

vi. (U//FOUO) Second call with RUSSIAN OFFICIAL 2 (High-ranking member of a Russian Foreign Intelligence Service): In January 2022, SMIRNOV had a second call with RUSSIAN OFFICIAL 2 (SMIRNOV used a second throw phone). SMIRNOV asked RUSSIAN OFFICIAL 2 for a "favor"—namely that Russian troops do not hurt SMIRNOV's associate, an official of COUNTRY C. RUSSIAN OFFICIAL 2 asked what SMIRNOV thought of SMIRNOV's associate. SMIRNOV later reiterated his "ask" that his associate not be harmed during any Russian incursion. RUSSIAN OFFICIAL 2 said he was told by RUSSIAN OFFICIAL 5, who SMIRNOV "befriended" years earlier after RUSSIAN OFFICIAL 5 was caught spying, that SMIRNOV was a "good guy," and therefore RUSSIAN OFFICIAL 2 would help to ensure SMIRNOV's associate was not killed or harmed.

vii. (U//FOUO) Third call with RUSSIAN OFFICIAL 2 (High-ranking member of a Russian Foreign Intelligence Service): After SMIRNOV returned from his overseas trip, he again asked RUSSIAN OFFICIAL 5 to set up another call with RUSSIAN OFFICIAL 2. During the call, SMIRNOV discussed the additional escalation of Russian troops along the Ukraine border and asked RUSSIAN OFFICIAL 2 whether he could provide any details about Russia's intentions. RUSSIAN OFFICIAL

16

2 stated he was 99% that only a skirmish would
occur.

11.    (U//FOUO) (Document 11)
   a. (U//FOUO) In or about October 2023, SMIRNOV provided the
      following information:
      i. (U//FOUO) Photo of passport of RUSSIAN OFFICIAL 1.
      ii. (U//FOUO) In October 2023, SMIRNOV advised that
          RUSSIAN OFFICIAL 1, the son of a high-ranking former
          Russian government official, was invited to attend a
          birthday party in October 2023 in COUNTRY A, which
          will be held on RUSSIAN INDIVIDUAL 2's mega yacht.
          SMIRNOV received a copy of RUSSIAN OFFICIAL 1's
          Russian passport.

Smirnov's anticipated travel from the United States, on Friday
of last week, two days after his return, was for the purpose of meeting
with Russian intelligence officials, among others.  Specifically:

12.    (U//FOUO) (Document 12)
   a. (U//FOUO) In or about January 2024, SMIRNOV provided the
      following information. The information was recorded in an
      FD-1040a, CHS travel/ET Activity Request Form.
      i. SMIRNOV reported future travel and meeting
         itineraries to his FBI Handler, which outlined
         travel to various countries in February 2024.
         SMIRNOV planned to meet with RUSSIAN OFFICIAL 1, an
         operative of a Russian Intelligence Service. The
         primary purpose of the meeting with RUSSIAN OFFICIAL
         1 was to discuss the exchange of Russian and
         Ukrainian military prisoners. The meeting was set to
         occur in COUNTRY A.

Smirnov's contacts with Russian officials who are affiliated with
Russian intelligence services are not benign.  At his meeting with FBI
investigators in September 2023, Smirnov pushed a new story about
Public Official 1 and Businessperson 1, as described in the indictment.
Indictment at ¶51.  Specifically, Smirnov wanted them to look into
whether Businessperson 1 was recorded in a hotel in Kiev called the
Premier Palace.  *Id*.  Smirnov told investigators that the entire
Premier Palace Hotel is "wired" and under the control of the Russians.

*Id.* Smirnov claimed that Businessperson 1 went to the hotel many times and that he had seen video footage of Businessperson 1 entering the Premier Palace Hotel. *Id.* Investigators know that Smirnov's new story is false because Businessperson 1 has never travelled to Ukraine. *Id.* at ¶ 54.

Smirnov suggested that investigators check to see if Businessperson 1 made telephone calls from the Premier Palace Hotel since those calls would have been recorded by the Russians. *Id.* at ¶ 52. Smirnov claimed to have obtained this information a month earlier by calling a high-level official in a foreign country. *Id.* Smirnov also claimed to have learned this information from four different Russian officials. *Id.*

Smirnov told investigators that the four different Russian officials are all top officials and two are the heads of the entities they represent. *Id.* at ¶ 53. These Russians said that conversations with Ukrainians about ending the war will include the next U.S. election. Smirnov told investigators he is involved in negotiations over ending the war and had been for the previous four months. *Id.* According to Smirnov, the Russians want Ukraine to assist in influencing the U.S. election, and Smirnov thinks the tapes of Businessperson 1 at the Premier Palace Hotel is all they have. *Id.* Smirnov told investigators he wants them to ask Businessperson 1 how many times he visited and what he did while at the Premier Palace Hotel. *Id.*

Thus, Smirnov's efforts to spread misinformation about a candidate of one of the two major parties in the United States continues. The Court should consider this conduct as well when evaluating his personal history and characteristics. What this shows

is that the misinformation he is spreading is not confined to 2020. He is actively peddling new lies that could impact U.S. elections after meeting with Russian intelligence officials in November. In light of that fact there is a serious risk he will flee in order to avoid accountability for his actions.

   2. <u>Smirnov has access to millions of dollars that he did not disclose to Pretrial Services</u>.

