DAVID Z. CHESNOFF, ESQ.
*Pro Hac Vice* pending
RICHARD A. SCHONFELD, ESQ.
California Bar No. 202182
CHESNOFF & SCHONFELD
520 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702) 384-5563
rschonfeld@cslawoffice.net
dzchesnoff@cslawoffice.net
Attorneys for Defendant, ALEXANDER SMIRNOV

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
* * * * * *

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CASE NO. 2:24-CR-00091-ODW |
| v. ) | |
| ) | |
| ALEXANDER SMIRNOV, ) | DATE OF HEARING: |
| ) | February 26, 2024 |
| ) | TIME OF HEARING: 9:00 a.m. |
| Defendant, ) | |
| _____ ) | |

**DEFENDANT'S OPPOSITION TO GOVERNMENT'S "APPLICATION**
**FOR REVIEW OF MAGISTRATE JUDGE'S BAIL ORDER"**

COMES NOW, Defendant, ALEXANDER SMIRNOV ("Mr. Smirnov"), by

and through his attorneys, DAVID Z. CHESNOFF, ESQ., and RICHARD A.

SCHONFELD, ESQ., of the law firm of CHESNOFF & SCHONFELD and hereby

move this Honorable Court to follow both 1) the guidance of the Pretrial Services Office in Las Vegas, Nevada, and 2) the ruling and guidance of the Honorable Magistrate Judge Daniel J. Albregts, and deny the government's application for pretrial detention. *See* Gov. App. (ECF No. 11) (Feb. 21, 2024).

This Opposition is made and based upon the attached Memorandum of Points and Authorities; the transcript of the detention hearing before the Magistrate Judge Albregts (Feb. 20, 2024) (attached as Exhibit 1) ("Tr."); the argument of counsel; and any other such evidence as may be presented at the time of hearing on the government's application.

This opposition is timely.

Dated this 23rd day of February, 2024.

Respectfully Submitted:

CHESNOFF & SCHONFELD

   /s/    Richard A. Schonfeld
DAVID Z. CHESNOFF, ESQ.
*Pro Hac Vice* pending
RICHARD A. SCHONFELD, ESQ.
California Bar No. 202182
520 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702)384-5563
rschonfeld@cslawoffice.net
dzchesnoff@cslawoffice.net
Attorneys for Defendant ALEXANDER SMIRNOV

## MEMORANDUM OF POINTS AND AUTHORITIES

**A.    Background, Procedural History, and the Pretrial Services'
Recommendation of Pretrial Release on Conditions**

At the outset, Mr. Smirnov notes that he is an American citizen with dual-nationality (United States and Israel); that the Government has possession of his United States passport; that the undersigned counsel provided Mr. Smirnov's Israeli passport to the Pretrial Services Office for the District of Nevada after the detention hearing on February 20, 2024; that he lives in Las Vegas, Nevada; that, before moving to Las Vegas, he was a long time resident of the State of California; and that he has no criminal history of any sort.

Mr. Smirnov was arrested and detained on or about February 14, 2024, in Las Vegas, Nevada. The two-count Indictment filed in the Central District of California charges Mr. Smirnov with : 1) Making False Statements to a Government Agent, in violation of 18 U.S.C. § 1001; and 2) Falsification of Records in a Federal Investigation, in violation of 18 U.S.C. § 1519.

As alleged in the Indictment, Mr. Smirnov served as a confidential human source ("CHS") for the FBI for several preceding years. Virtually all of the allegations recited in Count One, however, occurred in 2020 (*see* Ind. at 34, ¶57) and the alleged falsifications pertain to alleged acts taking place between 2015 and 2017. *See id*. at 34-35. Similarly, the alleged falsifications charged in Count Two pertain to alleged acts that took place in June 2020.

It should further be noted that the United States Sentencing Guidelines calculation for the offenses with which Mr. Smirnov is charged include a base offense level of 14 which results in a sentencing range of 15-21 months if convicted at trial. *See* U.S.S.G. § 2J1.2.[1]

On February 15, 2024, after making an initial appearance, Mr. Smirnov – for whom English is a second (if not third) language – was interviewed without counsel (at that point, the Public Defender) by Emily McKillip, Senior United States Pretrial Services Officer.

