EXHIBIT 1

—2:24-mj-00166-DJA—

1    UNITED STATES DISTRICT COURT

2    DISTRICT OF NEVADA

3

4  UNITED STATES OF AMERICA,        )
                                     )
5              Plaintiff,            )  Case No. 2:24-mj-00166-DJA
                                     )
6        vs.                         )  Las Vegas, Nevada
                                     )  February 20, 2024
7  ALEXANDER SMIRNOV,                )
                                     )
8              Defendant.            )  DETENTION HEARING
   _____   )
9                                       *C E R T I F I E D   C O P Y*

10

11

12

13              TRANSCRIPT OF PROCEEDINGS

14         THE HONORABLE DANIEL J. ALBREGTS,
              UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19  APPEARANCES:            See Next Page

20  DIGITALLY RECORDED:     Liberty Court Recorder
                            3:02 p.m.
21

22  TRANSCRIBED BY:         PATRICIA L. GANCI
                            (702) 385-0670
23

24
   Proceedings recorded by electronic sound recording, transcript
25  produced by mechanical stenography and computer.

```
                         2:24-mj-00166-DJA
```

 1   APPEARANCES:

 2   For the Plaintiff:

 3        **LEO J. WISE, ESQ.**
          **DEREK E. HINES, ESQ.**
 4        **CHRISTOPHER R. RIGALI, ESQ.**
          **SEAN F. MULRYNE, ESQ.**
 5        U.S. DEPARTMENT OF JUSTICE
          950 Pennsylvania Avenue NW, Room B-200
 6        Washington, DC 20530
          (771) 217-6091
 7
     For the Defendant:
 8
          **DAVID CHESNOFF, ESQ.**
 9        **RICHARD A. SCHONFELD, ESQ.**
          CHESNOFF & SCHONFELD
10        520 S. 4th Street
          Las Vegas, Nevada 89101
11        (702) 384-5563

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2:24-mj-00166-DJA

1          LAS VEGAS, NEVADA; TUESDAY, FEBRUARY 20, 2024; 3:02 P.M.

2                               --oOo--

3                       P R O C E E D I N G S

4          THE COURT:  Thank you.  Please be seated.

5          COURTROOM ADMINISTRATOR:  United States of America

6   versus Alexander Smirnov, 2:24-mj-166-DJA.  This is a detention

7   hearing.

8          Counsel, make your appearance for the record, please.

9          MR. WISE:  Good afternoon, Your Honor.  Leo Wise, Derek

10  Hines, Christopher Rigali, and Sean Mulryne for the United

11  States.

12         THE COURT:  Good afternoon.

13         MR. CHESNOFF:  May it please the Court, Your Honor.

14  David Chesnoff, Richard Schonfeld, and also with us Peter Levitt

15  here on behalf of Mr. Smirnov.

16         THE COURT:  All right.  Thank you.  Good afternoon.

17  Good afternoon, Mr. Smirnov.

18         All right.  This matter is scheduled for the continued

19  detention hearing this afternoon.  However, a couple of other

20  matters have been filed that I want to resolve here before we

21  begin.  Specifically, at Dockets Number 9, 10, 11, and 12 the

22  Government has filed motions to admit all four Government

23  attorneys.  I will grant those here today.  So 9, 10, 11, and 12

24  are granted.

25         Additionally, there was a motion to file documents

 1  under seal filed by -- on behalf of the United States at

 2  Document Number 13.

 3          Mr. Chesnoff, did the Defense receive and review the

 4  motion to file some of the documents related to their filing

 5  today under seal?

 6          MR. CHESNOFF:  Yes, Your Honor.

 7          THE COURT:  Does the Defense have an opposition to

 8  that?

 9          MR. CHESNOFF:  No, Your Honor.

10          THE COURT:  All right.  Well, I've reviewed the motion

11  and I've reviewed the documents.  I do note that the request to

12  seal does not outline the Ninth Circuit case law that I believe

13  would apply, *Kamakana* and its progeny.  But when I apply

14  *Kamakana* and its progeny, I do think that sealing these

15  documents would be appropriate in this case.

16          I will of course remind the parties, as you well know,

17  that there's a presumption of access to the courtroom documents

18  and the public having access to those filings.  And the Ninth

19  Circuit outlines standards that I am to employ when deciding to

20  change that and to seal things.  And so I have done that

21  analysis.  And I do believe it's appropriate to seal Exhibits 1,

22  3, 4, 5, 6, 7, and 10 given the information that's contained in

23  there and my analysis of the case law as it applies to those

24  exhibits.  So I will grant Number 13 as well and allow those

25  documents to be filed under seal.

1        So the parties are aware, I have also reviewed the
2   Defense's motion for release, which is found at Number 8.  I
3   reviewed the Government's memorandum in support of detention,
4   which is found at Number 15.  And I reviewed a filing that
5   Mr. Chesnoff and Mr. Schonfeld entered later this afternoon at
6   Document 16, which is a response.

7        Mr. Chesnoff, as it relates to that response, you note
8   that the Government's was filed this morning, mid to late
9   morning, and that you didn't have time to respond in whole to
10  the memorandum and the hundreds of pages of exhibits that were
11  attached thereto given that it was just filed this morning.

12       Are you prepared to proceed today with the detention
13  hearing notwithstanding that or would you be requesting some
14  more time to review and consider those -- those documents?

15       MR. CHESNOFF:  Your Honor, considering the fact that
16  he's been held for this many days when we believe that he should
17  have been released and the report that we have from Pretrial
18  Services, we'll -- we'll waive any defect in not being able to
19  fully respond.  We feel our arguments will cover enough of it to
20  satisfy the Court, Your Honor.

21       THE COURT:  All right.

22       All right.  With that, then, I will hear from the
23  Government regarding release or detention.

24       MR. WISE:  Thank you, Your Honor.

25       The Government has moved for the defendant's detention

1  pursuant to 3142(f)(2)(A) and (B) because there is a serious

2  risk the defendant will flee and a serious risk the defendant

3  will obstruct justice.  Applying the 3142(g) factors to the

4  facts presented in the Government's memorandum in support of

5  detention compels the conclusion that there are no conditions or

6  combination of conditions that will reasonably assure the

7  defendant's appearance.  Therefore, pursuant to Section 3142(e)

8  he should be detained pending trial.

9       As we outline in our papers, detention is appropriate

10  where a defendant is either a danger to the community or a

11  flight risk.  It is not necessary for the Government to prove

12  both.  And while the former requires clear and convincing

13  evidence, the latter is accomplished by a lower standard, by a

14  preponderance of the evidence.  And, again, as we cite in our

15  memorandum, that means, and this is the District of Idaho case

16  we cite, that the Government must demonstrate that it is more

17  likely than not that there is a serious risk that the defendant

18  will flee, not that it is more likely than not that the

19  defendant will flee.

20       I'll briefly address the 3142(g) factors which we

21  discuss at greater length in our memorandum.  First as we

22  outline, the nature and circumstances of the offense in this

23  case support detention.  In any situation, in any case, pretrial

24  supervision is based on trust, and the defendant has

25  demonstrated he can't be trusted.  And this is something I'll

1  come back to.

