```
                    UNITED STATES DISTRICT COURT
                   CENTRAL DISTRICT OF CALIFORNIA
                  (WESTERN DIVISION - LOS ANGELES)



UNITED STATES OF AMERICA,    ) CASE NO: 2:24-cr-00091-ODW-1
                             )
            Plaintiff,       )           CRIMINAL
                             )
    vs.                      )    Los Angeles, California
                             )
ALEXANDER SMIRNOV,           )    Monday, February 26, 2024
                             )
            Defendant.       )    (9:05 a.m. to 9:41 a.m.)


                       STATUS CONFERENCE

           BEFORE THE HONORABLE OTIS D. WRIGHT, II,
                UNITED STATES DISTRICT JUDGE
```

APPEARANCES:              (CONTINUED ON PAGE 2)

For Plaintiff:            AUSA LEO J. WISE
                          AUSA DEREK HINES
                          AUSA SEAN MULRYNE
                          AUSA CHRISTOPHER RIGALI
                          U.S. Department of Justice
                          Ofc. of Special Counsel David C. Weiss
                          950 Pennsylvania Ave. NW, Room B-200
                          Washington, DC 20530

For Defendant:            RICHARD A. SCHONFELD, ESQ.
                          DAVID Z. CHESNOFF, ESQ.
                          Chesnoff & Schonfeld
                          520 South 4th St.
                          Las Vegas, NV 89101

Court Reporter:           Recorded; CourtSmart

Courtroom Deputy:         Sheila English

Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 8365
                          Corpus Christi, TX 78468
                          361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES:**                    (CONTINUED)


For Defendant:              NASER J. KHOURY, ESQ.
                            14427 Sylvan Street
                            Van Nuys, CA 91401

Also present:               MARK BRYNE, ESQ.

3

```
 1        Los Angeles, California; Monday, February 26, 2024; 9:05 a.m.

 2                        (Call to Order)

 3             THE CLERK:  Calling Item 1, CR 24-91, United States

 4   of America versus Alexander Smirnov.

 5             Counsel, may I have your appearances please?

 6             MR. WISE:  Good morning, Your Honor.  Leo Wise, Derek

 7   Hines, Sean Mulryne and Christopher Rigali for the United

 8   States.

 9             THE COURT:  Gentlemen, good morning.

10             ALL:  Good morning, Your Honor.

11             MR. SCHONFELD:  Good morning, Your Honor.  Richard

12   Schonfeld appearing on behalf of the defendant, Alexander

13   Smirnov.  My partner, David Chesnoff, is also appearing.  He

14   has submitted an application to appear in this case pro hac

15   vice.  We also have local counsel, Naser Khoury, present; and

16   substituting local counsel, if the Court permits it, Mark

17   Bryne, present.

18             THE COURT:  Good morning, gentlemen.

19             ALL:  Good morning.

20             THE COURT:  Good morning to you-all.

21             All right.

22        (Pause)

23             We've got a fairly busy calendar this morning so I

24   want to be as efficient with our time as possible.  The good

25   looking gentleman sitting next to me is Judge Michael Wilner of
```

4

1    the Central District of California.

2        **(Pause; Court and Clerk confer)**

3            All right.  Mr. Smirnov, I am going to assume, sir,

4    that you have received the form upon which are listed all of

5    your various rights, you know, your right to counsel and to

6    have counsel appointed for you and all of the constitutional

7    rights, the rights that you have to be -- to insist on being

8    charged by an indictment -- and I think that is what has

9    occurred here.  You are entitled to plead not guilty to any

10   offense and to persist in that plea.  You are entitled to a

11   jury trial; and if you and the Government both waive your right

12   to a jury trial, you have the right to be tried by the Court.

13           Any of this sounding familiar at all?

14           **THE DEFENDANT:**  Yes, Your Honor.

