DAVID C. WEISS
Special Counsel
LEO J. WISE
Principal Senior Assistant Special Counsel
DEREK E. HINES
Senior Assistant Special Counsel
SEAN F. MULRYNE
CHRISTOPHER M. RIGALI
Assistant Special Counsels
    950 Pennsylvania Avenue NW, Room B-200
    Washington, D.C. 20530
    Telephone: (771) 217-6090
    E-mail:    LJW@usdoj.gov, DEH@usdoj.gov
    E-mail:    SFM@usdoj.gov; CMR@usdoj.gov
    Attorneys for the United States

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>ALEXANDER SMIRNOV,<br><br>    Defendant. | No. CR 2:24-cr-00091-ODW<br><br>GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S SECOND *EX PARTE* APPLICATION FOR A CONTINUANCE OF TRIAL |

    The United States of America, by and through its counsel of record, hereby submits this response in opposition to the defendant Alexander Smirnov's second *ex parte* application asking the Court to consider a motion for another continuance. ECF No. 159.

    This opposition is based upon the attached memorandum of points and authorities, the Declaration of Derek E. Hines, the filings and records in this case, and any further argument as the Court may deem necessary.

Dated: November 5, 2024

Respectfully submitted,

DAVID C. WEISS
Special Counsel

/s/

LEO J. WISE
Principal Senior Assistant Special Counsel

DEREK E. HINES
Senior Assistant Special Counsel

SEAN F. MULRYNE
CHRISTOPHER M. RIGALI
Assistant Special Counsels

United States Department of Justice

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

On November 4, 2024, the defendant made his third request for a continuance when he filed his Second *Ex Parte* Motion to Continue Trial Date ("Motion"), ECF 159. *See also* ECF 64, 132. The Motion is meritless. The defendant falsely claims, without any support, that he only recently received reports that contain *Brady* material. He did not. The proof that his claim is false is that his Motion does not attach as an exhibit a single report that purportedly contains *Brady* material. Tellingly, in his own motion, the defendant contradicts himself—on the one hand he claims that the reports contain *Brady*, but on the other hand he asserts he has not had time to review the reports, so a continuance is warranted. Put another way, if he hasn't reviewed the reports he doesn't know and can't know that they contain *Brady*. And they don't. Out of an abundance of caution, the government is treating these reports, for the sake of argument, as Jencks material for the defendant's Handling Agent, who authored them and will testify at trial. The government chose to produce them now six (6) weeks earlier than the Jencks deadline in an effort to avoid wasting the Court's time and judicial resources.

Defense counsel's claim that they need a four-month continuance to review the reports is baseless. One attorney for the government reviewed these reports in less than four hours. The defendant claims his four lawyers need 120 days to do the same task. Rather than having any of his four retained lawyers review the reports, he instead filed this Motion trying to revive his request for a trial continuance, which was denied by the Court, and has now filed a further baseless motion to dismiss the charges, which also does not include a single exhibit containing any alleged *Brady* material. ECF 137, 162. Because none of the reports the defendant complains about contain *Brady* material, and because he has failed to meet the *ex parte* standard and failed to show cause for a continuance, the Motion should be denied.

## II. FACTUAL BACKGROUND

The defendant was indicted for making false statements to federal law enforcement, in violation of 18 U.S.C. § 1001 (Count One), and for causing the creation of a false record in a federal investigation, in violation of 18 U.S.C. § 1519 (Count Two). ECF 1. The charges are based on false derogatory information that he provided in June 2020 to the Federal Bureau of Investigation about Public Official 1, an elected official in the Obama-Biden Administration who left office in January 2017, and Businessperson 1, the son of Public Official 1. He provided this information in June 2020 about supposed conversations that he had years earlier only after Public Official 1 became a candidate for President of the United States.

Specifically, the Indictment alleges that in June 2020, the defendant reported to his FBI handler, for the first time, two meetings that occurred in 2015 and/or 2016, during the Obama-Biden Administration, in which he claimed Burisma executives admitted to him that they hired Businessperson 1 to "protect us, through his dad, from all kinds of problems," and later that they had paid $5 million each to Public Official 1 and Businessperson 1, when Public Official 1 was still in office, so that "[Businessperson 1] will take care of all those issues through his dad," referring to a criminal investigation being conducted by the then-Ukrainian Prosecutor General into Burisma and to "deal with [the then-Ukrainian Prosecutor General]." ECF No. 1 (Indictment) ¶¶ 6(b), 24, 26. The defendant also told his FBI handler about "two purported phone calls between himself and Burisma Official 1 wherein Burisma Official 1 stated that he had been forced to pay Public Official 1 and Businessperson 1 and that it would take investigators 10 years to find records of illicit payments to Public Official 1." *Id*. ¶¶ 6(c), 24, 35. Prior to those statements, the defendant had expressed bias against Public Official 1 in a series of messages exchanged between himself and his handler. *See id*. ¶¶ 8–21.