Smirnov has already demonstrated that he cannot be trusted to provide truthful information to Pretrial Services. When he was interviewed, he told Pretrial Services that he only had access to $1,500 in cash and another $5,000 in a checking account. *See* Exhibit 11 at 2.

That is not true. Smirnov is the sole signatory on a Bank of America business checking account ending with 3928 in the name of Avalon Group Inc. (hereafter "BOA 3928") Exhibit 3 (under seal). *As of December 31, 2023, BOA 3928 had a balance of $2,917,496.61.* Exhibit 4 (under seal). The fact that Smirnov lied to Pretrial Services in his very first interaction with them establishes conclusively that there are no conditions that could reasonably assure his appearance. That is because the effectiveness of any condition or combination relies on Pretrial Services ability to obtain truthful information from Smirnov.

Smirnov uses BOA 3928 to fund his and DL's lifestyle, although the transfers themselves look like payments from a business, "Avalon Group, Inc." to DL. From February 2020, when the account was opened, through December 31, 2022, Smirnov withdrew $1,737,500 to purchase cashier's checks in the name of "Avalon Group Inc." and payable to DL. *Id*. Those cashier's checks were then deposited in DL's account, in

some cases within 30 minutes of Smirnov withdrawing the funds to purchase the checks. *See* Exhibit 10 (under seal). DL deposited these cashier's checks into one of her accounts at a branch near where Smirnov withdrew the funds. *Id.* For example, on October 13, 2020, a withdrawal was conducted by Avalon Group Inc. in the amount of $599,000 from BOA 3928. Exhibit 5 (under seal). The transaction was conducted at a Bank of America branch located in San Juan Capistrano, California. *Id.* A handwritten note on the withdrawal slip identified "CADL XXXX349 4/26/2022," which was Smirnov's California driver's license. *Id.* Immediately following the withdrawal, Bank of America official check 1145711247 in the amount of $599,000 payable to DL was purchased using the funds. Exhibit 6 (under seal). On October 14, 2020, Bank of America official check 1145711247 was deposited to DL's Wells Fargo account ending 1356, for which she is the sole signer. *Id.* The transaction was conducted at a Wells Fargo branch located in San Juan Capistrano, California. *Id.* The withdrawal from BOA 3928 was funded by a previous wire transfer of $600,000 received from Economic Transformation Technologies Corporation on September 22, 2020. The BOA 3928 account balance prior to receipt of the wire transfer was approximately $31.

Smirnov also wired DL $785,000 in two payments, $740,000 at the end of 2020 and another $45,000 at the end of 2022. Exhibit 4 (under seal).

*As of February 1, 2024, DL had $3,827,460 in her Wells Fargo account ending in 1356.* Exhibit 7 (under seal).

In 2022 and 2023, after Smirnov began making these substantial transfers to DL, albeit using cashier's checks that make it appear she is receiving the funds from a business, "Avalon Group Inc.," DL made

1   payments to Smirnov's Citi credit card, which is the primary means by
2   which he pays personal expenses.  *See* Exhibit 10 (under seal).
3   Specifically, in 2022, DL paid $108,916.52 towards Smirnov's Citi
4   credit card debt and in 2023, she paid $275,869.44.  *Id*.

5       Smirnov told Pretrial Services that he lives with DL in a
6   condominium she leases.  *See* Exhibit 11 at 1.  That is also not true.
7   The attached report shows she is in fact the owner, having purchased
8   it on February 28, 2022, for the sale price of $1,425,000.  *See* Exhibit
9   1 (under seal).  In February 2022, DL purchased a condominium in Las
10  Vegas where she and Smirnov reside.  *Id*.  While the condominium is
11  titled in her name, she purchased it after receiving more than $2.4
12  million from Smirnov.  *See* Exhibit 10 (under seal).

13      Smirnov also withdrew $174,219 in cash from the account, including
14  $60,304.25 in 2023.  Exhibit 4 (under seal).  In addition to DL paying
15  his personal expenses, Smirnov also pays various personal expenses out
16  of this account including gasoline, credit card payments, restaurants,
17  duty free shopping and others.  *Id*.

18      The government assumes that Smirnov did not disclose these
19  substantial assets to the Court when he submitted his financial
20  affidavit.  That is because while the government has not seen the
21  affidavit, the Court appointed the Office of the Federal Public
22  Defender to represent Smirnov at his initial appearance.  The court
23  specifically admonished Smirnov that he was submitting his financial
24  affidavit under the penalties of perjury.  If he did not disclose his
25  substantial assets the this is a second example of an instance where
26  Smirnov lied to the Court.

27      In the event that Smirnov did not disclose these assets, the
28  government respectfully requests that the Court release the affidavit

to the government so that the government can consider whether to charge Smirnov with perjury.

   3. Smirnov can obtain an Israeli passport at any time.

Finally, the Court should also consider that Smirnov is a dual national who holds both U.S. citizenship, and a U.S. passport, and Israeli citizenship, and an Israeli passport.  While Smirnov can be ordered to turn both passports in to Pretrial Services and could be prohibited from obtaining a new U.S. passport, he cannot be prohibited from obtaining a new Israeli one.  He can obtain a new Israeli passport in the United States by visiting any one of Israel's consulates in Washington, DC, New York, Houston, Miami or Los Angeles.  *See* Exhibits 8 and 9.

V.  Conclusion

Based on the above, this Court should conclude that no condition or combination of conditions will reasonably assure the appearance of the Smirnov as required and order him detained pending trial.