Officer McKillip thereafter prepared a Pretrial Services Report ("PTS"),[2] recommending Mr. Smirnov's release on the following conditions: 1) submit to supervision by and report for supervision to the U.S. Pretrial Services Offices; 2) continue to actively seek employment; 3) surrender any passport to U.S. Pretrial Services; 4) travel is restricted to the continental United States; and 5) avoid all

---

[1] In anticipation of the Government asserting that every conceivable guideline enhancement applies, which they do not, the highest guideline level that the Government could seek is a level 19 which results in a sentencing range of 30-37 months.

Moreover, in addition to the low guidelines range at issue here, neither crime charged in the Indictment carries a statutory presumption in favor of detention under 18 U.S.C. § 3142(e)(2),(3). *See* Tr. at 30.

[2] Because it contains personal information regarding Mr. Smirnov, the PTS will be cited to, but not included as an exhibit.

contact, directly or indirectly, who is or may be a victim or witness in the investigation or prosecution, including: government provide witness list. PTS at 3.

**B.     Additional Relevant Background Information**

Mr. Smirnov is 43 years old, has no prior criminal history, has been in a relationship with his significant other, Diana Lavrenyuk ("Diana"), for decades, resides with Diana in her home in Las Vegas, has lived in Las Vegas for two years, has a Nevada Driver's License, and lived in California for the 16 years prior to moving to Las Vegas. Mr. Smirnov clearly has a stable residential history.

Mr. Smirnov also has significant ties to the United States with familial relationships.  Diana's son (Nikolay Lavrenyuk, a former Marine Sergeant who has been a part of Mr. Smirnov's life for decades) lives in Washington D.C. along with his wife and has a good relationship with Mr. Smirnov. Additionally, Mr. Smirnov's cousin Linor Shefer resides in Florida and, like Nikolay, she flew to Las Vegas at her own expense to attend Mr. Smirnov's detention hearing on February 20, 2024. *See* Letters at Exhibits 2 and 3, attached.

Mr. Smirnov suffers from significant medical issues related to his eyes that require ongoing treatment. Mr. Smirnov has had seven surgeries in the last year; he must take prescription medication daily.

It should be noted that Mr. Smirnov has no history of drug or alcohol abuse and has no history of mental illness. His personal history supports release on conditions to be fashioned by this Honorable Court.

**C.   After Briefing and a Full Detention Hearing, Magistrate Judge Albregts Orders Mr. Smirnov Released On Stringent Conditions**

From the outset, the Government has labelled Mr. Smirnov as inherently untrustworthy. *See, e.g.*, Tr. at 6 ("[T]he defendant has demonstrated he can't be trusted."), 7 (alleging he "lied to his FBI handler), 10-13 (alleging defendant lied about his net worth and cash in his various accounts), 14 ("So we've got lies, sort of, big and small in his very first instance of interacting with the Court[.]"), 14-15 (alleging that, "in his first interaction with Pretrial Services and the Court, he withheld information that shows he has access to millions of dollars that he could use if he were to flee the United States"). The Government asserted that while Mr. Smirnov lacked strong ties to the United States, *see* Tr. at 7-8 ("His family members live in Israel. He doesn't own any property here. He doesn't have a job here . . . . [T]hat doesn't make for significant ties"), he did maintain ties with "foreign intelligence." *See* Tr. at 8 (claiming that Mr. Smirnov's "contacts with foreign intelligence services, specifically Russian intelligence services and operatives," was "*the most extraordinary feature* of this defendant") (emphasis added).

Throughout the Government's presentation, the unbiased Magistrate Judge periodically interjected with questions designed to determine the strength of the

connection between the Government's torrent of allegations, on the one hand, and the relevant statutory bail factors, on the other. The Magistrate Judge was, to be sure, understandably alert to the potential flight risk posed by a dual citizen who routinely travelled abroad. *See, e.g.*, Tr. at 38 (Magistrate Judge agrees that Mr. Smirnov's foreign contacts are factors it should "notice and note" and further agrees "that that's a concern and certainly raised by the Government that I should consider it").