2      Here, the defendant lied to his FBI handler after a

3  nearly 10-year relationship.  This is someone with whom he had

4  nearly daily contact, somebody whom the defendant has described

5  as family.  If he's willing to betray someone under those

6  circumstances, how can the Court have any confidence that he

7  will provide truthful information to a Pretrial Services officer

8  he has never met when his liberty is at stake?

9      As to the weight of the evidence against the defendant,

10  and this is also summarized in -- in our papers and cites

11  extensively to the speaking indictment, the evidence in this

12  case will come from the defendant's own travel records, e-mail

13  messages with his handler and others, and from travel records

14  e-mails and messages with the individuals that he claimed

15  participated in these meetings and phone calls where these

16  outrageous allegations were made.

17      The trial won't be a swearing contest between the

18  defendant and these witnesses, although witnesses will refute

19  the defendant's story in no uncertain terms.  But the

20  Government's witnesses will be corroborated by these documents

21  and other unimpeachable evidence, and the defendant's story

22  won't be.

23      Turning to the history and characteristics of the

24  defendant, Defense counsel asserts in his motion for pretrial

25  release that Smirnov has significant ties to the United States,

 1   but he does not.  His family members live in Israel.  He doesn't

 2   own any property here.  He doesn't have a job here.  According

 3   to his own motion for pretrial release, the only relation they

 4   can point to is a cousin in Florida, but that doesn't make for

 5   significant ties.

 6           Now, while a consideration of these factors alone

 7   compels detention, the extraordinary characteristics of the

 8   defendant that we've outlined in our memorandum make it clear

 9   that there are no conditions that will reasonably assure his

10   appearance.  And I'll address these in more detail.

11           First, his self-professed claims of ties to foreign

12   intelligence services including Russian intelligence; the

13   between 3 million and $6 million in liquid funds he access to;

14   three, the fact that he didn't disclose those assets to Pretrial

15   Services or to the Court, and I'll address the defendant's

16   recent reply on at least they only address the Pretrial Services

17   disclosure and that, too, was deficient regardless of what's in

18   their reply; and, finally, the fact that as a dual national he

19   can obtain an Israeli passport at any time after he surrenders

20   it.

21           Turning first to I think what is the most extraordinary

22   feature of this defendant, his contacts with foreign

23   intelligence.  His contacts with foreign intelligence services,

24   specifically Russian intelligence services and operatives,

25   distinguish his case from the two cases cited by the defendant

1  in his motion for release, *Karni* and *Hanson*.  And I would

2  venture to guess that a situation like this has probably never

3  been presented to the Court.

4       Those contacts are regular and recent.  In our

5  memorandum we quoted recently declassified FBI reporting

6  summarizing the defendant's contact with Russian intelligence

7  and others, and most notably his recent -- his most recent

8  election disinformation story, the one he told the FBI in

9  September 2023 about the Premier Palace Hotel in Kyiv and the

10  recordings of Businessperson 1, came after he met with Russian

11  intelligence.

12       Again, these contacts make this defendant different

13  from other defendants who merely have foreign ties, and they

14  heighten the risk of flight dramatically.  And that is because

15  he can use these contacts with foreign intelligence services to

16  flee and to resettle overseas, something I would again venture

17  to say is almost unique in the presentation of a defendant being

18  considered for the pretrial release.

19       THE COURT:  So let's say that happens.  You don't think

20  that the Federal Government would have the ability to find him

21  and take action to bring him back?  You think that these Russian

22  ties that you're talking about are the type of people that would

23  literally take him and secrete him from prosecution?

24       MR. WISE:  If he were to resettle in Russian, we

25  couldn't extradite him.  Russian won't extradite under these

1    circumstances.

2        If he were to resettle in other -- in third countries,

3    we couldn't extradite him.  And so, yes, I think that is the

4    case.

5        THE COURT:  All right.  Go ahead.  I'll --

6        MR. WISE:  That's even assuming we could find him.

7    That's even assuming we could find him.

8        THE COURT:  You think the long arm of the United States

9    of America couldn't find him on this planet?

10       MR. WISE:  Yes.  I think the best thing we have going

11   for us is the idea that people think we have that long arm, and

12   having been in Government for 17 years, I'm routinely astonished

13   at how short it is.

14       THE COURT:  All right.  Go ahead.

15       MR. WISE:  The next factor that makes this defendant

16   extraordinary is his access to funds and, worse, the fact that

17   he didn't disclose these assets to Pretrial or to the Court last

18   week.

19       Now, to be clear, the defendant's PSR says he has

20   access to $6,500, $1,000 or $1,500 cash on hand and $5,000 in a

21   checking account.

22       He actually has access to approximately $3 million in

23   a -- in an account in the name of the Avalon Group where he is

24   the sole signatory.  We received a balance on that account as of

25   this morning.  It has $2,886,893.18.  And contrary to what is in

1  the reply the Defense filed, this is not a business account.  He

2  uses it to pay personal expenses.

3        As we outlined in our filing, he's withdrawn $175,000

4  in cash out of it.  He's transferred more than 2.6 million to

5  his girlfriend who has then used that money to purchase the

6  million dollar condominium they live in, to make credit card

7  payments which is his primary means of paying these personal

8  expenses in the amount of more than $100,000 in 2022, more than

9  $275,000 in 2023, and there is no discernible business activity

10  in this account nor can he or his girlfriend actually articulate

11  what his business is.

12        The only personal checking account he appears to have

13  has at last -- the last time we checked about $500 in it which

14  is used only to make a very small recurring insurance payment.

15  So this is his money.  It is not the case that he was confused

16  and thought this was a business account that he didn't have to

17  disclose.

18        And, further, even if there was some confusion with

19  Pretrial, which I submit there was not, these are his funds.  We

20  haven't seen the financial affidavit, but I have what -- I've

21  seen what these financial affidavits that he filled out and

22  submitted to Your Honor say.  And it says:  "Cash and bank

23  accounts.  Do you have any cash or money in savings or checking

24  accounts?"  Doesn't say personal accounts.  Doesn't say business

25  accounts.  It says:  "Cash or save" -- it says:  "Cash or money

 1  in savings or checking accounts."  And he does.

 2       THE COURT:  Does the Government think -- well, let me

 3  ask first.  Does the -- do you have any knowledge about what

 4  happens from the time of the arrest till the time of the initial

 5  appearance a few hours later?

 6       MR. WISE:  In what -- I'm sorry.

 7       THE COURT:  Well, just how the Pretrial interview goes

 8  and -- and the discussions and, you know, the time constraints

 9  that people are -- I mean, you're so certain that these are just

10  blatant misrepresentations when there might have -- why wouldn't

11  it possibly be confusion when he's just been arrested, he's been

12  taken into custody, and somebody shows up and starts asking him

13  questions?