15           **THE COURT:**  All right.  And I also have a form here

16   signed by your lawyer and a symbol, something like Prince I

17   suppose would have done, which is an over-the-line marked

18   signature of the Defendant.  You recall signing --

19           **THE DEFENDANT:**  Yes.

20           **THE COURT:**  -- this form sir?  Okay.

21           More importantly, have you spoken with your attorney

22   about your various rights?

23           **THE DEFENDANT:**  Yes, Your Honor.

24           **THE COURT:**  Did you all have a discussion about that?

25           **THE DEFENDANT:**  Yes, Your Honor.

1          **THE COURT:**  Okay.  Do you have any questions of the

2     Court regarding any of your rights?

3          **THE DEFENDANT:**  No, Your Honor.

4          **THE COURT:**  All right.  Have you seen the indictment?

5     It is longer than it needs to be because it's got all kinds of

6     little copies of things, screenshots, et cetera.  Have you seen

7     it, sir?  It's a total of 37 pages.  Have you seen it?

8          **THE DEFENDANT:**  Yes, Your Honor.

9          **THE COURT:**  You have the right to have this

10    indictment read to you at this time.  Would you like it read to

11    you or do you give up that right?

12         **THE DEFENDANT:**  No, thank you, Your Honor.

13         **THE COURT:**  Okay.  All right.  You've indicated that

14    you have received copies of the indictment and your statement

15    of rights, your both statutory and your constitutional rights.

16         **THE DEFENDANT:**  Yes, sir.

17         **THE COURT:**  I don't see that you have signed that

18    document so we're going to take care of that.  Yes, here it is,

19    wait a minute.  And it's signed, yes, all right, good.

20         Do you have any questions at all, sir, about any of

21    your statutory or constitutional rights?

22         **THE DEFENDANT:**  No, Your Honor.

23         **THE COURT:**  All right.  Then I'll tell you what we'll

24    do then.  Let me get a response from you.

25         Is your true and correct name, sir, Alexander

1    Smirnov, as stated on the indictment?

2            **THE DEFENDANT:** Yes, Your Honor.

3            **THE COURT:** Okay. Is there anything at all that you

4    would like me to further explain to you? Anything at all?

5    You've got an awful lot of legal horsepower over there. It's

6    certainly fine for you to rely on that but if there's any

7    questions that you have of me --

8            **THE DEFENDANT:** No, Your Honor.

9            **THE COURT:** None at all. All right. Then let's talk

10   about what we're all here for.

11           A lot of words have been spent over this past week

12   about the issue of your release or conditions of release or if

13   I believe that we can establish conditions or combinations of

14   conditions which will assure that you will show up for trial.

15   I am concerned. And I've seen all of the papers and I will

16   entertain further discussion now if counsel wish but just to

17   let you know what I'm thinking, I'm not satisfied that there

18   are conditions or combinations of conditions which will

19   establish or satisfy my concern as to whether or not you will

20   not flee the jurisdiction. Hang on.

21           **(Pause)**

22           Back to the two-count indictment charging making a

23   false statement and creating a fictitious or a false record. I

24   believe your plea has already been taken in the District Court

25   of Nevada but indulge me.

1          How do you plead to the First Count of the Indictment

2     charging a violation of Title 18, United States Code, Section

3     1001, *Making a False Statement*.  How do you plead to that, sir?

4          **THE DEFENDANT:**  Not guilty, Your Honor.

5          **THE COURT:**  How do you plead to Count Two, a

6     violation of Title 18, United States Code, Section 1519,

7     *Creating a False or a Fictitious Record*.  How do you plead?

8          **THE DEFENDANT:**  Not guilty, Your Honor.

9          **THE COURT:**  I am concerned about what appears to me

10    to be a habit or practice of making false statements and I take

11    no comfort in assurances that you may offer that you will not

12    attempt to flee the jurisdiction but I will hear from your

13    lawyers.  I've read the papers and I saw the transcript of the

14    proceedings, the Detention Hearing in Vegas.  But if anyone

15    wishes to expand upon what is already before the Court, I will

16    entertain it.