The Indictment alleges that the defendant knew that his statements about the purported bribery payments were false (based on the defendant's communications and

2

travel records which contradict his claims, among other evidence), and that the defendant did not have contacts with Burisma officials until the year 2017, "after the end of the Obama-Biden Administration and after the then-Ukrainian Prosecutor General had been fired in February 2016, in other words, when Public Official 1 had no ability to influence U.S. policy and when the Prosecutor General was no longer in office." *Id*. ¶ 6(d); *see also id*. ¶ 25 (timing of payments according to the defendant), *id*. ¶¶ 29–32. The Indictment further alleges that specific meetings and conversations claimed by the defendant, including the purported bribery admissions made by Burisma officials, did not occur. *See id*. ¶ 31 (no statements made by Burisma Official 2 during meeting at Burisma's headquarters regarding the hiring of Businessperson 1 to "protect us, through his dad, from all kinds of problems"); *id*. ¶¶ 33, 36 (no calls or meetings between Associate 1 and Burisma Official 1); *id*. ¶ 34 (no travel to Vienna by the defendant during relevant period).

On October 16, 2024, the defendant filed a motion to compel the production of certain discovery, ECF 139, which is meritless for the reasons explained in the government's opposition, ECF 141. He requested FBI reports that predate and postdate the allegations in this case and that, in any event, contain no mention of Burisma or Public Official 1 or Businessperson 1. In an effort to resolve the dispute and avoid wasting the Court's time, the government elected to treat these reports as Jencks material for the Defendant's Handling Agent, who will testify at trial, and further elected to produce these reports on October 25, 2024, rather than waiting to disclose the discovery with the other Jencks materials one week before trial as the government previously advised it would do (and which the defendant did not object to). Hines Decl. at ¶ 2. This production included approximately 420 FBI FD-1023 reports, called "1023s," which included statements that the defendant made to his Handling Agent over the course of their 13-year relationship. None of these reports mention Burisma or Public Official 1 or Businessperson 1. The reports are not exculpatory, because they show that between 2010 and 2023, the defendant never reported on Burisma, Businessperson 1, or Public Official 1, other than as alleged

1 | in the 2017 and 2020 reports cited in the Indictment, which were produced to the defendant in April 2024.

Hypothetically, an exculpatory report could have included, for example, statements in which the defendant told his Handling Agent in 2015, 2016, or 2017 about the same conversation he later reported in 2020, which would be contradictory to the allegations in the Indictment. However, no such exculpatory report exists. That is because, as alleged in the Indictment, the defendant fabricated his claims in 2020 and never met with Burisma executives prior to 2017, as he falsely claimed. This is further evident because the defendant fails to cite to any such report in his Motion.

Instead, the 420 reports contain only unrelated claims the defendant made to his handling agent over the course of their 13-year relationship, the large majority of which relate to an Armenian organized crime and check-cashing scheme the defendant was involved with primarily from 2011 to 2014. In that vein, the bulk of the reports consist of a brief cover page where the Handling Agent notes that the defendant has provided him with government benefit checks that the defendant received from members of an Armenian organized crime group, followed by pages of photographs of those checks. To be clear, because the defendant never reported on the bribery allegations he claimed in 2020 in prior years, the reports from prior years include nothing exculpatory and, therefore, they are not *Brady* as the defendant wrongly claims. In fact, the absence of this information from the reporting is inculpatory.