But the Magistrate Judge nevertheless questioned the Government whether those foreign contacts were sufficiently pronounced to make the possibility of a flight risk foreordained, and then preclude imposition of conditions to mitigate the risk. Tr. at 38 ("I just don't know . . . that that is *as grave a concern as the Government outlines.*") (emphasis added); *see also id.* (expressing skepticism that Mr. Smirnov would jump bail here and try to settle in Russia: "[M]y guess is at this stage he probably thinks that's not the most attractive place to go . . . .").

Thus, when the Government suggested that Mr. Smirnov had lied about the value of his assets to the Pretrial Services Officer, the [3]Magistrate Judge proposed a

---

[3] Defense counsel stated (and the Government did not contest) the following:

> Your Honor, we asked Pretrial Services about this question of financial disclosure because when we read their motion this morning, both Mr. Schonfeld and I said, "What happened here?" So we contacted the Pretrial officer. We asked to meet with her. And we asked her specifically, "Did you ask him about any other account than a personal account?" And the officer was candid

less sinister alternative, particularly for a non-English speaker who had just been arrested and was not, then, represented by counsel: "I mean, you're so certain that these are just blatant misrepresentations . . . why wouldn't it possibly be confusion when he's just been arrested, he's been taken into custody, and somebody shows up and starts asking him questions?" Tr. at 12; *see also* id. at 25-26 (defense counsel explains – and the Government never contests – the nature of Pretrial Services' questioning of Mr. Smirnov).

The Magistrate Judge also questioned whether, as the Government suggested: 1) the United States would be flatly unable to find Mr. Smirnov if he did flee abroad (*see* Tr. at 10: "You think the long arm of the United States of America couldn't find him on this planet?), or 2) Pretrial Services would somehow be unable to monitor him if he tried to flee. *See* Tr. at 23 (Magistrate asks "[w]hat if I put geographical limits on where he can go and we monitor that so that the minute he leaves Clark County, Pretrial's notified of that?" Government replies: "My understanding of the technology is that it's not that – it is limited, that there are lags, that there are – you know, that the geographic space is not tight enough to know if someone is in an

---

and said no. *It's exactly why my client answered the question the way he did because he was not asked about anything else.*

Tr. at 27-28 (emphasis added). Nor did Officer McKillip, who addressed the Court repeatedly throughout the hearing, suggest that any of these representations were inaccurate.

airport as opposed to some other location."). The Government's "limited . . . understanding of the technology," was indeed later shown to be just that – electronic restrictions can, and often are, plausibly imposed as conditions of release. *See* Tr. at 41 (Officer McKillip assures the Court: "We *can* put an exclusion zone around the airport so if he goes into the area of the airport, we *will* get notified.") (emphases added).

Having considered the parties' arguments and invoked the applicable statutory principles (primarily, the Bail Reform Act and Section 3142), the Magistrate Judge issued a careful, balanced analysis:

> I think *it's pretty clear to this Court that Mr. Smirnov is a flight risk by a preponderance of the evidence*. His dual citizenship, his possession of passports, his foreign ties, his extensive foreign travel, and some questions about his employment and where he makes his money . . . clearly rise to the level that he's a risk of nonappearance by a preponderance of the evidence.
>
> The bigger question . . . is *whether or not there are conditions or a combination of conditions that can address those concerns*.
>
> I do have concerns about his access to money and . . . some of the representations made to Pretrial . . . , but I also place those in the context of . . . the language issue, the nature of the Pretrial interviews and how quickly they occur, he did not have counsel at the time, the context in which the questions were asked. . . . *I don't know that . . . I'm convinced that he was sitting there . . . intentionally lying to Pretrial to keep them from knowing about his finances*. I just . . . don't know that it rises to that level.
>
> The other concern . . . is the allegations and his relationship with his handler . . . . I do on some level . . . recognize that how he deals with his handler and the FBI . . . would probably be

*different* than how he would treat a Court order or a Court decision, and whether or not the lack of trust he showed, according to the Government, with his handler would rise to the level of a lack of trust that he would not follow my orders . . . . *I'm not convinced of that given the complex nature of that relationship.*

Tr. at 36-37 (emphases added).