14       MR. WISE:  So if someone asked me what kind of funds I

15  had access to and I had $3 million in an account and I told them

16  I had $6,000 in an account, I think it would --

17       THE COURT:  I don't know that they ask him what kind of

18  funds he has access to.  The questions are:  Do you have a

19  savings account?  Do you have a checking account?  And what's in

20  them?  I mean, I've sat in on these interviews for many, many

21  years.

22       MR. WISE:  And I think any defendant that was looking

23  to be forthcoming would say, "I have this account that I use to

24  pay my personal expenses out of.  I have this account that I've

25  transferred millions of dollars to the woman I live with to that

1  she's used to purchase the home we live in."  I think -- I've

2  heard these questions and I think they absolutely would call for

3  this information.

4          THE COURT:  Okay.

5          MR. WISE:  And then when he sat in front of Your Honor

6  and Your Honor asked him before appointing -- and as I said, we

7  haven't seen the affidavit, but I'm fairly certain it didn't

8  have $6 million on it or Your Honor wouldn't have appointed CJA

9  for him.  It says:  "Do you have any cash or money or savings or

10 checking accounts?"  And he clearly did have that and he

11 chose -- he chose not to disclose that information.

12         And, in addition, the balance in the DL -- what we

13 refer to as the DL account as of today is an additional

14 $3,784,218.51.  And we see this pattern of him taking money out

15 of the Avalon account, buying cashier's checks, giving it to DL.

16 She then goes to a nearby branch within 30 minutes and deposit

17 it, which makes it look like there's some kind of business

18 relationship between her and this Avalon Group, but not with

19 him.

20         THE COURT:  Did you ever call Pretrial or reach out to

21 Pretrial to ask about the circumstances of the questions to

22 determine whether there might have been misunderstandings or

23 that the questions weren't as direct so that it's not as clear

24 in your mind that he's flat-out lying to them?

25         MR. WISE:  Your Honor, my approach to Pretrial is that

1  they have a job to do as an agency of the Court, and I wouldn't

2  be comfortable asking them to essentially become witnesses

3  against the defendant under those circumstances.  So I

4  typical -- I haven't done that.

5          THE COURT:  All right.  Fair enough.

6          MR. WISE:  But I think it is very clear that these are

7  his funds as we outline --

8          THE COURT:  Okay.  So -- and you've made that clear in

9  there.  So move on past the funds.  I understand that argument.

10          MR. WISE:  And the other things -- you know, the other

11  thing he said -- he made a number of statements to Pretrial that

12  were untrue.  He, for instance, said this condominium was leased

13  by the girlfriend when we know in fact it was purchased by her

14  with his funds.  And Defense counsel even had to concede that in

15  their -- in their filings.  So we've got lies, sort of, big and

16  small in his very first instance of interacting with the Court,

17  when one would think you would err on the side of providing all

18  of the information that might be necessary so that one might be

19  released on conditions.

20          In short, the evidence that the defendant can't be

21  trusted to abide by conditions and provide truthful information

22  to Pretrial Services isn't speculation.  He's shown that he

23  can't be trusted by providing misinformation to his handler, and

24  in his first interaction with Pretrial Services and the Court he

25  withheld information that shows he has access to millions of

1    dollars that he could use if he were to flee the United States.

2         I'd like briefly now to turn, if Your Honor would like,

3    or I can depending on how Your Honor -- the sequence, I can turn

4    to some of the arguments made in the defendant's motion for

5    pretrial release or I can wait until after they go, whatever

6    Your Honor would prefer.

7         THE COURT:  You argue how you feel appropriate.

8         MR. WISE:  Sure.

9         So I'm not going to address all of the arguments.  Some

10   of them I think are -- are sort of on their face ones that I

11   think I don't need to address, but the first -- the first thing

12   I will note is that the defendant argues that the Government

13   knew about Mr. Smirnov's alleged conduct for years, yet, took no

14   steps to end his cooperation, seize his passports, or prosecute

15   him for anything.  And the Defense argues that should be kept

16   firmly in mind when, as expected, the Government reverses course

17   in this bail proceeding and suddenly protests that Mr. Smirnov

18   now presents an extreme flight risk.

19        So the mistake the defendant makes is in thinking that

20   the Government is a monolith.  The FBI is divided into field

21   offices and the Department of Justice and to U.S. Attorney's

22   Offices.  And while both organizations have some coordinating

23   functions in Washington, they're limited.

24        And to be clear, in this case the defendant was the

25   source for an agent based out of the Seattle field office and he

 1  volunteered information about Burisma, volunteered, to that
 2  agent in 2017 which the agent recorded.  Later in 2020 the FBI's
 3  Pittsburgh field office was conducting an assessment of
 4  information being provided by the public concerning the Ukraine,
 5  most notably Rudolph Giuliani, and reached out to the
 6  Seattle-based handler and asked him to interview the defendant
 7  about the defendant's 2017 reporting.  And what the Seattle
 8  agent learned he reported back to the Pittsburgh Agent in June
 9  of 2020.

10          And -- and the FBI in Pittsburgh took some limited
11  investigative steps, but their steps were limited by the fact
12  that they were only conducting an assessment, which under FBI
13  policies is not an investigation.  And it prevents, for
14  instance, the use of compulsory process like grand jury
15  subpoenas or the compulsion of testimony.  So based on that
16  limited review, the FBI closed its assessment in August.

17          Fast-forward to July of 2023, that's when the FBI asked
18  the U.S. Attorney's Office in the District of Delaware to assist
19  in evaluating the claims in the 2020 1023.  And in August the
20  U.S. Attorney for the District of Delaware was made Special
21  Counsel by the Attorney General.  Also in August investigators
22  in Delaware spoke with the defendant's handler for the first
23  time, and then in September investigators in Delaware spoke with
24  the defendant, again, for the first time.

25          After those meetings investigators began collecting

2:24-mj-00166-DJA

1 evidence on the defendant's allegations, including for the first

2 time with the benefit of the grand jury.  And it was through the

3 use of the grand jury that investigators in Delaware learned

4 that the defendant was lying.  So it is not the case that the

5 defendant -- that the Government knew he was lying back in 2020

6 and took no steps to address his conduct.

7          THE COURT:  So what was the date, then, that you're

8 saying you were aware that he was lying?

9          MR. WISE:  Just this fall, in a run up to these

10 charges.  We first met with him in September --

11          THE COURT:  That's the September 23rd -- September 2023

12 meeting you're talking about?

13          MR. WISE:  Yes, Your Honor.

14          THE COURT:  All right.

15          MR. WISE:  That was the beginning -- after speaking

16 with the handler in August that was really the beginning of the

17 grand jury investigation, and then evidence was collected

18 shortly thereafter that led to the presentation of these

19 charges.

20          THE COURT:  All right.

21          MR. WISE:  Now, in addressing the 3142(g) factors,

22 specifically the nature and seriousness of the offense, the

23 defendants argues that "These allegations are make-weight and

24 politically motivated.  They do not involve espionage or theft

25 and are, thus, not serious."