17         **MR. CHESNOFF:**  May it please the Court, Your Honor?

18         **THE COURT:**  Yes?

19         **MR. CHESNOFF:**  David Chesnoff, Your Honor.  I do not

20    want to speak without the Court first admitting me pro hoc vice

21    out of respect to the Court.  I've applied, I provided --

22         **THE COURT:**  I haven't seen it.  Let's deal with one

23    thing at a time.

24         **MR. CHESNOFF:**  Okay.  May I proceed then?

25         **THE COURT:**  Yes, please.

1          **MR. CHESNOFF:**  Thank you.  Thank you, Your Honor.

2          Your Honor, when the <u>Bail Reform Act</u> was enacted,

3   Congress instituted various protections to make sure that only

4   a small discreet group of people were to be detained.  That

5   would be people who had a history of fleeing or a history of

6   violence or long criminal records.

7          In the instant case, Your Honor, our client has never

8   been convicted of a crime.  He has worked with the United

9   States Government for at least a decade.  There have never been

10  any accusations of false statements attributed to him in all

11  the years that he served the United States Government,

12  particularly with respect to providing intelligence for both

13  the FBI and the military.  And so right now, Your Honor, the

14  only false statements that we're concerned with are the ones in

15  the indictment; and of course, Your Honor, that has not been

16  tried to a jury or before Your Honor so there's been no

17  finding.

18         Your Honor, the <u>Bail Reform Act</u> talks about cases

19  where there's a presumption of a fear of flight and one where

20  there isn't.  This is not a presumption case.  This is a case

21  where the Court is asked by the Ninth Circuit through *Motamedi*

22  and its progeny to shape conditions to ensure that the

23  defendant appear.

24         The guidelines on this case, Your Honor, after

25  conviction, at a minimum or a probability, would be 20 months;

1   at the maximum, 36 months.  The penalty for bail jumping is

2   higher than the penalties for this particular case.

3         In the courtroom today, Your Honor, are a woman who's

4   been his significant other for 20 years and I'd ask her to

5   stand so the Court can see her.  She was in court in Las Vegas.

6   She lives with the Defendant.  He was with her for the period

7   of time where the Nevada judge allowed him out.  He left his

8   home which is about 20 minutes from our office on his first day

9   of freedom.  He came to our office to work and was subsequently

10  returned to Los Angeles.  She is happy to have him with her.

11  They've been together for all these years.  And in fact, Your

12  Honor, we submitted a supplement this morning where she has

13  been willing to tell Your Honor that she would expect third-

14  party custody of him, understanding that the Court could direct

15  her to basically call Pretrial, call the Court if he did

16  anything to deviate from any of the conditions that you set.

17        In addition in the courtroom, Your Honor, is a cousin

18  of his who appeared from -- came from Miami to Nevada, went

19  back to Miami when he got released and came back here when he

20  got arrested because she's known him her whole life and she's a

21  very reputable citizen with a long real estate career who also

22  vouches for him.

23        In our pleadings, Your Honor, we attached a letter

24  from the son of Diana, the woman willing to be third-party

25  custodian, who honorably served this country as a sergeant in

1    the United States Marine Corps.  He lived with the Defendant.

2    He's written to Your Honor that he's known him for all these

3    years and based on his experience with him, Your Honor, he

4    would not disrespect this Court.

5           Your Honor, the Defendant has met with us at our

6    office.  He just pled not guilty.  He intends to vigorously

7    defend these allegations having never been in trouble his

8    entire life.

9           Your Honor, he has no history of flight.  He's always

10   worked in some capacity, either for the Government or for his

11   own business which is a financial business with investors and

12   partners.  He has --

13          Oh, important thing I want to point out to Your

14   Honor.

15          The other day the Government represented that they

16   were concerned that even though he's turned in his Israeli

17   passport and his American passport that he could go to the U.S.