Because the defendant failed to attach any of the reports to his Motion, a glaring omission that reveals its frivolousness, the government has attached ten reports to this Motion which fairly represent the type of reporting the defendant made to his handling agent and cover a sample time period in 2011. *See* Exh. 1. The first report provides information about two checks in a check cashing scheme. Exh. 1 at 1. This has nothing to do with the allegations in the Indictment. In the second report, the defendant discloses an arrest that did not involve any of the individuals in this case. Exh. 1 at 2. The third report

4

discloses a bank manager who the defendant claimed was an insider in an illicit financial scheme that has nothing to do with this case. Exh. 1 at 3. In the fourth report, the defendant claims someone is involved in drug dealing, investment fraud, and insurance fraud, but neither that person nor the schemes the Defendant claims that person is involved in has any relationship to anyone or any of the allegations in this case. Exh. 1 at 4. The fifth report is about someone named "Mike" who was purportedly attempting to cash fraudulently obtained checks. Exh. 1 at 5. "Mike" has no relationship whatsoever to this case. The sixth report is of contact information on a business card for a bank manager who has no relation to this Indictment. Exh. 1 at 6. The seventh report describes someone that the defendant claims is a member of the Zetas cartel who is using an Aston Martin to smuggle cocaine from Mexico. Exh. 1 at 8. This is not a drug case. The eighth report relates to someone who obtained either 200 or 300 Green Dot money transfer cards in an illicit federal tax return scheme, which also bears no relationship to this case. Exh. 1 at 9. The ninth report contains an allegation by the defendant that someone stole a half million dollars and paid off Mexican law enforcement officials. Exh. 1 at 10. There is no allegation regarding Mexican law enforcement officials in this case. The tenth report contains information about two checks that are purportedly part of a check cashing scheme. Exh. 1 at 11. This is not a check cashing case. In sum, none of these ten reports, like the other 410 reports, even mention Burisma or Public Official 1 or Businessperson 1.

Contrary to the defendant's categorical claims, none of these reports are exculpatory. Rather, the reports are inculpatory and establish not only that the defendant never told his Handling Agent about the allegations he later told the Handling Agent in 2020, but they also establish the defendant's knowledge that information he provided his Handling Agent was recorded in reports and used in criminal investigations.

Further, reports included in the Exhibit are each 1 or 2 pages in length. Often they don't even fill those one or two pages. This is consistent with most of the other reports in the production. Of the 420 reports, approximately 366 reports are only 1-2 pages in length,

and approximately 47 reports are only 3 to 4 pages in length. Hines Decl. at ¶ 4. There are only approximately 7 reports which are 5 or more pages in length. *Id.* As stated previously, undersigned counsel reviewed all 420 reports in less than four hours and defense counsel should have no difficulty reviewing them in that amount of time either. *Id.* In fact, with four defense lawyers, these reports could be reviewed in an hour. Or reviewed four times over in four hours.

**III. ARGUMENT**

The defendant's motion should be denied for at least three reasons. First, the defendant fails to meet the requirements for *ex parte* relief. Second, the defendant's motion includes false generalized claims that the production he received on October 25, 2024 includes supposes "*Brady*" materials, but that is not true. Third, the defendant fails to meet the requirements for a continuance articulated by the Ninth Circuit.

**A.  Defendant Has Not Met the Standards for *Ex Parte* Relief.**

*Ex parte* applications are solely for extraordinary relief and are rarely justified. *Mission Power Eng'g Co. v. Cont'l Cas. Co.*, 883 F. Supp. 488, 490 (C.D. Cal. 1995). A party filing an *ex parte* application must support its request for emergency relief with "evidence . . . that the moving party's case will be irreparably prejudiced if the underlying motion is heard according to regularly noticed motion procedures," and a showing "that the moving party is without fault in creating the crisis that requires ex parte relief, or that the crisis occurred as a result of excusable neglect." *Id*. at 492. As described in *Mission Power*:

> The purpose of the first part of the ex parte motion papers is to establish why the accompanying proposed motion for the ultimate relief requested cannot be calendared in the usual manner. In other words, it must show why the moving party should be allowed to go to the head of the line in front of all other litigants and receive special treatment… To show irreparable prejudice, it will usually be necessary to refer to the merits of the accompanying

6

> proposed motion, because if it is meritless, failure to hear it cannot be prejudicial. A sliding scale is used to measure the threat of prejudice. If the threatened prejudice would not be severe, then it must be apparent that the underlying motion has a high likelihood of success on the merits. If drastic harm is threatened, then it is sufficient to show that there are close issues that justify the court's review before the party suffers the harm.

*Id*.