The Magistrate then noted that, despite its wide-ranging attacks on Mr. Smirnov, the substance of those attacks did not preclude the type of release contemplated by the Bail Reform Act – particularly where the independent Pretrial Services Office was itself recommending release on conditions.

The Government has argued the nature and circumstances of the offense. They put about a quarter of their 28-page brief to discuss the nature and circumstances and the weight of the evidence. And . . . those are the least important factors . . . . And they argue that his ties to the community are weak, and they've argued that both in their pleading and here today such that there are no condition or combination of conditions that would address that . . . . [I] understand the concern about foreign intelligence agencies potentially resettling Mr. Smirnov outside of the United States, his connections to them, *but I think on some level that's speculative as well* . . . .

[T]his Court . . . puts a lot of stock into Pretrial Services and their investigation and their recommendations and their belief about whether or not they believe somebody *can* be supervised with conditions. And in this case Pretrial Services believes, notwithstanding some of the issues that the Government's raised, *and they acknowledge those issues*, they believe that Mr. Smirnov *can* be supervised and that there *are* conditions that can be placed upon him . . . . And so that carries weight with the Court as well . . . . [I]t's not just [defense counsel] saying his client should be released, *but Pretrial Services believes that conditions can be fashioned.*

10

Tr. at 37-40 (emphases added).

The Magistrate Judge then fashioned the stringent conditions for Mr. Smirnov's release.

> I'm finding today that the Government has not met their burden as it relates to conditions because I believe that conditions can be fashioned because Pretrial believes that . . . .

> I'm going to release you on your personal recognizance, which is just your signature and promise to appear in court and to follow these conditions. If you do not, that will be revoked and you will be detained . . . .

> I'm going to go through [the conditions] somewhat quickly. If you don't understand everything, you will have time to talk to [defense counsel] and make sure you understand.

> First, you're to submit to supervision by Pretrial Services . . . immediately . . . and follow their direction for supervision.

> I'm going to allow them to order you to seek employment . . . . [Y]ou're not going to be able to continue with your consulting business while this case is pending. *You're going to have to figure out some other way to conduct business because I'm not going to allow foreign travel. In fact, I'm not going to allow any travel.* So you need to seek employment that Pretrial approves and that's appropriate while this case is pending.

> You're to surrender your U.S. passport and your Israeli passport to Pretrial Services immediately. I believe that the Government took your United States passport. [Defense counsel]. . . shall give [the Israeli passport] to Ms. McKillip upon the conclusion of this hearing.

> Number four, *you shall not obtain a passport or any other international travel documents.*

Number five, I'm going to order you that your travel is restricted to Clark County, Nevada . . . .  I'm going to allow the travel in Clark County alone and exclude you from the airport. *So if you are in the zone of the airport, . . . they will be notified immediately . . . . So you are not allowed to go to that airport.*

Tr. at 40-42.

 Despite the stringency of these conditions, Mr. Smirnov – after being released and spending a single day out of from custody – was rearrested at his lawyer's office while preparing his defense. He was ordered detained and transported to California *See* Exhibit 4 (attached).

**D.  Statement of the Law: *De Novo* Review Does Not Justify Prejudging a Detention Issue**

While this Court reviews the Magistrate Judge's release order under a *de novo* standard, *see, e.g.*, *United States v. Koenig*, 912 F.2d 1190, 1192-93 (9th Cir. 1990), that non-deferential standard does not justify what is happening here: that is, *pre-judging of a detention issue*.