1          I didn't know what make-weight meant so I looked it up.
2   According to Miriam Webster, the meaning of make-weight is
3   something thrown into a scale to bring the weight to a desired
4   value.  I have no idea what that means in this context.  Maybe
5   Your Honor does.
6          And politically motivated, by whom?  If Defense counsel
7   is referring to his client's allegations, then we agree.  His
8   client's messages that are quoted in the indictment show
9   political bias on his client's part.
10          Or is the -- is Defense counsel referring to us, the
11  Government in this case?  And that would certainly be curious.
12  We're prosecuting Hunter Biden on tax and gun charges, and his
13  lawyers make the unfounded claim that we're working at the
14  direction of former President Trump and Congressional
15  Republicans, although they can never explain why or how.
16          So then I guess what Defense counsel in this case is
17  arguing is we're working at the direction --
18          THE COURT:  Are you saying Mr. Chesnoff and
19  Mr. Schonfeld said that in their pleadings?
20          MR. WISE:  That's what they wrote.  They wrote the
21  charges in this case are make-weight and politically motivated.
22          THE COURT:  So -- but where do they -- okay.  But I --
23  you've taken that quite a bit beyond that they're saying -- what
24  did you just say was ...
25          MR. WISE:  Well, I'm trying to figure out -- it sounds

-2:24-mj-00166-DJA-

 1  like they're saying we're working at the direction of the White

 2  House and the Biden campaign.  And the other cases --

 3          THE COURT:  Is that a leap?

 4          MR. WISE:  And the other cases --

 5          THE COURT:  I guess you don't --

 6          MR. WISE:  -- the Defense counsels are making the

 7  opposite argument.

 8          THE COURT:  Well --

 9          MR. WISE:  So we're sort of curious which it is.

10          THE COURT:  Well, and I'm not getting into the politics

11  of this.  I have to make a determination under the Bail Reform

12  Act whether he's a flight risk or a danger and whether, if he

13  is, there are conditions or a combination of conditions to

14  address that.

15          MR. WISE:  Right.

16          THE COURT:  So I have no time for the politics of this

17  case.  I understand the underlying charges.  There's a component

18  to that.  But I'm not going to spend a lot of time here talking

19  about the politics.

20          MR. WISE:  Good.  Because when we saw that, we were

21  shocked that he would make the accusations --

22          THE COURT:  So go on and continue with your argument.

23          MR. WISE:  Now, the Defense counsel calls the charges

24  not serious, which begs the question is he serious.  The

25  defendant's lies have captured --

1    THE COURT:  All right.  I'm not going to get personal

2    with the attacks on counsel.  All right?  Let's keep it to the

3    facts and the law.  You don't need to make snide remarks about

4    "is he serious."  And I'm not going to tolerate that from either

5    side.

6        MR. WISE:  Understood, Your Honor.

7    The defendant's lies in this case have captured the

8    national imagination.  And while the -- while the filing says

9    they do not involve espionage, of course the charges do involve

10   foreign intelligence services.  The defendant claims to have met

11   with Russian intelligence agencies on multiple occasions, and

12   the U.S. intelligence community has concluded that Russian

13   intelligence interfered in the 2020 election and continues to

14   interfere in our elections by spreading misinformation.

15   And I can supplement the record with these two public

16   reports, but in January of 2017 the Office of the Director of

17   National Intelligence made public a declassified version of a

18   highly classified assessment regarding Russia's efforts to

19   interfere in the 2016 presidential election.  And in 2020 the

20   ODNI published a similar declassified report regarding the 2020

21   U.S. presidential election.  And one of the key judgments of

22   that report, which was expressed with high confidence, was that

23   Putin authorized and a range of Government organize -- and a

24   range of Russian government organizations conducted influence

25   operations aimed at denigrating President Biden's candidacy and

1  the Democratic Party, supporting former President Trump,

2  undermining public confidence in the electoral process, and

3  exacerbating sociopolitical divisions in the United States.  And

4  that's a quote from that report that we can file as a supplement

5  to the direct -- for the record.

6          Now, the defendant also argues for release, in part,

7  based on where the defendant is currently housed.  That's

8  premised on the idea that he'll actually stay in that location,

9  and I don't think that's correct.  I think he was brought to

10 that location temporarily, but if he were detained, I believe he

11 would be detained in the Central District of California, not in

12 the District of Nevada.  And so whatever the conditions are at

13 that facility I don't think bear on --

14         THE COURT:  I think that's correct.  If he's detained,

15 he'll under Rule 5 be transferred to the Central District of

16 California and they'll have the decision as to where he's housed

17 and incarcerated -- or detained.  I shouldn't say incarcerated.

18 Detained pending trial.  But go ahead.

19         MR. WISE:  And the issue -- and this came up in the

20 previous hearing.  You know, the issue of the defendant's --

21 where he is detained, the conditions under which he is detained,

22 those are all things that the Marshals or the Bureau of Prisons

23 or we can work with Defense counsel to address.  They are not

24 factors that the law or the statute recognizes as bearing on

25 whether he poses a risk of flight or whether there are

 1  conditions that can reasonably assure his appearance.

 2         In the last hearing we discussed the fact that he is,

 3  as the indictment makes clear, or was a confidential informant.

 4  And we take -- we take security seriously.  We take safety

 5  seriously.  And those -- those issues need to be addressed and

 6  will be addressed, but none of that bears on the determination

 7  of whether he poses a serious risk of flight which for all of

 8  the reasons we identify in our motion we believe he does.

 9         THE COURT:  And why -- there's no addressing -- and I

10  think I know the answer, but I'd like to hear it from you -- no

11  addressing the conditions that Pretrial suggests and why, you

12  know, with the idea that it's -- Bail Reform Act, it's the least

13  restrictive, you know, that I have to consider and the least

14  restrictive conditions.  Why won't some of the things that they

15  recommended address these things?  Is it just the trust issue or

16  is there something more?

17         MR. WISE:  So the trust issue is at the heart of it,

18  Your Honor, but as we said, I mean, when you combine the

19  resources he has access to, the fact that he can travel

20  internationally on the second passport -- and as we point out,

21  there is -- there is literally no way to prevent that.  And this

22  is a problem that's present with dual nationals where they can

23  go into a consulate.  They can say they lost their passport.

24  They'll be issued another passport.  There's no way that the

25  Government -- our Government learns of that.  There's no way

1    that there can be a stop at the border over that.  It simply

2    is --

3            THE COURT:  What if I put geographical limits on where

4    he can go and we monitor that so that the minute he leaves Clark

5    County Pretrial's notified of that?

6            MR. WISE:  My understanding of the technology is that

7    it's not that -- it is limited, that there are lags, that there

8    are -- you know, that the geographic space is not tight enough

9    to know if someone is in an airport as opposed to some other

10   location.

11           My experience with that is not that it's as precise as

12   one would -- would think or hope.

13           THE COURT:  All right.  All right.

14           MR. WISE:  But as I said, Your Honor, you know, usually

15   the arguments are someone's whole family is here, their whole

16   life is here, their job is here, this is where their, you know,

17   livelihood comes from.  We've seen none of that in this case.