18   consulate and get another Israeli passport.  I took it upon

19   myself, Your Honor, to speak to Ziv Bilaus who is the consular

20   for the Consular Affairs for the Israeli Embassy in Los Angeles

21   who informed me that if Your Honor were to direct

22   correspondence to the Israeli consulate asking the Israeli

23   government not to issue him any new passports at any other

24   consular facilities, at any other embassies, that can be done.

25          I would also point out, Your Honor, that putting in

11

1    strict travel restrictions, you could have monitoring.  They

2    have geographic monitoring.  All of these things are regularly

3    used in cases where a judge may have had concern that the

4    person is going to leave but they're used all the time.  And

5    there's nothing unusual about it and especially in a case where

6    there is not a presumption of flight.

7            I respectfully point out to you the following Your

8    Honor:  Both Pretrial officers, entrusted with giving their

9    best opinion to Article III judges, have both said that he can

10   have conditions that will work.

11           This is going to be a interesting and complicated

12   case, Your Honor, where we have a Defendant who is going to

13   need to be able to assist us in defending him by contacting

14   people in different parts of the world by phone, by computer.

15   More importantly, there are language differences.  He's fluent

16   in English, he's fluent in Russian.  He can speak and

17   communicate with people that can assist us in refuting the

18   allegations that have been made against him.

19           Yesterday morning I got here about 8:00 in the

20   morning and I went to visit him at the MDC.  He is not in

21   regular population as a result in large part to what the Court

22   said was a lot of things in an indictment that probably didn't

23   need to be there, exposing the people that run the MDC to

24   concerns for him because of the things that were said -- I'm

25   drawing that conclusion -- in the indictment.

1              So he's in basically what's called "the shoe".  He's

2      isolated.  He only has access to a phone once or twice a week.

3      The ability to work with us on a case that's going to have

4      voluminous documents is going to be limited.  So I'm asking

5      you, Your Honor, so that he gets a fair trial -- which we know

6      he will get in this courtroom -- he has to be able to help us.

7              So having him released under electronic monitoring at

8      his home in Las Vegas close to his office so he can work with

9      us is one solution; or Your Honor, he would, through his

10     friends and family, rent another place here in Los Angeles to

11     reside if that's what the Court thinks is safer.

12             And this electronic monitoring that limits people

13     from going to airports works.  It's been used for some -- some

14     of the most notorious people.

15             One final thing I would add, Your Honor --

16             **THE COURT:**  Before you -- I said I wasn't going to

17     interrupt you --

18             **MR. CHESNOFF:**  No prob -- thank you.

19             **THE COURT:**  -- but I can't help myself sometimes.

20             The electronic monitoring that you're referring to is

21     the one that's generally strapped to your ankle?

22             **MR. CHESNOFF:**  Yes, Your Honor.

23             **THE COURT:**  With a plastic strap?

24             **MR. CHESNOFF:**  I'm not -- I don't know the physics of

25     it, Your Honor --

13

1          **THE COURT:**  I do.

2          **MR. CHESNOFF:**  Okay, I understand and it could be cut

3     off.  I'm --

4          **THE COURT:**  Yes, it can be.

5          **MR. CHESNOFF:**  But Your Honor, it's regularly used

6     throughout the federal courts in the United States and in this

7     instance it worked.  You know how I know it worked, Your Honor?

8     Because when he left his home to come work at his office when

9     he was free, they were able to track him to my office where

10    they arrested him.  So the device works.

11          I understand the Court's concern.  And based on the

12    rendition that the Government gave you, I appreciate your

13    concern.  But I believe Your Honor can recognize -- and the

14    magistrate judge as well from his own experience -- that the

15    conditions that we are offering are the strictest conditions

16    that can be imposed, especially in a non-presumption case where

17    the penalties for the crime are so limited.  This would be a

18    very, very unique situation where someone similarly situated to

19    Mr. Smirnov would not get out.  And so far we've had two

20    federal Pretrial offices, both entrusted with giving their best

21    advice to the Court, both say that he should be released.  And

22    the conditions that they recommend, Your Honor, are less than

23    the ones we're now offering you because we so badly want him to

24    be out so we can fight this case, Your Honor.