The defendant does not meet the *ex parte* standard because he presents no evidence that his case will be irreparably prejudiced if his motion for a second continuance is not heard according to regularly noticed motion procedures. He has six (6) weeks to review the Jencks material that was produced early on October 25, 2024. Further, the Defendant cannot show "that [he] is without fault in creating the crisis that requires ex parte relief," as *Mission Power* requires. In April 2024, the government advised the defendant that it would provide Jencks materials one week before trial and the defendant did not object. He cannot now claim he is prejudiced by receiving Jencks material six (6) weeks before that deadline.

The defendant also does not meet the requirements to show excusable neglect. Courts consider four factors in the excusable neglect inquiry: (1) the danger of prejudice to the opposing parties; (2) the length of the delay and the potential impact on judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the party seeking relief; and (4) whether that party acted in good faith. *Pincay v. Andrews*, 389 F.3d 853, 855 (9th Cir. 2004) (en banc) (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)).

For the reasons outlined above, the defendant fails to meet his burden on the first factor because he cannot show any danger of prejudice. To begin with, he cannot claim prejudice because, as he admits, the defendant didn't even bother to review the early Jencks material before he filed the instant motion. In any event, the defendant has retained

7

<u>four</u> lawyers in this matter—the docket lists his counsel as Mark A. Byrne of Byrne and Nixon LLP, Richard A. Schonfeld and David Z. Chesnoff of Chesnoff and Schonfeld and Naser J. Khoury of the Naser J. Khoury Law Offices. While none of his lawyers reviewed the discovery before filing the Motion on November 4, 2024, they easily could have, as evidenced by the fact that it took one of the government's attorneys less than four hours to review all of the reports while preparing a response to the Motion. The defendant also has not articulated why the exorbitant length of his requested delay, 120 days—four months—is necessary to accomplish something that could be done in an afternoon and that he has not even attempted. Thus, he fails to establish the second *Mission Power* factor. Similarly, the defendant also fails to meet the third *Mission Power* factor, because defense counsel is fully capable of reviewing the modest amount of Jencks material that was produced six (6) weeks earlier than the deadline he did not object to. As to the fourth *Mission Power* factor, defense counsel's tactics, rather than showing good faith, show bad faith on their part. It is inexcusable that counsel would waste the government and the Court's time with a motion to continue without first reviewing the Jencks material produced on October 25, 2024. These are litigation tactics that should not be countenanced. Defense counsel did not object to the government's proposed Jencks deadline of one week before trial. Then they filed a motion to compel demanding that the government produce the material early. When the government elected to do so, rather than reviewing it, they filed a baseless motion for a continuance and filed another baseless motion to dismiss the charges based on the early production of Jencks. The defendant is not acting in good faith.

  Rather than review the discovery, which would obviate this *ex parte* motion because counsel would see there is no *Brady* material, the defendant seeks *ex parte* treatment, which carries a high burden for the moving party, but provides no basis for it. The defendant's Motion fails to cite the law, much less establish that he is acting in good faith. The defendant's *ex parte* application should be denied.

### B.     The Discovery Production Does Not Include Brady Materials.

The defendant suggests that the reports consist of *Brady* material, and accordingly, the government's recent production of this material somehow justifies a four-month continuance. Contrary to his general representation, none of the materials the defendant received are *Brady* materials. The government has complied with and will continue to comply with its obligations under *Brady*. In *Brady v. Maryland*, the Supreme Court held that the government must disclose "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment." 373 U.S. at 87. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Griffin*, 659 F.2d 932, 939 (9th Cir. 1981) (citing *United States v. Augurs*, 427 U.S. 97 (1976)). In *Griffin*, the defendant demanded that he receive the notes taken by agents of his interviews based on nothing more than speculation that the missing records might contain *Brady* or *Giglio*. The Ninth Circuit held that this speculation was insufficient to sustain a discovery violation. *Id.*; *see also United States v. Ramos*, 27 F.3d 65, 70 (3rd Cir. 1994) ("We think it unwise to infer the existence of *Brady* material based upon speculation alone."). "[M]ere speculation about materials in the government's files [does] not require the district court to make those materials available, or mandate an in camera inspection." *United States v. Mincoff*, 574 F.3d 1186, 1200 (9th Cir. 2009).

Unlike the defendant in *Griffin*, who did not receive the notes he claimed contained *Brady*, here the defendant has the Jencks material and still has not identified any *Brady* in it. In other words, just like the defendant in *Griffin*, the defendant's Motion is based on pure speculation. While he could have reviewed the entire discovery production in the time it took him to write his Motion, instead he simply claims, "[t]he material is undoubtedly *Brady* as it is favorable to the Defendant." But he does not say what reports supposedly contain *Brady*, what information is material, and how or why he needs to make use of the information but is unable to do so in the six weeks before trial.