Thus, in ordering Mr. Smirnov summarily rearrested, detained, and brought to California, this Court stated flatly that – in doing their jobs and representing their client – defense counsel was "likely to *facilitate his absconding* from the United States." Order Setting Hearing on Gov't Mot. for Review of Release Order (Feb. 22, 2024) at 1 (emphasis added) (attached as Exhibit 4). The suggestion that defense counsel is participating in an unlawful plot by advocating for release under Section 3142 is wrong.   The Court's Order stating that it had already granted the

Government's Application, without having heard from the Defendant, further revealed that this Court has already decided to detain Mr. Smirnov at the February 26 hearing.

Nevertheless, in a case where the detention issue had not been prejudged, the starting point would be *United States v. Salerno*, 481 U.S. 739, 107 S. Ct. 2095 (1987). There, the Supreme Court stated that, in the United States, liberty is the norm, and detention is the carefully limited exception. The Court found that the Bail Reform Act of 1984 operates only on individuals who have been arrested for particularly serious offenses, and carefully delineates the narrow circumstances under which detention is permitted.

The Bail Reform Act of 1984 does allow a court to detain a defendant if no release conditions "will reasonably assure the appearance of the person and the safety of any other person in the community." But it is only under those rare circumstances where no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person in the community, that a court may reasonably (not to mention, constitutionally) order the pretrial detention of a never-convicted, presumptively innocent defendant like Mr. Smirnov.

These principles were reinforced in *United States v. Gebro*, 948 F.2d 1118 (9th Cir. 1991), where the Ninth Circuit stated that the Bail Reform Act required

release of persons under the least restrictive condition or combination of conditions that will reasonably assure appearance of the person and the safety of community. *See Gebro*, 948 F.2d at 1121. "Only in rare circumstances should release be denied, and doubts regarding the propriety of release should be resolved in the defendant's favor." *Id*. (citing *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985)). Finally, "[o]n a motion for pretrial detention, the government bears the burden of showing [1] by a preponderance of the evidence that the defendant poses a flight risk, and [2] by clear and convincing evidence that the defendant poses a danger to the community." *Gebro*, 948 F.2d at 1121.[4]

Citing 18 U.S.C. § 3142(g), the *Motamedi* Court stated: "The court must take into account available information concerning the nature and circumstances of the offense charged, the weight of the evidence against the person, the history and characteristics of the person, including his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug and alcohol abuse, criminal history, record concerning appearance at court proceedings, and the nature and

---

[4] The parties and Magistrate Judge agreed that the principal detention issue in this case concerns the risk of non-appearance, not the danger to the community. *See* Tr. at 35 ("I'll take the . . . the danger prong, which requires the Government to provide evidence of clear and convincing evidence that he's a danger to the community. That's not what they've asked or argued, and that's not what any of the parties have raised.").

seriousness of the danger to any person or the community that would be posed by the person's release." *Motamedi*, 767 F.2d at 1407.

As shown below, these factors – coupled with the Pretrial Service Office's recommendation of pretrial release for Mr. Smirnov – militate overwhelmingly in favor of release in this case. Pointedly, when he was arrested for a second time, Mr. Smirnov was already free and working on his defense in his lawyers' office. This is hardly what would be expected of a person preparing to jump bail and flee the country; to the contrary, had he not been rearrested, Mr. Smirnov would have voluntarily traveled to Los Angeles with his lawyers to attend the upcoming hearing.

**E.     The *Motamedi* Factors Militate Overwhelmingly In Favor Of Release: Nature and seriousness of the offense charged.**

As stated above, Mr. Smirnov is charged under 18 U.S.C. § 1001 and 18 U.S.C. § 1519, both of which accuse him of making false statements in connection the current president's (and, particularly, the current president's son's) connection to a business deal with a company based in Ukraine. These allegations are makeweight and related to political issues; they do not involve espionage or theft and are thus not "serious," especially as to the penalty.