18   And that's why to answer Your Honor's question, I think -- I

19   think the conditions simply -- simply don't reasonably assure

20   his appearance.

21           And if -- if we could -- I mean, Defense counsel when

22   he called me on Friday said, "Is there some" -- "Are there some

23   conditions that we could agree on?"  If we could, we would.  I

24   mean, this is not hyperbole.  If we thought there was some way

25   that we could reasonably assure that he would appear in this

──2:24-mj-00166-DJA──

1  proceeding, that would be where we'd go.  But in light of the

2  contact with foreign intelligence, in light of the $6 million in

3  funds, in light of our experience so far with him, we simply

4  don't believe that's the case.

5         THE COURT:  All right.  Thank you very much.

6         MR. WISE:  Thank you, Your Honor.

7         THE COURT:  Mr. Chesnoff, Mr. Schonfeld.  One or the

8  other, not both, please.

9         MR. CHESNOFF:  May it please the Court.

10        Your Honor, it's amazing to me that the question the

11 Court asked about the power of the Government to find somebody

12 is so limited that to have the Government's position adopted by

13 the Court would mean that nobody who they are concerned could

14 run ever gets out.  And that's not the Ninth Circuit law.  The

15 Court is well aware it's the least restrictive.  The idea that

16 someone cannot be geographically controlled, I've had multiple

17 cases, as the Court knows, where people have been restricted not

18 to go to a bus station, not to go to an airport, not to rent a

19 car.

20        I have with me, Your Honor, his Israeli passport which

21 I secured so that we could give it to Pretrial.  The idea that

22 the Court cannot make a condition that says you are not to apply

23 for a new passport, U.S. or Israeli, happens all the time, Your

24 Honor.  Judges impose those conditions.  If the Court could not

25 impose those conditions, the Bail Reform Act, *Motamedi* and all

1  of its progeny, would have no meaning at all, at all.

2      I'm old enough, Your Honor, to have remembered when the

3  Bail Reform Act was enacted in 1984.  I did a deep dig into the

4  legislative history.  The legislative history of the Bail Reform

5  Act, it was created to protect flight and danger from a small

6  and discrete group of people, either violent offenders, people

7  with prior records, people who had history of not showing up in

8  court.

9      We have a gentleman who's an American citizen.  He has

10 an Israeli passport as well which he's willing to turn in.  He's

11 lived in L.A. where this case is for 16 years.  He's lived here

12 for two years.  He lives with his significant other who's

13 present in court.

14     I -- I -- the Court observed the idea of what happened

15 in the beginning.  His English is better than hers, but it's not

16 the best.  I don't think an interpreter was supplied to him

17 during any of the interviews.  I know for a fact that when his

18 significant other spoke to Pretrial, she had the limited ability

19 to communicate.  I got her in my office.  I got someone who

20 spoke Russian.  She then gave all the right and truthful answers

21 to Pretrial Services.

22     Your Honor, we asked Pretrial Services about this

23 question of financial disclosure because when we read their

24 motion this morning, both Mr. Schonfeld and I said, "What

25 happened here?"  So we contacted the Pretrial officer.  We asked

1    to meet with her.  And we asked her specifically, "Did you ask

2    him about any other account than a personal account?"  And the

3    officer was candid and said no.  It's exactly why my client

4    answered the question the way he did because he was not asked

5    about anything else.

6         THE COURT:  What about Mr. Wise's point, and I think

7    there's some legitimacy to it, that, you know, you're in there

8    talking that maybe he thinks, "Well, should I talk about these

9    other accounts?  You know, they're asking me about money" --

10        MR. CHESNOFF:  Perhaps, if I had been there with him,

11   Your Honor, because he didn't have counsel with him, I wasn't

12   there, then those issues would be ferreted out.  We would have

13   explained to him the importance of being as complete as

14   possible.  But in this instance it was completely not his fault

15   that the question was not asked, and he responded truthfully to

16   the question.

17        Their suggestion that somehow that should lead the

18   Court to question his overall truthfulness considering the

19   context, the language, the fact that the Pretrial officer made

20   her own evaluation of him when she spoke to him and has

21   recommended to you that he be released, answers that question in

22   my opinion, Your Honor.

23        Your Honor, the fact that they can document foreign

24   travel, the Court can't lose sight of the fact that a lot of the

25   foreign travel was at their behest.  So it's kind of like a

1  catch 22.  We're going to let you go there.  We're going to send

2  you there.  We're going to use you for our purposes, which is

3  what they did.  And now they turn around and tell Your Honor,

4  "See, he travels everywhere."

5          The other thing that they said was that the handler

6  somehow found out now that he was untruthful.  But for 10 years,

7  Your Honor, apparently, he was truthful.  Now, the question of

8  whether he's not truthful now has not been decided.  And as the

9  Court knows, that's a factual question which is the least

10  important factor that this Court should consider.  And I can

11  tell you, Your Honor, that there will be a vehement defense to

12  the argument that in fact he was not truthful.  He had this

13  personal relationship with the handler.  It was so personal,

14  Your Honor, that he wouldn't even call him on his FBI phone; he

15  would call him on his personal phone.  So we're going to dig

16  down once we start defending this case and we're going to find

17  out who knew what when.

18          Now, when we made the suggestion, Your Honor, that he

19  deserves to be out because of the fact that he needs to defend

20  himself and the housing situation, I can tell you, Your Honor, I

21  visited the MDC in L.A. for years representing clients.  The

22  conditions there are even tougher than the conditions in Pahrump

23  vis-à-vis attorneys.  The waiting period of time sometimes to

24  see a client is hours upon hours.

25          If they are going to have him in PC like they do in

1  Pahrump, which I assume they will since they've managed to put
2  out to the entire world his cooperation without any concern for
3  his safety, but ultimately he is safer out as opposed to being
4  in a detention facility in a major metropolitan city where I can
5  tell you, Your Honor, I would be concerned about his safety.

6          THE COURT:  I know there's constitutional
7  considerations when it talks -- you know, when we consider his
8  right to meet with counsel and prepare for trial and look at
9  documents.  But how does that play into the Bail Reform Act and
10 my decision that I have to make?

11         MR. CHESNOFF:  I can tell you, Your Honor.

12         It's almost a due process question that comes into
13 conflict maybe with just looking at the Bail Reform Act as the
14 only thing the Court considers.  I cited to a case called *U.S.*
15 *v. Kinney* where a State Court was holding somebody, and the
16 Court decided that because of social reality it would be harder
17 for a Defense attorney to speak to witnesses because the
18 defendant came from a community that was foreign to the Defense
19 lawyer.

20         In this case, Your Honor, we are going to need to speak
21 to people in foreign countries that don't speak English, that
22 speak Russian.  Not to have the -- and I can tell you, Your
23 Honor, the MDC in L.A. is not going to allow us to be calling
24 Kyiv from the MDC with our client to speak to people.