25          **THE COURT:**  One of those Pretrial offices has not

14

1  interviewed your client.

2      **(Pause; Counsel confers)**

3          **MR. CHESNOFF:**  Oh, I was not aware of that, Your

4  Honor.  All I got was a report, I --

5          **THE COURT:**  It's all right.

6          **MR. CHESNOFF:**  Yeah.

7          **THE COURT:**  All right.  I won't interrupt anymore.

8          **MR. CHESNOFF:**  No, no, that's fine.

9          **THE COURT:**  But these are things that scrambled

10  around in my mind.  As you're speaking I'm thinking, okay, just

11  how much is that worth?

12          **MR. CHESNOFF:**  Well I appreciate that, Your Honor.

13  And the last thing I would add to you is there's a couple of

14  more points.

15      **(Pause; Counsel confers)**

16          **THE COURT:**  Okay.

17          **MR. CHESNOFF:**  Okay.  The first full day he was out,

18  he worked with us.  The second full day he was out, he worked

19  with us and that's when he got arrested.  But Your Honor, he

20  retained us -- and without going into detail on that -- with a

21  significant legal fee which bespeaks the fact that someone who

22  is going to flee is not going to give lawyers money and then

23  take off and squander the money.

24          **THE COURT:**  Unless it's not your money.

25          **MR. CHESNOFF:**  Sorry?

15

1          **THE COURT:**  Never mind.

2          **MR. CHESNOFF:**  No, I heard you.  It is his money

3    but --

4          **THE COURT:**  Okay.

5          **MR. CHESNOFF:**  -- that's -- I point that out to you,

6    Your Honor.

7          The final thing I would say to you is this:  There

8    were no misstatements about his finances.

9          We interviewed the Pretrial Officer in Las Vegas.  We

10   put it on the record in front of the magistrate.  She simply

11   asked him about his personal holdings, not his business

12   holdings.  The magistrate acknowledged that, one, it was done

13   quickly; two, he had no counsel with him; three, there was a

14   language issue; and four, the Pretrial Officer who interviewed

15   him was in court, it was not refuted in any way and the

16   magistrate accepted the representation.

17         The last thing I'll say is this, Your Honor.

18         If the Court wants, we will hire private security to

19   monitor his 24 hours a day where he is.  That's how important

20   it is that he be out so he can work with us, Your Honor.  And

21   he would do that at his expense and it's been done in other

22   cases.  I think the Bernie Madoff who ripped off most of

23   America and half of Europe, he was allowed to do that.

24         This is an isolated case.  I remind the Court he gave

25   10 years of service to the United States.  And it's now only

16

1    argued by the Government that he made a false statement about

2    facts that occurred seven years ago which will be a highly

3    contested part of his trial.

4            I appreciate the opportunity to be heard by you and

5    thank you very much, Your Honor.

6            **THE COURT:**  Thank you, sir.

7            **MR. CHESNOFF:**  Oh, I'm sorry, my partner reminded me

8    one last thing.

9            He has a very serious eye condition.  He's undergone

10   multiple surgeries, he has another surgery scheduled.  He takes

11   daily medication.  And so another reason to need him out so

12   that -- because he's not going to get the type of eye treatment

13   he needs within the Bureau of Prisons MDC -- is so that he can

14   visit his doctor and get the procedures he need because

15   obviously we need him to maintain his sight while we go through

16   this process.  Thank you.

17           **MR. WISE:**  Good morning, Your Honor.  Just briefly

18   I'll address some of the points that Counsel has made.

19           **THE COURT:**  You're from DOJ?

20           **MR. WISE:**  I am, Your Honor.

21           **THE COURT:**  I'm surprised.