Based on the defendant's other filings in this case, ECF 157, ECF 152-1, the government infers that he may want to rely on these reports as specific instances of truthfulness. But as the government has established, because character for truthfulness is not an element of the offenses charged in this case, Federal Rule of Evidence 405(b) prohibits the defendant from offering such specific instances of conduct evidence at trial. ECF 152. As described above and as demonstrated in the ten reports attached as Exhibit 1, the defendant's reporting over the course of his 13-year relationship with his Handling Agent does not contain references to Burisma or Public Official 1 or Businessperson 1. The defendant offers no explanation for why his prior reporting about Armenian check cashing scheme, Mexican drug smuggling, or California-based financial frauds are *Brady*. The reports are not *Brady*. Moreover, the defendant already knows what he told his Handling Agent and this information, already known to him, also would not be a *Brady* violation. Because he fails to meet his burden of establishing a *Brady* violation, the motion should be denied.

### C. Defendant's Motion for a Second Continuance Does Not Satisfy the Ninth Circuit's Requirements for a Continuance.

As described, the defendant's Motion does not include any evidence of a *Brady* violation, much less a discussion of why he needs "120 days" to review the reports that can be reviewed in less than four hours (or one hour per defense lawyer if his lawyers split them up). The Ninth Circuit has held that *Brady* material should be disclosed before trial, *United States v. Nagra*, 147 F.3d 875, 881 (9th Cir. 1998), when the defense can make practical use of the material. *United States v. Zuno-Arce*, 44 F.3d 1420, 1427 (9th Cir. 1995); *see also United States v. Miller*, 529 F.2d 1125 (9th Cir. 1976) (if exculpatory evidence can be effectively presented at trial and the defendant is not prevented by lack of time to make necessary investigation, there is no grounds for reversal from belated disclosure). The government has done just that. Even if it were *Brady*, which it is not, the

defendant does not even attempt to explain why more than six weeks is needed to review the supposedly *Brady* information.

Despite labeling the discovery as "*Brady*" without specifying what he believes is actually *Brady*, the defendant separately contends that the materials are *Giglio* materials because information in the reports "impeaches the quality of the law enforcement conduct in this case." Motion at 8. Defendant fails to explain how any of this information is admissible impeachment material and the government has already filed a motion in limine to preclude its introduction. ECF 151 ("Motion in Limine to Exclude FBI Handling Agent's Alleged Mistakes"). Notwithstanding his incorrect assumption that the reports contain impeachment material, even if it were impeachment material, it would be considered *Giglio* material which "ripens into evidentiary material for purposes of impeachment only if and when the witness testifies at trial." *United States v. Cuthbertson*, 630 F.2d 139, 144 (3rd Cir. 1980); *see also United States v. Nixon*, 418 U.S. 683, 701 (1974) ("Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial."); *Smith v. Kemp*, 715 F.2d 1459, 1467 (11th Cir. 1983) ("The thrust of *Giglio* and its progeny has been to ensure that the jury knows the facts that might motivate a witness in giving testimony[.]"). Thus, if the material were impeachment material as the defendant claims, he was not entitled to receive the material until trial, but the government produced it six weeks before trial. A six-week early production of inadmissible reports that the defendant contends are impeachment material does not satisfy the Ninth Circuit's requirements for a continuance.

The Court provides guidance on its website to parties that "[t]he Court has a strong interest in keeping scheduled dates certain. Changes in dates are disfavored. Trial dates set by the Court are firm and will rarely be changed." The Court has "broad discretion" in determining whether to grant or deny a motion for continuance. *Morris v. Slappy*, 461 U.S. 1, 11 (1983); *United States v. Flynt*, 756 F.2d 1352, 1358 (9th Cir. 1985). "A trial court clearly abuses its discretion only if denial of the continuance was arbitrary or