**Weight of evidence against defendant.**

The Ninth Circuit has held that the "weight of the evidence" is the least important factor to be considered during the pretrial detention hearing. *See, e.g.,*

*Motamedi*, 767 F.2d at 1408. This guards against the possibility of making a "preliminary determination of guilt" that then leads to punishment in the form of a refusal to grant release. *Id.* "The [ ] factor may be considered only in terms of the likelihood that the person will fail to appear or will pose a danger to any person or to the community." *Id.*; *see also United States. v. Armstrong*, 2010 WL 5102203 (D. Ariz. 2010) (granting pretrial release to defendant charged with two separate armed bank robberies while recognizing that the evidence against the defendant was strong because bank surveillance photos show her committing the robberies and because she admitted her participation.).

While it is not clear what the government's evidence consists of at this preliminary stage, Mr. Smirnov vigorously disagrees with the Government's recitation of the facts. That aside, when the "evidence factor" is considered in conjunction with the other factors outlined here, the balance weighs in favor of release.

**Defendant's character, physical and mental condition.**

Mr. Smirnov has an exemplary character and is in good mental health. Mr. Smirnov has ongoing medical issues related to his eyes and will need continuing care.

**Defendant's family and community ties.**

Mr. Smirnov has lived in Las Vegas for two years, lived in California for the sixteen years prior to moving to Las Vegas, has relatives that live in the United States, and has his long term significant other that he resides with in Las Vegas.  He thus has strong ties to the community and has the strong support of family and friends.

**Defendant's past conduct, history relating to drug and alcohol abuse, criminal history.**

Mr. Smirnov has no criminal history and there is no indication of any drug or alcohol abuse whatsoever.

**The nature and seriousness of danger to any person or community that would be posed by defendant's release.**

Mr. Smirnov is 43 years old and has no criminal history.  Any concern that Mr. Smirnov is a danger while on release can be adequately addressed through the imposition of certain conditions including electronic monitoring, maintaining his residence, travel restrictions, and any other condition the Court deems necessary.

**Additional, Critical Factors Unique to This Case.**

In the days leading up to his detention hearing on February 20, 2024 in Nevada, Mr. Smirnov was detained by the U.S. Marshals. It took the undersigned counsel several hours on February 16 (not to mention many phone calls), to secure

even a brief phone call with Mr. Smirnov – at which the matter of legal representation, and nothing else, was discussed.

Moreover – and particularly relevant to the issue of pretrial release – a representative from the facility where Mr. Smirnov is being held advised counsel: 1) that Mr. Smirnov is in protective custody; and 2) that, given this restrictive classification, the entire facility needed to be "frozen" just so Mr. Smirnov could take this brief, non-substantive phone call.  It is not anticipated that the confinement conditions will be drastically different in Los Angeles.

Given the foregoing – and coupled with the volume of records that the government will doubtless produce and the overriding need for in-person trial preparation with the client – it will be virtually impossible to mount an effective trial defense through intermittent telephone calls and truncated, sparse jail visits.

The federal courts warn that pretrial detention can hamstring trial preparation:

> The Supreme Court has recognized that "to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during trial itself." *Maine v. Molton*, 474 U.S. 159, 170, 106 S. Ct. 477 (1985); see also Wolfish v. Levi, 573 F.2d 118, 133 (2d Cir.1978) ("[O]ne of the most serious deprivations suffered by a pretrial detainee is the curtailment of his ability to assist in his own defense."), *rev'd on other grounds, Bell v. Wolfish*, 441 U.S. 520, 99 S. Ct. 1861 (1979).

*Estrada v. Munoz*, No. 2010 WL 1999525, at *2 (C.D. Cal. May 17, 2010).

Moreover, with Mr. Smirnov in custody he will not be able to facilitate his counsel's contact with critical witnesses, and assist counsel with language barriers

that are sure to exist.  In *Kinney v. Lenon*, 425 F.2d 209 (9th Cir. 1970), the Ninth Circuit found the detention of a juvenile to interfere with his due process right to a fair trial, as the Defendant was likely the only person that witnesses would cooperate with due to "age and race."  Here, with the cultural and language barriers, it is anticipated that Mr. Smirnov will be the only person that can effectively contact and facilitate interviews of critical witnesses for his defense.