25         So the -- the harm to him in defending himself against

2:24-mj-00166-DJA

1   -- and, Your Honor, when we say "not serious," obviously we're

2   in Federal Court.  It's a federal crime.  What we're talking

3   about, Your Honor, is this.  Our guideline calculations show

4   that at a max he's looking at three years.  So when I say "not

5   serious," it's not 10 years.

6        Why would somebody risk a bail jumping charge on top of

7   really an admission of guilt by fleeing when in reality the

8   maximum punishment at the best with the guidelines is three

9   years?  It's even lower without all the potential enhancements.

10  It's absurd, Your Honor.

11       The only reason they want to keep him in is so that he

12  cannot defend himself in a way which shows that the allegations

13  that are being made against him are being made for whatever the

14  Bureau's reasons, whatever Justice's reasons are.  But he has a

15  right, Your Honor, to straighten the record out as far as he's

16  concerned, especially in light of the 10 years of service that

17  he gave to the United States Government and to the people of the

18  United States.

19       So to hold him in custody and restrict his ability to

20  truly defend himself on a case where he's looking at 20 months,

21  Your Honor, I -- I can't even really comprehend it.

22       THE COURT:  So when you said "serious" or "not serious"

23  in your pleading, you were referring to the amount of time and

24  the potential exposure as opposed to the underlying --

25       MR. CHESNOFF:  Yeah.

2:24-mj-00166-DJA

1    THE COURT:  -- current of the case and the political

2 ramifications?

3    MR. CHESNOFF:  You know me -- known me a long time.

4 I'm not belittling the seriousness that the Government feels

5 about this.  What I was talking about is the seriousness in

6 terms of the ultimate --

7    THE COURT:  Potential.

8    MR. CHESNOFF:  -- potential problem.

9    (Defense conferring.)

10    MR. CHESNOFF:  Mr. Schonfeld points out to me it's also

11 not a presumption case, Your Honor, and that bespeaks the

12 recommendation that has been made by Pretrial.

13    Court's indulgence.

14    (Pause.)

15    MR. CHESNOFF:  Your Honor, every condition that's

16 required by the Ninth Circuit law in terms of history, no drug

17 usage, no alcohol, none of the things that are indicia of danger

18 or flight exists.  There's not a single representation, Your

19 Honor, that he's ever committed a violent act, nothing, in the

20 10 years of his service with the FBI.

21    THE COURT:  What -- you know, they raise a good point

22 about being concerned about his access -- so let's set aside the

23 disclosures to Pretrial and whether or not the circumstances

24 rise to the level of he's not trustworthy such that I'll detain

25 him.  That will be something I address here in a moment.

1       But really, I mean, it's legitimate to say he's got

2 access to a lot of money and he knows a lot of people that might

3 be willing to help him out. I mean, how do I address those

4 concerns that the Government's raised?

5       MR. CHESNOFF: Your Honor, he's on electronic

6 monitoring. He's at -- we've offered, we suggest, third-party

7 custodian. His lady friend is present in court. I've explained

8 to her the implications of that, that she has an obligation to

9 the Court if in fact he is doing anything that he's not supposed

10 to do. I don't know what more you can do other than -- Your

11 Honor, anybody can -- anybody can run. That's a fact. The fact

12 that he has connections overseas, that can be addressed by the

13 Court in terms of the conditions it sets: You stay -- this is

14 where you're staying. This is what you're wearing.

15       Your Honor, you can even limit in terms of phone usage

16 if you want, Your Honor. There are things that can be done, but

17 the idea that somehow he's going to escape and the United States

18 Government is not going to find him, I mean, they got I don't

19 know how many people are here --

20       THE COURT: Yes, but counsel raises a good point that

21 even though they know he's in Russia, they can't get him back.

22       MR. CHESNOFF: Well, I have a feeling the idea of him

23 going to Russia is not really such a good idea for him since

24 they've revealed that he helped the United States vis-à-vis

25 Ukraine, and I don't think Russia's going to be too happy about

 1 | that.

 2 | THE COURT:  Well, that's -- that's a relevant point.

 3 | All right.  Go ahead.

 4 | MR. CHESNOFF:  Your Honor, I -- I think that the Court

 5 | should follow the recommendation.  I think that the Court

 6 | understands that this is a situation where a man deserves an

 7 | opportunity to truly defend himself.  And he's never shown

 8 | anybody that he has any disrespect for a courtroom or a Court.

 9 | And the question of the veracity issue, that's the try -- that's

10 | the case, but that's not been proven.  We just had a -- that's

11 | not proven.

12 | THE COURT:  All right.

13 | MR. CHESNOFF:  Thank you, Your Honor.

14 | THE COURT:  All right, Mr. Wise.  Anything in response?

15 | MR. WISE:  Just briefly, Your Honor.

16 | Counsel started with saying -- holding up the Israeli

17 | passport saying, "Well, the Court can impose a condition that

18 | you can't get a new passport."  But of course the issue is you

19 | can impose the condition, but you can't police it.  And that's

20 | what makes the problem of dual nationality particularly unique.

21 | As to the question of a GPS anklet or bracelet, in

22 | addition to the technology not being as precise as one might

23 | assume in 2024, defendants can and do cut them off and then they

24 | alarm, but it's not like law enforcement can instantly respond.

25 | And in any location that's near a major city with an

 1   international airport, the amount of response time is usually

 2   not -- is usually not short enough that it would prevent someone

 3   from going to an international airport or a location where they

 4   could -- where they could use air travel.

 5          Counsel mentioned that the foreign -- what he calls the

 6   foreign travel was at our behest.  Well, let me be very clear

 7   this -- we're not talking about foreign travel.  What we point

 8   out is that the defendant self -- he claims himself to have all

 9   of these contacts with foreign intelligence services.  He

10   volunteers that information to the handler.

11          And, for instance, this most recent trip where he came

12   back with this new disinformation story was absolutely of his

13   own doing.  And -- and he pushed that story when we met with him

14   in September, and it shows that the bad conduct is not, as

15   counsel says in their memorandum, limited to 2020.  It is much

16   more recent and much more -- and much more pronounced.

17          Counsel says, you know, that the Court can somehow

18   address how he could have contact with overseas witness -- with

19   folks overseas.  I have no idea how that could be addressed by a

20   court in the United States whose jurisdiction is limited to the

21   United States.  Counsel said there could be limits on phone

22   usage.  You can go to a kiosk in a mall and buy a burner phone.

23   He was actually communicating over Signal and Telegram.  Those

24   are web-based applications that the Court would have no ability

25   to police or prevent.