22           **MR. WISE:**  Why is that?

23           **THE COURT:**  I'll tell you later.

24           **MR. WISE:**  Okay (chuckles).

25           Your Honor, I'll move perhaps in the order that -- or

1    reverse order from some of the points Counsel made.

2          He said that the misstatements that the Defendant

3    made were from seven years ago.  Well we know that's not

4    accurate.

5          In September he was peddling a new story, new lies

6    about a hotel in Kiev where supposedly Hunter Biden was

7    recorded making calls to his father.  This was a new

8    disinformation story that's just a few months old that he

9    admits came from Russian intelligence.  So it is not the case

10   that these are statements that were made seven years ago.  And

11   while it's correct that he was a source for many years, he

12   clearly betrayed that trust.

13         Now, Mr. -- Counsel said that there are similarly --

14   he referred to similarly situated defendants to Mr. Smirnov.

15   Well it is our submission based on the facts before this Court

16   that there are not similarly situated defendants to Mr. Smirnov

17   for two principal reasons.  One, his contacts with foreign

18   intelligence; and two, his access to more than six million

19   dollars that he did not disclose.

20         Counsel, began his presentation talking about

21   Ms. Lavrinyok (phonetic) acting as a third-party custodian.  I

22   will note that in the interview that was done with her by

23   Pretrial Services here, she apparently doesn't know how much

24   money she has in this account.  That's what it says in the

25   report.  She survives on a savings account, amount unknown, and

1    fully owns her own apartment.  But we know how much is in that

2    account.  As of February 20th, the day of the detention

3    hearing, it was 3.7 million dollars.  So the question is, how

4    could someone who doesn't know they have access to 3.7 million

5    dollars be asked to act as a third-party custodian?

6          Further in the report it indicates that both Defense

7    Counsel and the individual that was pointed out from Florida

8    say that she doesn't handle the bills.  Well we also know that

9    that account is used to pay Mr. Smirnov's bills.  For instance,

10   more than 108,000 in CitiCard credit card payments in 2022 and

11   more than 275,000 in 2023.  So either she is paying the bills

12   but is -- did not disclose that, or he's using the account or

13   some other third party is using the account.  So she certainly

14   does not present a suitable third-party custodian.

15         Defense Counsel made much of the fact that he was

16   arrested at their law office.  That was done because he had

17   nine firearms, including an assault-styled weapon in his home

18   and so law enforcement chose a safe location in which to

19   contact him.

20         We hear -- we've heard two conflicting accounts of

21   what he does for a living.  Defense Counsel said he's in the

22   financial business while Mr. Smirnov told Pretrial that he was

23   in the security business.  And the accounts we've seen don't

24   support either.

25         Defense Counsel points to both Pretrial Service

19

 1   reports recommending conditions.  Neither Pretrial Service

 2   Office had access to the information that was submitted to the

 3   magistrate court or to Your Honor.  Those reports were prepared

 4   before those reports were delivered, specifically the contacts

 5   with foreign intelligence; and second, the amount of money he

 6   had access to.  Obviously he did not disclose that.

 7          Now, Counsel says well there was some confusion.

 8   Well there's no evidence of any confusion.  While the Pretrial

 9   Services Officer said she did ask for personal funds, these

10   accounts that we've pointed to, the account that had almost

11   three million dollars in his -- that he has access to in the

12   name of Avalon Group and the 3.7 million that Ms. Lavrinyok has

13   access to, are used as personal accounts.  They bought -- the

14   home they live in was purchased out of those accounts, the

15   credit card payments they make are out of those accounts, large

16   volumes of cash are taken out of those accounts.  So there's no

17   question that those are personal accounts.

18          And instead, what he told Pretrial was he had $6500

19   in personal -- in a personal account.  Well there is no such

20   account that has that amount of money in it.  The nearest thing

21   we found was the single personal checking account that had a

22   balance in the hundreds that appear to be used to pay a

23   recurring charge to a small life insurance policy.  So even

24   what he disclosed as a personal account was inaccurate.