11

unreasonable." *United States v. Wills*, 88 F.3d 704, 711 (9th Cir. 1996) (internal quotation and citation omitted). In reviewing whether a district court has abused its discretion in denying motions for continuance, the Ninth Circuit considers four factors: (1) the extent of the defendant's diligence in readying his defense prior to the date set for trial; (2) the likelihood that the continuance would serve a useful purpose; (3) the extent to which a continuance would inconvenience the district court, the parties, or witnesses; and (4) the extent of prejudice, if any, that the defendant would suffer from denying a continuance. *Flynt*, 756 F.2d at 1359; *United States v. Mejia*, 69 F.3d 309, 314-16 (9th Cir. 1995). The "most critical question" is the final factor—whether a defendant will be prejudiced from a continuance denial. *Mejia*, 69 F.3d at 316. In fact, a defendant cannot prevail on any appeal of the denial of a continuance if he fails to show prejudice as a result. *Flynt*, 756 F.2d at 1359; *United States v. Mitchell*, 744 F.2d 701, 704 (9th Cir. 1984) ("To demonstrate reversible error, the defendant must show that the denial resulted in actual prejudice to his defense").

        1.    <u>The "Diligence" Factor Does Not Weigh in Favor of a Continuance</u>

The defendant has not been diligent in reviewing the discovery production that he received access to on October 25, 2024. He has four lawyers, yet his Motion makes clear that he has not even attempted to review the material that he finally downloaded on October 29, 2024 and indeed he cites nothing in the discovery that is *Brady*. The defendant has not been diligent.

        2.    <u>The Defendant Has Not Shown That a Continuance Would Be "Useful"</u>

Trial in this case was originally set for April 23, 2024. The defendant asked the government to agree to a stipulation to continue the trial for seven months to December 2, 2024, so that it could review discovery. ECF 64. The government agreed. The defendant did not object to a Jencks production deadline of one week before trial and the defendant now asks for an additional 120 days, or five additional months to review that same material

that can be reviewed in less than a day. A continuance of 120 days is unnecessary as he has more than sufficient time in the next six weeks to review the reports. Thus, a continuance is not useful because the defendant shows he continues to prefer to work on frivolous filings, such as the filing of this Motion, rather than spend the time reviewing the discovery, which could have been accomplished in roughly the same amount of time.

The defendant's Motion is almost entirely devoid of any explanation of why the defendant needs more time. He claims his proposed expert needs to review the reports but, for the reasons discussed in the government's motion in limine to preclude proposed defense expert Gregory Scott Rogers, Rogers should be excluded from testifying and thus that review is not necessary or useful. ECF 150. It also would take his proposed expert less than a day to review the reports. The defendant also claims he may need to file additional motions—but that is pure speculation since he has not spent the time reviewing the reports. Even if did, the remedy would be for the defendant to request to file a pretrial motion—even though the deadline for motions in limine has already passed—rather than a continuance. Thus, this factor does not favor the defendant.

### 3. The Government, Witnesses and the Court Will be Inconvenienced by a Continuance

The trial schedule in this case was set in April of this year. Relying on that schedule, the government has made scheduling decisions in other cases based on that date. In fact, the government moved the United States District Court for the District of Delaware to reschedule Hunter Biden's sentencing on his convictions for firearms related offenses precisely because this case was set for trial on December 3, 2024. *See* ECF 135, Exh. 1. Furthermore, trial subpoenas have been issued for the December 3, 2024 date and witnesses have arranged their schedules in order to be present for trial at that time. The government and those witnesses will be inconvenienced by a continuance.

As quoted above, the Court provides guidance on its website to parties that "[t]he Court has a strong interest in keeping scheduled dates certain. Changes in dates are

disfavored. Trial dates set by the Court are firm and will rarely be changed." The government infers that that guidance reflects the fact that the Court is also inconvenienced by continuances.

          4.    <u>The Defendant Has Not Shown That He Will be Prejudiced by Any Denial of a Continuance</u>

The defendant has not created a record from which this Court could find that he will be prejudiced by the current trial schedule. He has failed to show how any continuance will actually be useful to him. He claims that some of the reports show that he "did have contact with the Ukraine in the time frame of 2015 to 2016" but the defendant presumably already knows this, it is not new information, and in any event, a mere contact with someone in Ukraine does not mean the defendant had contact with executives at Burisma like he later claimed in 2020. And again, he never reported any contact with Burisma in previous years. His diligence with respect to readying his defense is far from clear. Given the lack of any support for the Motion, the record provides no basis for the Court to find that the defendant will be better able to pursue a defense strategy, interview witnesses, or review discovery or anything else if the Court continues trial for another four months, as opposed to proceeding on the current schedule.

## IV. CONCLUSION

For the reasons set forth above, the Court should deny the defendant's ex parte application and second motion to continue the trial in this case.