Keeping Mr. Smirnov in custody will thus work an irreparable harm to his ability – indeed, *right* – to prepare effectively for trial.

**F.    Mr. Smirnov is Neither a Flight Risk Nor a Danger to the Community**

Federal courts embrace the "strong presumption against detention." *See, e.g., United States v. Hanson*, 613 F. Supp. 2d 85, 87 (D.D.C. 2009); *United States v. Karni*, 298 F. Supp. 2d 129 (D.D.C. 2004). And, along these lines, we refer this Court to Letters attached at Exhibits 2 and 3 for a personal explanation as to why Mr. Smirnov will not flee.

In both *Hanson* and *Karni*, the courts held that conditions for release could be fashioned to ensure the appearance of defendants who – unlike the Mr. Smirnov – did *not* have significant ties to the United States and who *did* pose a serious danger to the United States. There, the defendant was an Israeli national who had been residing in South Africa for the last eighteen years. He was charged with violating federal law by allegedly acquiring "products that are capable of triggering nuclear

weapons and [exporting] them to Pakistan, via South Africa, avoiding the requirement of obtaining an export license for the devices." *Karni*, 298 F. Supp. 2d at 130. Despite the serious nature of his crime and the fact that he "had no ties to the United States or to the Washington, D.C. area," the court determined that the defendant should be released subject to certain conditions including release into third party custody, home detention, and electronic monitoring.

In *Hanson*, the defendant was a Chinese citizen who had become a naturalized citizen of the United States.  She was alleged to have illegally exported unmanned aerial vehicle ("UAV") autopilot components to the People's Republic of China. According to the government, Mrs. Hanson carried these UAV components to Germany and handed them to an acquaintance who took them to China. The government represented that these sophisticated components enable UAVs to perform certain tasks without the aid of human pilots, including autonomous take offs, bungee launches, and hand launches and landings, and that they have other tactical military uses.  Moreover, according to the government's expert, UAVs equipped with these components could be used to simulate stealth planes and cruise missiles to test air defense detection systems, and potentially could be armed. The government argued that she was a flight risk because 1) she had closer ties to China than to the United States; 2) her marital relationship in the United States was faltering, and she had no other family ties here; 3) she faced a steep jail sentence and

the government had strong evidence against her; 4) it would have been easy for her to get a new Chinese passport and depart to China; 5) and she had strong business interests, family ties, and property in China. After hearing the evidence, the court – like the Magistrate Judge in this case -- found that conditions *could* be fashioned that would reasonably assure the defendant's presence.

These cases (and countless others like them) illustrate the type of conditions that can easily be fashioned to ensure that Mr. Smirnov attends all Court hearings.

Again, it should also be noted that Mr. Smirnov is dual-citizen who is lawfully in the United States. His dual citizenship should not be a concern for this Honorable Court, and both Pretrial Services and the Magistrate Judge in Nevada have recognized that conditions can be fashioned regarding the factor of alleged flight.

/ / /

**G.    Conclusion**

Despite this Court having already decided to arrest Mr. Smirnov, we are optimistic that it will apply the law of the Ninth Circuit and direct Mr. Smirnov's release, consistent with Pretrial Services' and Magistrate Judge Albregts' prior recommendations.

DATED this 23rd day of February, 2024.

Respectfully Submitted:

CHESNOFF & SCHONFELD

        /s/         Richard A. Schonfeld
DAVID Z. CHESNOFF, ESQ.
*Pro Hac Vice* pending
RICHARD A. SCHONFELD, ESQ.
California Bar No. 202182
520 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702)384-5563
rschonfeld@cslawoffice.net
dzchesnoff@cslawoffice.net
Attorneys for Defendant ALEXANDER
SMIRNOV

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 23rd day of February, 2024, I caused the forgoing

document to be filed electronically with the Clerk of the Court through the CM/ECF

system for filing; and served on counsel of record via the Court's CM/ECF system.


_____/s/ Rosemary Reyes____
Employee of Chesnoff & Schonfeld