 1      You know, while counsel claims, I guess -- I mean, in
 2  addition -- and I hear him say now that the "serious" comment
 3  was about the -- the sentence, but that's -- that's not actually
 4  what he wrote.  He wrote:  "These allegations are make-weight
 5  and politically motivated.  They do not involve espionage or
 6  theft and are, thus, not serious."
 7      That's -- that's his words.  And he -- he actually
 8  ascribes bad motives to us.  He says the only reason we want to
 9  keep him in is so that he can't defend himself, and he mentioned
10  improper motives of the Bureau.  I wasn't quite following what
11  he meant.
12      MR. CHESNOFF:  Your Honor, could you ask him to stop?
13  Like, suggest -- enough is enough.
14      THE COURT:  I'm allowing some leeway.  Let's finish the
15  argument.
16      Counsel.
17      MR. WISE:  Third-party custodians that are wives or
18  intimate partners are in the worst possible position one could
19  be in.  And I've seen this in case after case.  To ask someone
20  to --
21      THE COURT:  I'm not going to do a third party.  If I
22  release, that's not going to be a condition so go ahead.
23      MR. WISE:  Okay.  Putting someone in that position I
24  think is really untenable.
25      So I don't think that any of the -- any of the

1  suggestions that counsel make even come close to addressing the

2  risks that this defendant presents for all the reasons we've

3  outlined.

4            THE COURT:  All right.  Thank you.

5            Mr. Chesnoff, briefly.

6            MR. CHESNOFF:  Yeah, just briefly.  It's not just

7  Chesnoff who says it; it's Pretrial that says it, Your Honor.

8            THE COURT:  On the release?

9            MR. CHESNOFF:  Yeah.

10           THE COURT:  Understood.  All right.

11           (Pause.)

12           THE COURT:  Well, as the parties know, my decision is

13 based upon what the Bail Reform Act tells me to consider and to

14 apply to this particular case and this particular defendant,

15 Mr. Smirnov, and his personal characteristics and history.

16 There's two prongs to that.  The first -- or I'll take the

17 second which is generally the second, which is the danger prong,

18 requires the Government to provide evidence of clear and

19 convincing evidence that he's a danger to the community.  That's

20 not what they've asked or argued, and that's not what any of the

21 parties have raised.

22           And so while one may argue the underlying politics of

23 the case or the danger to our system as a whole or to the free

24 elections or some of those issues, and while those may be issues

25 that are ripe for intelligent, honest discussion, they aren't a

1  consideration for this Court under the Bail Reform Act as it

2  relates to clear and convincing evidence of danger.

3      And so I don't find that Mr. Smirnov is a danger

4  notwithstanding the underlying allegations.  I know the Pretrial

5  report suggested that he could be a danger based upon the

6  underlying allegations.  And as the parties have acknowledged,

7  Mr. Chesnoff has argued, and I've stated, the underlying facts

8  under Ninth Circuit case law are the least important factor of

9  all of the other factors to consider, except on the level that

10 it relates to the trust factor that the Government argues.

11     And so in terms of considering Mr. Smirnov's underlying

12 actions, I think they do come into this idea of whether or not

13 he can be trusted to the point where I would release him.

14     I think it's pretty clear to this Court that

15 Mr. Smirnov is a flight risk by a preponderance of the evidence.

16 His dual citizenship, his possession of passports, his foreign

17 ties, his extensive foreign travel, and some questions about his

18 employment and where he makes his money I think clearly rise to

19 the level that he's a risk of nonappearance by a preponderance

20 of the evidence.  The bigger question, obviously, is whether or

21 not there are conditions or a combination of conditions that can

22 address those concerns.

23     I do have concerns about his access to money and -- and

24 some of the representations made to Pretrial on Thursday, but I

25 also place those in the context of the case insofar as the

1  language issue, the nature of the Pretrial interviews and how

2  quickly they occur, he did not have counsel at the time, the

3  context in which the questions were asked.  I don't know that

4  that rises to the level that I'm convinced that he was sitting

5  there Thursday morning intentionally lying to Pretrial to keep

6  them from knowing about his finances.  I just -- I don't know

7  that it rises to that level.

8         The other concern, obviously, is the allegations and

9  his relationship with his handler.  I will tell you I cannot

10  even begin to understand or know what goes on in a relationship

11  between an FBI handler and somebody who's cooperating and the

12  dynamics of that relationship.  I would suspect it gets close.

13  I don't know how it couldn't when you're working that close with

14  people.

15         I do on some level, like Mr. Chesnoff noted, recognize

16  that how he deals with his handler and the FBI and how they're

17  dealing with him in that complicated context would probably be

18  different than how he would treat a Court order or a Court

19  decision and whether or not the lack of trust he showed

20  according to the Government with his handler would rise to the

21  level of a lack of trust that he would not follow my orders or

22  violate them if I gave him that chance.  I'm not convinced of

23  that given the complex nature of that relationship.

24         The Government has argued the nature and circumstances

25  of the offense.  They put about a quarter of their 28-page brief

 1   to discuss the nature and circumstances and the weight of the

 2   evidence.  And, again, those are the least important factors for

 3   the Court to consider.  And they argue that his ties to the

 4   community are weak, and they've argued that both in their

 5   pleading and here today such that there are no condition or

 6   combination of conditions that would address that.  And then

 7   they raise the four others.

 8        I -- you know, I understand the concern about foreign

 9   intelligence agencies potentially resettling Mr. Smirnov outside

10   of the United States, his connections to them, but I think on

11   some level that's speculative as well because, as Mr. Chesnoff

12   points out, I don't know what Mr. Smirnov will be thought of in

13   Russia, but my guess is at this stage he probably thinks that's

14   not the most attractive place to go either if he was in fact

15   inclined to go hide somewhere.

16        So while I notice and note that that's a concern and

17   certainly raised by the Government that I should consider it, I

18   just don't know in the context of what's happened in the last

19   couple of weeks with his arrest and everything else that that is

20   as grave a concern as the Government outlines.

21        I've already addressed the concern about the money, and

22   I'll have to make a decision here whether or not his access to

23   those funds can be addressed with conditions.  I've already

24   addressed his disclosure of those and how that came about to

25   Pretrial and the context in which I am placing that in.  And

 1  then the Government argues that as a dual citizen he can walk

 2  into an Israeli consulate and obtain a passport and be gone.

 3  And, again, the question is are there conditions that can

 4  address that.

 5         As the parties may or may not know, this Court, as do

 6  most courts across the country, when making these decisions puts

 7  a lot of stock into Pretrial Services and their investigation

 8  and their recommendations and their belief about whether or not

 9  they believe somebody can be supervised with conditions.  And in

10  this case Pretrial Services believes notwithstanding some of the

11  issues that the Government's raised, and they acknowledge those

12  issues, they believe that Mr. Smirnov can be supervised and that

13  there are conditions that can be placed upon him if I were to

14  consider his release today.  And so that carries weight with the

15  Court as well.  As Mr. Chesnoff points out, it's not just

16  Mr. Chesnoff saying his client should be released, but Pretrial

17  Services believes that conditions can be fashioned.

18         And, again, I recognize the underlying political

19  ramifications of this investigation in this case and what the

20  Government believes the effect on our country and on our

21  elections that this might have had.  But, again, other than how

22  that relates to the trust issue, which I've discussed, and as it

23  relates to his relationship with his handler, I'm not sure that

24  those factors are of huge importance to the Court in making my

25  determination.