25          Nor did he accurately disclose his expenses.  He

1    claimed a few thousand dollars a month in expenses when we know

2    from the credit card payments that he has hundreds of thousands

3    of dollars in personal expenses every year.

4            So all of that goes to the point that he cannot be

5    trusted to provide truthful information to Pretrial Services.

6    He has demonstrated that, putting aside the charges in the

7    indictment which clearly point out that he cannot be trusted to

8    provide information even to someone to whom he has a multi-year

9    very close relationship; again, based on trust.

10           Lastly, Counsel spent a good deal of his argument

11   talking about the need for Mr. Smirnov to help counsel assist

12   in his representation.  That of course is not a factor under

13   the Bail Reform Act that augers either for or against detention

14   or release.

15           But I will point out that Counsel says this is going

16   to be a case that has voluminous documents.  It is not.  This

17   is a fairly straightforward matter.  The Defendant claimed

18   meetings that didn't happen.  There are not voluminous

19   documents that demonstrate a meeting didn't happen or meetings

20   didn't happen.

21           The records are fairly clear -- his own emails, text

22   messages, travel records from himself and the people he claim

23   to participate -- that he made it all up.  That's not a

24   voluminous case.  This isn't a securities fraud case like

25   Madoff where there were millions of documents.  It's a fairly

1   discrete set of documents.

2          Counsel also says that he will be contacting people

3   in different parts of the world.  Well that of course wasn't

4   even allowed under the conditions that were set by the

5   magistrate judge.  The magistrate judge imposed the condition

6   that he had no contact, direct or indirect, with any witness in

7   the investigation or prosecution.  So they're not going to be

8   able to have him contacting witnesses in this case.  He can

9   obviously point them to witnesses but they're going to have to

10  contact them themselves and they're going to have to hire

11  translators just like in any case.  That's a standard condition

12  that applies.

13         Your Honor, I'm not going to repeat what we included

14  in our motion.  The factors that they're actually under

15  consideration clearly demonstrate that there are no conditions

16  or set of conditions that can reasonably assure the appearance

17  of the Defendant.  Those are laid out under 3142(g).  They are

18  the nature and circumstances of the offense, that this is an

19  offense based on a violation of trust which is precisely before

20  the Court.

21         The weight of the evidence which is strong based on

22  the voluminous indictment that includes much of that evidence

23  to make it abundantly clear what the evidence against the

24  Defendant is; and then of course his history and

25  characteristics.  The fact that he has little to no ties to Las

1    Vegas, no job, no home, no real family.  All of those

2    connections are overseas.  And more extraordinarily, these

3    self-professed contacts with foreign intelligence and access to

4    a vast sum of money that he failed to disclosed.

5            So for all those reasons, the Defendant should be

6    detained.

7            **THE COURT:**  Thank you.

8            **MR. CHESNOFF:**  Just briefly, Your Honor.

9            **THE COURT:**  Yes.

10            **MR. CHESNOFF:**  It's a catch-22, Your Honor.  He has

11    connections with foreign agents or foreign representatives at

12    the direction of the Government.  That's what he was doing for

13    them.  They had him do that.  So to suggest that he has some

14    nefarious contacts with foreign agents when in fact any

15    contacts he had was in order to accomplish the work that the

16    Government asked him to accomplish, not just the FBI but

17    apparently there are, as the case develops, contacts with the

18    Department of Defense as well.

19            So it's really unfair to him to say you shouldn't let

20    him out because he has foreign contacts when in fact he had the

21    foreign contacts as a result of their use of him.  And now

22    they've of course kind of thrown him to the wolves in that

23    regard, Your Honor.  As far as --

24            **THE COURT:**  All of his foreign contacts are or were

25    at the behest of the Government?