1       So, Mr. Smirnov, you know, there's a lot of different

2  issues here.  But I do think that I can fashion conditions for

3  your release.  You may or may not make a mockery of me when I do

4  that, but that's not for my consideration either.  And when I

5  say "mockery," meaning you don't follow the conditions or you

6  flee.  And so I recognize that the Government's made some

7  arguments, but I think that despite those conditions can be

8  fashioned.

9       But as you now know, under the Bail Reform Act -- and

10  this may not be the end of it.  They may decide to appeal this.

11  But under the Bail Reform Act you can be detained, and in a case

12  like this, as Mr. Chesnoff has referenced, it could be a lot of

13  time before they can be ready for a trial and that could be a

14  long time that you're detained while that's pending.

15       I'm finding today that the Government has not met their

16  burden as it relates to conditions because I believe that

17  conditions can be fashioned because Pretrial believes that, and

18  so I'm going to give you that opportunity.

19       But if you come back before this Court or a Court in

20  the Central District of California, I can assure you that if it

21  is proven you have violated any of those conditions, there will

22  not be any hesitation to revoke your release and to remand you

23  to custody.  And listen to the conditions because there's going

24  to be some more that are not in the Pretrial report.

25       And I want to ask Pretrial, if we do the monitor travel

1  restrictions, I know Clark County is easier because of the

2  different municipalities, but can we restrict him from the

3  international airport as well?

4       OFFICER MCKILLIP:  Yes, Your Honor.  We can put an

5  exclusion zone around the airport so if he goes into the area of

6  the airport, we will get notified.

7       THE COURT:  And that would be, say, without prior

8  permission.  So that if he with his lawyers say, "We're going to

9  L.A. to appear or we're going to L.A. to work on the case, we'll

10 be in the airport," that's something you can monitor as well?

11      OFFICER MCKILLIP:  Yes, Your Honor, as long as he tells

12 us beforehand.

13      THE COURT:  Right.

14      All right.  I'm going to release you on your personal

15 recognizance, which is just your signature and promise to appear

16 in court and to follow these conditions.  If you do not, that

17 will be revoked and you will be detained.

18      You will have time to go over these conditions with

19 your officer and with your lawyers.  I'm going to go through

20 them somewhat quickly.  If you don't understand everything, you

21 will have time to talk to them and make sure you understand.

22      First, you're to submit to supervision by Pretrial

23 Services.  You should report immediately to their office and

24 follow their direction for supervision.

25      I'm going to allow them to order you to seek

PATRICIA L. GANCI - (702) 385-0670

1  employment.  I have -- you're not going to be able to continue

2  with your consulting business while this case is pending.

3  You're going to have to figure out some other way to conduct

4  business because I'm not going to allow foreign travel.  In

5  fact, I'm not going to allow any travel.  So you need to seek

6  employment that Pretrial approves and that's appropriate while

7  this case is pending.

8          You're to surrender your U.S. passport and your Israeli

9  passport to Pretrial Services immediately.  I believe that the

10 Government took your United States passport.  Mr. Chesnoff has

11 your Israeli passport.  He shall give that to Ms. McKillip upon

12 the conclusion of this hearing.

13         Number four, you shall not obtain a passport or any

14 other international travel documents.  Number five, I'm going to

15 order you that your travel is restricted to Clark County,

16 Nevada.  And the reason I say "Clark County" is it's too

17 difficult if you're in Las Vegas and you cross into Henderson or

18 you cross into North Las Vegas, that could create an issue.  So

19 I'm going to allow the travel in Clark County alone and exclude

20 you from the airport.

21         So if you are in the zone of the airport, and they'll

22 explain the zones, they will be notified immediately.

23 Government counsel may be correct that they can't do anything

24 quickly, but my guess is they will try.  So you are not allowed

25 to go to that airport.

1       You can go to Los Angeles for court appearances in this

2  case and to prepare your case, but for no other reason.  So

3  while this case is pending, you're in Clark County, Nevada.

4       You are to avoid all contact directly or indirectly

5  with any person who is or may be a victim or witness in the

6  investigation or prosecution, and the Government will provide a

7  list to you of who that is.

8       As it relates to the travel restriction, I'm going to

9  order stand-alone monitoring with GPS.  And again, as I've

10  indicated, that will be restricted to Clark County and you will

11  not be allowed to go to the airport.

12       We need a tampering restriction on that, don't we,

13  Ms. McKillip?  I think I might have one.

14       (Pause.)

15       OFFICER MCKILLIP:  Yes, Your Honor.  The defendant

16  shall not tamper with, damage, or remove the monitoring device

17  and shall charge the equipment according to the instructions

18  provided by Pretrial Services.

19       THE COURT:  All right.  And, next, the defendant shall

20  pay all or part of the costs of the location monitoring program

21  based upon his ability to pay as determined by Pretrial Services

22  or the supervising officer.

23       Ms. McKillip, do -- does Pretrial request any

24  additional conditions to address the concerns that have been

25  raised here today?

1    OFFICER MCKILLIP:  No, Your Honor, but just in

2    reference to the condition about not allowed to go to the

3    airport, we would just ask without prior permission just so that

4    he could get there --

5    THE COURT:  Yes.

6    OFFICER MCKILLIP:  -- to California for court.

7    THE COURT:  Yes, without prior permission.  But, again,

8    the airport for that will only be to go to Los Angeles for court

9    appearances, unless you find a need during the course of

10   preparation for the defense that you need to travel somewhere

11   else.  But that will have to be outlined and get Court approval,

12   Mr. Chesnoff.

13   MR. CHESNOFF:  We will file whatever is appropriate,

14   Your Honor.

15   THE COURT:  All right.

16   All right.  Mr. Chesnoff, Mr. Schonfeld, any questions

17   about these conditions?

18   MR. CHESNOFF:  No thank you, Your Honor.

19   THE COURT:  Mr. Smirnov, any questions about these

20   conditions?

21   THE DEFENDANT:  No.

22   THE COURT:  All right.  Anything else from the

23   Government, Mr. Wise?

24   MR. WISE:  Your Honor, we would request -- respectfully

25   request that you stay your order so that the Government can file

1  a motion for review in the court of original jurisdiction in the

2  Central District of California before Judge Wright which we will

3  do promptly.

4        THE COURT:  All right.  That will be denied.

5        Anything else?

6        MR. WISE:  No, Your Honor.

7        THE COURT:  Mr. Chesnoff, anything else?

8        MR. CHESNOFF:  No.  Have a nice afternoon, Your Honor.

9        THE COURT:  All right.  Court will be in recess.

10       MR. SCHONFELD:  Thank you.

11       (Whereupon the proceedings concluded at 4:01 p.m.)

12                          --oOo--

13       I, Patricia L. Ganci, court-approved transcriber, certify

14  that the foregoing is a correct transcript transcribed from the

15  official electronic sound recording of the proceedings in the

16  above-entitled matter.

17

18       /s/ PATRICIA L. GANCI        FEBRUARY 20, 2024
            Patricia L. Ganci                Date
19

20

21

22

23

24

25