1        **MR. CHESNOFF:**  I wouldn't represent that to you, Your

2    Honor, because he obviously knows people in different places

3    and that's what's made him valuable, his ability to know

4    people.  So but I would not suggest that everybody that he

5    knows overseas is as a result of his contacts with the

6    Government.

7            As far as the financial issue, Your Honor, courts

8    routinely put restrictions through magistrate judges or

9    district court judges on the ability of a client or a defendant

10   to utilize funds.  I've been in situations where Pretrial has

11   to be approved transactions.  They have to tell you whether or

12   not you can make a financial transaction.  That could be

13   imposed by the Court.  I mean there are just so many things

14   that the Court can impose that he's willing to do to assure you

15   so that he can defend himself.

16           The Government is connect that in the <u>Bail Reform Act</u>

17   it doesn't talk about the right to defend yourself but you've

18   just heard that the Government doesn't think he should be

19   allowed to speak to any witnesses.  We of course when we

20   litigate this will say that there are witnesses that are not

21   hostile witnesses that he should be able to talk to.

22           There's a case in -- an old case in the Ninth

23   Circuit, U.S. v. Kinney (phonetic), in which the Ninth Circuit

24   said the fact that the defendant came from a particular culture

25   and his lawyer didn't, that the defendant needed to be released

24

1    from custody in order to assist his lawyer because witnesses

2    wouldn't talk to the lawyer without either the approval or the

3    assistance of the client.  That's Ninth Circuit law.

4           I'm asking you, Your Honor, this is not the

5    circumstance.  He was out, Your Honor.  And if he had been

6    given the chance, most respectfully, he would have been here

7    with us this morning voluntarily.  He didn't try to run, he

8    didn't try to move the money.  All he did was get out, go home,

9    take a shower and get ready to work on the case.

10          And so he should not be treated differently which is

11   what my learned cocounsel just said, that he's different.  He's

12   not different.  He's the same as every defendant that comes in

13   front of you where a learned judge evaluates it and reaches a

14   conclusion.

15          I really implore you, Your Honor, to allow us to

16   defend this case with him out with restrictions.  He will -- as

17   the magistrate judge in Nevada said, "Please don't disappoint

18   me," and he said he wouldn't, the same applies here, Your

19   Honor.  And I mean it.

20          **THE COURT:**  I know.  I wish that's all it took.

21   "Please don't disappoint me."

22          I'm not going to get into this.  I've read everyone's

23   papers, I understand the arguments.

24          One of the things that I haven't been able to quite

25   understand is the disparity in the money that's coming in -- I

EXCEPTIONAL REPORTING SERVICES, INC

1   believe that was $10,000 a month -- and the money that's going

2   on.  And you haven't brought it up, I'm not asking you

3   directly.  I'm just going to let it go but it's just one of

4   those things, one of those unresolved things and there's a

5   whole lot of them and I will make this one comment.

6           There is nothing garden variety about this case.  To

7   compare this to all the cases that we normally see, this is an

8   outlier.  Okay?  So ...

9           All right.  I have not changed my mind.  This man

10  will be remanded pending trial.

11          Deputies?

12          By the way, under Federal Rule of Criminal Procedure

13  5(f), the Government is ordered to comply with its disclosure

14  obligations under Brady versus Maryland and related cases.

15  Failure to do so may result in sanctions.  And a written order

16  to this effect will follow.

17          **MR. WISE:**  Thank you, Your Honor.

18          **THE COURT:**  Thank you, gentlemen.

19          **MR. CHESNOFF:**  Your Honor, may I ask you one

20  question?

21          **THE COURT:**  Yes.

22          **MR. CHESNOFF:**  We have some eye medication that he

23  needs.  Should I discuss that with the marshals?

24          **THE COURT:**  Let's go off the record.

25          **MR. CHESNOFF:**  Thank you.

(Off the record at 9:41 a.m.; proceeding adjourned)

**CERTIFICATION**

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                         **February 27, 2024**
         Signed                                            Dated


*TONI HUDSON, TRANSCRIBER*