1                    UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4  UNITED STATES OF AMERICA,      ) Case No. LA CR 24-00091-ODW
                                  )           LA CR 24-00702-ODW
5            Plaintiff,           )
                                  ) Los Angeles, California
6  vs.                           )
                                  ) Monday, December 16, 2024
7  ALEXANDER SMIRNOV,            )
                                  ) (8:04 a.m. to 9:14 a.m.)
8            Defendant.           )
   _____)

9

10                    TRANSCRIPT OF CHANGE OF PLEA
               BEFORE THE HONORABLE OTIS D. WRIGHT, II
11                    UNITED STATES DISTRICT JUDGE

12

13  Appearances:                  See next page.

14  Court Reporter:               Recorded; CourtSmart

15  Courtroom Deputy:             Sheila English

16  Transcribed by:               Jordan Keilty
                                  Echo Reporting, Inc.
17                                9711 Cactus Street, Suite B
                                  Lakeside, California 92040
18                                (858) 453-7590

19

20

21

22

23

24
   Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

2

1 | APPEARANCES:

2 | For the Plaintiff:          LEO J. WISE, ESQ.
                               DEREK E. HINES, ESQ.
3 |                            SEAN F. MULRYNE, ESQ.
                               United States Department of
4 |                               Justice
                               Office of Special Counsel
5 |                            950 Pennsylvania Avenue, NW
                               Room B-200
6 |                            Washington, D.C. 20530
                               (771) 217-6091
7 |
   | For the Defendant:          RICHARD A. SCHONFELD, ESQ.
8 |                            DAVID Z. CHESNOFF, ESQ.
                               Chesnoff & Schonfeld
9 |                            520 South 4th Street
                               Las Vegas, Nevada 89101
10 |                           (702) 384-5563

11 |                           MARK A. BYRNE, ESQ.
                               Byrne & Nixon, LLP
12 |                           700 North Brand Boulevard
                               Suite 1180
13 |                           Glendale, California 91203
                               (213) 620-8012
14 |
   |                           CHAD D. NARDIELLO, ESQ.
15 |                           1801 Century Park East
                               Suite 1050
16 |                           Century City, California 90067
                               (310) 201-0123
17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

3

1  Los Angeles, California; Monday, December 16, 2024 8:04 a.m.

2                          --o0o--

3                    (Call to Order)

4          THE CLERK:  Calling Item 1, CR 24-91 and CR 24-

5  702, United States of America versus Alexander Smirnov.

6          Counsel, may I have your appearances, please.

7          MR. WISE:  Good morning, your Honor.  Leo Wise,

8  Derek Hines and Sean Mulryne for the United States.

9          THE COURT:  Good morning, Gentlemen.

10          MR. CHESNOFF:  May it please the Court, your

11  Honor, David Chesnoff, Nasser Khoury, Chad --

12          MR. NARDIELLO:  Nardiello, your Honor.

13          MR. CHESNOFF:  -- Nardiello, and Mark Byrne, our

14  local counsel, your Honor.

15          THE COURT:  Good morning, Gentlemen.

16          ALL:  Good morning, your Honor.

17          THE COURT:  I hope you all realize this is just

18  fraught with opportunities to screw it up, but apparently --

19  well, I'm going to proceed as though you know that that's

20  what you're doing, you know that this is going to be tough

21  to keep straight, and you're going to proceed in this

22  fashion in spite of that.  We're going to try to do -- take

23  pleas on both cases, two unrelated cases.  I will do my

24  best.

25          Okay.  There's quite a bit of cross-over.  So, I'm

4

1  not going to repeat that twice, but -- oh, well.  Let's see

2  what happens.  I'll be surprised.

3          All right.  Mr. Chesnoff, it's my understanding

4  that your client is desirous of entering a plea of guilty to

5  Count 2 of the indictment in Case Number 24-CR-00091.  Is

6  that correct?

7          MR. CHESNOFF:  Yes, your Honor.

8          THE COURT:  Just in case I don't -- well, it's

9  also my understanding that your client is also interested in

10 entering a guilty plea in Case Number 24-CR-00702 to Counts

11 1, 5, and 8 of that indictment.  Correct?

12         MR. CHESNOFF:  Yes, your Honor.

13         THE COURT:  All right.  Mr. Smirnov, before I can

14 take your pleas, first I need to be certain that you have

15 been informed of and understand your various constitutional

16 rights and that you understand the rights that you would be

17 giving up by entering pleas of guilty in either or both of

18 these cases and that you understand that you can insist on

19 putting the Government to the burden and the test of proving

20 your guilt beyond a reasonable doubt in both of these cases

21 to all of the causes of action and that by pleading guilty,

22 you are waiving or giving up your right to a trial and a

23 right to put the Government to its burden of proof, and

24 you're simply admitting your guilt, and the only thing that

25 will remain is the imposition of sentence.

5

1          Do you understand that, sir?

2          THE DEFENDANT:  Yes, your Honor.

3          THE COURT:  Now, pull the mic closer.

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  All right.  The way this is going to

6  proceed is I'm going to be making a number of statements to

7  you, and I'm also going to be asking you a series of

8  questions, questions to which I will expect a truthful

9  response for, indeed, you will be placed under oath

10 momentarily by Ms. English, and that will obligate you to be

11 truthful in your response to the Court's questions.

12          If it is later determined that you have been

13 willfully false in your answers to the Court's questions,

14 that may subject you to a future prosecution for perjury or

15 for making a false statement.

16          Do you understand that?

17          THE DEFENDANT:  Yes, your Honor.

18          THE COURT:  If at any time during the course of

19 this hearing you don't understand anything that I say,

20 please let me know, and I will rephrase it or repeat it or

21 do whatever is necessary to see to it that you understand

22 precisely what is going on.

23          Will you do that?

24          THE DEFENDANT:  Yes, your Honor.

25          THE COURT:  Okay.  Also, during the course of this

6

1   hearing, if you wish to speak with your attorney, you may do

2   so, and you don't have to ask for permission.  That's what

3   your attorney is here for.  If anything is said or done that

4   is not clear to you, please seek clarification from your

5   attorney or you can seek clarification from me.

6          One of the things I don't want to happen here --

7   and it happens all too often -- is that I speak with

8   defendants who have just recently come from a -- a court

9   hearing, and they cannot tell me what occurred.  That should

10  not be, and for something as important as this, I want you

11  to be able to articulate exactly what occurred this morning.

12  All right.  And if anything is unclear, please let me know.

13  Okay?

14          THE DEFENDANT:  I will, your Honor.

15          THE COURT:  All right.  The most important thing

16  here is that what -- what you intend to do -- I'm going to

17  assume that it is your intention to -- to enter pleas of

18  guilty to these four counts.  What's vitally important is

19  that this be the product of your free will.  I'm going to

20  ask you more than once as to whether or not you are pleading

21  guilty voluntarily and of your free will.  I don't think

22  anything about this hearing is more important than that.

23          So, tell me, has anyone threatened you or promised

24  you anything of value, any benefit in exchange for your plea

25  of guilty other than what is contained in the written plea

7

1   agreement?  Is there anything else that is influencing your

2   decision to plead guilty?

3            THE DEFENDANT:  No, your Honor.

4            THE COURT:  Okay.  After you are placed under

5   oath, I'm going to ask you some questions which, admittedly,

6   are intrusive, and it's not because I care or that I really

7   want to know the answers.  The only thing I care about is

8   whether or not you are legally able to waive your

9   constitutional rights and plead guilty.  I need to know

10  whether or not you, for example, are intoxicated or heavily

11  medicated or even temporarily mentally incompetent.

12           So, the questions I'm going to put to you deal

13  with your mental competency, deal with your sobriety.  And,

14  again, not because I'm interested in that.  I'm not

15  interested in that.  I simply just want to establish a

16  record that you are legally competent to waive your

17  constitutional rights.

18           Do you understand?

19           THE DEFENDANT:  Yes, your Honor.

20           THE COURT:  And then we will move away from that

21  sort of thing.  Okay.

22           Now, I also need to know whether or not you are

23  willing to waive your right to remain silent so that you may

24  answer my questions.  You still possess and will always

25  possess your Fifth Amendment right against self-

8

1  incrimination, but the answers to some of these questions

2  will certainly involve you incriminating yourself.  So, I

3  need to know whether or not for the purpose of this hearing

4  only are you willing to -- to waive your Fifth Amendment

5  rights against self-incrimination?

6          THE DEFENDANT:  Yes, your Honor.

7          THE COURT:  Counsel join?

8          MR. CHESNOFF:  Yes, your Honor.

9          THE COURT:  All right.  Thank you.

10          All right, sir, do you have any questions of me

11  before we get started?

12      (Pause.)

13          MR. CHESNOFF:  He asked you do you have any

14  questions for him.  Say no, your Honor.

15          THE DEFENDANT:  No, your Honor.

16          THE COURT:  Okay.  All right.  Sheila, go ahead

17  and swear him.

18              ALEXANDER SMIRNOV - DEFENDANT - SWORN

19          THE COURT:  All right, sir.  Would you please

20  state your full and correct name, please.

21          THE DEFENDANT:  Alexander Smirnov.

22          THE COURT:  How old are you, sir?

23          THE DEFENDANT:  Forty-four.

24          THE COURT:  Did you say 44?  Okay.

25          How many years of education have you completed?

9

1          THE DEFENDANT:  High school.

2          THE COURT:  Okay.  Have you been treated recently

3    for any mental illness or addiction to narcotics of any

4    kind?

5          THE DEFENDANT:  No, your Honor.

6          THE COURT:  Are you presently under the influence

7    of any drug, medication or alcoholic beverage of any kind?

8          THE DEFENDANT:  No, your Honor.

9          THE COURT:  Have you had any drugs, medication or

10   alcohol within the last 24 hours?

11         THE DEFENDANT:  No, your Honor.

12         THE COURT:  Have you been prescribed any

13   medication which you have not taken?

14         THE DEFENDANT:  No, your Honor.

15         THE COURT:  Do you suffer from any mental

16   condition or disability that would prevent you from fully

17   understanding the charges against you or the consequences of

18   your guilty pleas?

19         THE DEFENDANT:  No, your Honor.

20         THE COURT:  Are you aware of any reason why we

21   should not go forward today and take your plea?

22         THE DEFENDANT:  No, your Honor.

23         THE COURT:  Okay.  Mr. Chesnoff, have you had an

24   opportunity to speak with your client about these

25   proceedings?

10

1        MR. CHESNOFF:  Yes, I have, your Honor.

2        THE COURT:  Do you have any reason to believe that

3   he is not in possession of his faculties and is competent to

4   proceed?

5        MR. CHESNOFF:  I have no such feelings, your

6   Honor.

7        THE COURT:  All right.  Based upon the statements

8   of the Defendant and his attorney, as well as my own

9   observations, I find that the Defendant is in full

10  possession of his faculties and is competent to proceed.

11       All right, sir.  Have you received -- arbitrarily

12  go into your 91 case.  Have you received a copy of the

13  indictment in the case 24-CR-91, the one charging the false

14  statement, the non-tax case?

15       THE DEFENDANT:  Yes, your Honor.

16       THE COURT:  Okay.  Have you seen the indictment?

17       THE DEFENDANT:  Yes.

18       THE COURT:  You're entitled to have that

19  indictment read to you, the entire indictment read to you at

20  this time.  Would you like the entire indictment read to you

21  now?

22       THE DEFENDANT:  No, your Honor.

23       THE COURT:  All right.  Thank you.

24       You are also entitled to the following

25  constitutional rights, rights that you would be giving up by

11

pleading guilty.

       First, you have the right to plead not guilty to any offense charged against you and to persist in that plea.

       You have the right to a speedy and public trial.

       You have the right to a trial by jury.  At trial you would presumed to be innocent, and the Government would have to prove your guilt beyond a reasonable doubt.  If both you and the Government give up your right to a jury trial, you have the right to be tried by the Court.

       You have the right to the assistance of counsel for your defense throughout the proceedings.  If you cannot afford counsel, the Court will appoint counsel to represent you free of charge and to assist you at trial and at every other stage of the proceedings.

       You have the right to confront and cross examine the witnesses against you, that is, to see and hear all of the witnesses testify and to have them questioned by your lawyer.

       You have the right to have witnesses subpoenaed and compelled to come to court to testify on your behalf.

       You have the right to testify yourself on your own behalf.  But, conversely, you have the privilege against self-incrimination, that is, you have the right not to testify or incriminate yourself in any way.

       If you went to trial and decided not to testify,

12

1  that fact could not be used against you.  But by pleading

2  guilty, you are giving up that right, and you are

3  incriminating yourself.

4          Lastly, you have the right to appeal your

5  conviction and your sentence if you go to trial and you are

6  convicted.

7          Have you been advised of all of these rights, sir?

8          THE DEFENDANT:  Yes, your Honor.

9          THE COURT:  Do you recall reading these rights in

10 your plea agreements?  Maybe I should establish that you

11 actually read the plea agreements.  Have you read them, sir?

12         THE DEFENDANT:  Yes, your Honor.

13         THE COURT:  And do you recall reading an entire

14 section in the plea agreements dealing with the waiver of

15 your constitutional rights?

16         THE DEFENDANT:  Yes, your Honor.

17         THE COURT:  That addressed each of the rights that

18 I have just gone over?

19         THE DEFENDANT:  Yes, your Honor.

20         THE COURT:  Do you have any questions about any of

21 your constitutional rights?

22         THE DEFENDANT:  No, your Honor.

23         THE COURT:  Would you like a few moments to speak

24 with your lawyer about any of your constitutional rights?

25         THE DEFENDANT:  No, your Honor.

13

1            THE COURT:  All right.  Counsel, are you satisfied

2  that his waivers are voluntarily, intelligently, and

3  knowingly made?

4            MR. CHESNOFF:  Yes, I am, your Honor.

5            THE COURT:  And do you join and concur in each of

6  these waivers?

7            MR. CHESNOFF:  Yes, I do, your Honor.

8            THE COURT:  All right.  Beginning with 91, you are

9  charged in Count 2 of the indictment ending in 91 with

10  causing the creation of a false and fictitious record in a

11  federal investigation, in violation of 18 U.S.C. Section

12  1519, hereinafter the obstruction of justice indictment.

13            Do you understand that?

14            THE DEFENDANT:  Yes, your Honor.

15            THE COURT:  Do you have any questions about that?

16            THE DEFENDANT:  No, your Honor.

17            THE COURT:  All right.  Mr. Wise, would you please

18  state the elements of the offense?  I'm sitting here

19  deciding how to proceed.  So, it's --

20            MR. WISE:  I'll proceed any way you tell me to,

21  your Honor.

22            The elements of the charge of 18 U.S.C. 1519 are

23  as follows:

24            First, the Defendant knowingly caused the making

25  of a false entry in an FBI Form 1023, a record and document,

14

1  and

2          Second, Defendant acted with the intent to impede,

3  obstruct or influence an actual or contemplated

4  investigation of a matter within the jurisdiction of the

5  United States Department of Justice, a department and agency

6  of the United States.

7          THE COURT:  Just so you know, I'm thinking about

8  getting them both out of the way.

9          All right, sir.  Do you have any questions about

10 what the prosecutor just said in terms of what would have to

11 be -- the facts that would have to be established beyond a

12 reasonable doubt in order to secure your conviction on Count

13 2 of the indictment in Case 91?  Do you have any questions?

14          THE DEFENDANT:  I don't, your Honor.

15          THE COURT:  Okay.  Unless someone's got a better

16 idea, because I'm not wed to any particular idea, then I

17 will go over the -- the same things with respect to the

18 other indictment.

19          Okay.  In the 702 indictment, there are three

20 charges alleged in Counts 1, 5 and 8, which charge the

21 Defendant with tax evasion for the tax years 2020, 2021,

22 2022.

23          Again, Mr. Wise, would you be so kind as to advise

24 of the charges and the facts that would have to be

25 established?

15

1          MR. WISE:  Yes, your Honor.  The Defendant

2   understands that for the Defendant to be guilty of the crime

3   charged in Counts 1, 5, and 8 in the tax evasion indictment,

4   in violation of 26 United States Code Section 7201, the

5   following must be true:

6          First, the Defendant owed more federal income tax

7   for the tax years 2020, 2021 and 2022 than was declared due

8   on the Defendant's income tax returns for each calendar

9   year;

10          Second, the Defendant knew that more federal

11   income tax was owed than was declared due on the Defendant's

12   income tax returns;

13          Third, the Defendant made an affirmative attempt

14   to evade or defeat such additional tax, including at least

15   one of the affirmative acts charged in the tax evasion

16   indictment and, fourth, in attempting to evade or defeat

17   such additional tax, the Defendant acted willfully.

18          THE COURT:  All right, sir.  Do you have any

19   questions about the facts that would have to be established

20   in the 7072 indictment in order for you to be convicted of

21   either Counts 1, 5, or 8?

22          THE DEFENDANT:  No, your Honor.

23          THE COURT:  Okay.  Next I'm going to ask the

24   prosecutor to go over the various penalties that you face.

25   We're going to talk about the maximum fine -- correction --

16

1  the maximum term of imprisonment which could be imposed.

2  Again, let's -- let's one at a time, start with 91, the

3  maximum term of imprisonment which could be imposed, the

4  maximum fine which could be levied against you, the concept

5  of supervised release, and the various collateral

6  consequences which might follow the suffering of a felony

7  conviction.

8           Are you a United States citizen, sir?

9           THE DEFENDANT:  Yes, your Honor.

10          THE COURT:  Okay.  Then we can forego a discussion

11 of the immigration consequences.

12          All right.  Go ahead, Counsel.

13          MR. WISE:  Thank you, your Honor.

14          And this is at paragraph eight of the plea

15 agreement.  Defendant -- Defendant understands that the

16 statutory maximum sentence that the Court can impose for a

17 violation of 18 United States Code 1519 -- this is Count 2

18 of the --

19          THE COURT:  Yes.

20          MR. WISE:  -- obstruction of justice indictment --

21 is 20 years imprisonment, a three-year period of supervised

22 release, a fine of $250,000 and a mandatory special

23 assessment of $100.

24          THE COURT:  While we're at it, let's move right

25 into 702.

17

1          MR. WISE:  Thank you, your Honor.

2          For a violation of --

3          THE COURT:  Oh, wait a minute.  You're right.

4   You're right.

5          Sir, do you have any -- any questions about what

6   he said with respect to indictment 91?

7          THE DEFENDANT:  No, your Honor.

8          THE COURT:  Okay.  Any -- any objection to us

9   moving now into the next indictment, 702?

10          MR. CHESNOFF:  None, your Honor.

11          THE COURT:  Okay.  Go ahead, sir.

12          MR. WISE:  Thank you, your Honor.

13          For a violation of 26 United States Code 7201,

14  which is Counts 1, 5, and 8 of the tax evasion indictment,

15  the maximum sentence the Court can impose is a five-year

16  term of imprisonment per count, a three-year period of

17  supervised release, a fine of $250,000 or twice the gross

18  gain or gross loss resulting from the offense, whichever is

19  greatest, and a mandatory special assessment of $100.

20          THE COURT:  Supervised release, if you happen to

21  have it at hand.

22          MR. WISE:  Three years, your Honor.

23          THE COURT:  Okay.  Collateral consequences?  I

24  don't see that in the plea agreement.  That's troublesome.

25          MR. WISE:  So, your Honor, starting at paragraph

18

1  11, collateral consequences are described as --

2          THE COURT:  Thank you.

3          MR. WISE:  -- well as in additional paragraphs,

4  and I can read those.

5          THE COURT:  Yes.

6          MR. WISE:  So, starting in paragraph 11, Defendant

7  understands that by -- that by pleading guilty, Defendant

8  may be giving up valuable government benefits and valuable

9  civic rights such as the right to vote, the right to possess

10 a firearm, the right to hold office, and the right to serve

11 on a jury.

12         Defendant understands that he is pleading guilty

13 to a felony and that it is a federal crime for a convicted

14 felon to possess a firearm or ammunition.

15         Defendant understands that the convictions in this

16 case may also subject Defendant to various other collateral

17 consequences, including but not limited to revocation of

18 probation, parole, or supervised release in an other case

19 and suspension or revocation of a professional license.

20         Defendant understands that unanticipated

21 collateral consequences will not serve as grounds to

22 withdraw Defendant's guilty pleas.

23         And then at paragraph 15 -- and I think your Honor

24 has already asked if the Defendant is -- is a citizen --

25 there is a paragraph concerning immigration consequences

19

1  which I can read or not.

2          THE COURT:  We need not bother with that, but you

3  probably need to do 12, 13, and 14.

4          MR. WISE:  Got it.  At paragraph 12, Defendant

5  agrees to pay restitution to the Internal Revenue Service

6  for his federal individual income taxes in an amount to be

7  determined by the Court pursuant to 18 United States Code

8  Section 3663(a)(3).

9          And then at paragraph 13, Defendant agrees that

10 restitution to the IRS is due and payable immediately after

11 the judgment is entered and is subject to immediate

12 enforcement in full by the United States.

13         If the Court imposes a schedule of payments,

14 Defendant agrees that the schedule of payments is a schedule

15 of the minimum payment due and that the payment schedule

16 does not prohibit -- prohibit or limit the methods by which

17 the United States may immediately enforce the judgment in

18 full.

19         THE COURT:  All right, sir.  Do you have any

20 questions about anything that's been said so far?

21         THE DEFENDANT:  No, your Honor.

22         THE COURT:  All right.  You should also understand

23 that parole has been abolished in the federal system, and if

24 you are sentenced to prison, you will not be released on

25 parole.

20

1          Now, do you have any questions regarding the

2   potential sentence that you may receive if the Court accepts

3   your pleas of guilty?

4          THE DEFENDANT:  No, your Honor.

5          THE COURT:  All right.  Do you think you've

6   understood everything that's been said so far?

7          THE DEFENDANT:  Yes, your Honor.

8          THE COURT:  Any reason I should not continue with

9   these proceedings and take your plea?

10          THE DEFENDANT:  No, your Honor.

11          THE COURT:  All right, sir.  You will be sentenced

12   under the Sentencing Reform Act of 1984.  The United States

13   Sentencing Commission has issued guidelines which judges

14   must consult and take into account but are not required to

15   follow in determining the sentence in a criminal case.

16          Now, have you and your attorney talked about how

17   the sentencing guidelines might be employed in your case?

18          THE DEFENDANT:  Yes, your Honor.

19          THE COURT:  During the course of those

20   discussions, did you have occasions to refer to a Sentencing

21   Table?

22          THE DEFENDANT:  Can you -- can you repeat?

23          THE COURT:  Does -- does this table look familiar

24   to you, sir?

25          THE DEFENDANT:  Yes.

21

1          THE COURT:  Okay.  You -- you went over the

2   Sentencing Table and --

3          THE DEFENDANT:  Yes.

4          THE COURT:  -- how it's read?

5          THE DEFENDANT:  Yes, your Honor.

6          THE COURT:  You don't need me to go over it again?

7          THE DEFENDANT:  No, your Honor.

8          THE COURT:  Okay.

9       (Pause.)

10         THE COURT:  You should understand that at this

11   particular stage that neither the Court nor your attorney

12   will be able to determine the guidelines range for your case

13   until after the Presentence Investigation Report has been

14   prepared by the Probation officer.

15         You should understand that both you and the

16   Government will have an opportunity to review that report

17   and to challenge the reported facts, as well as the

18   guidelines range calculated by the Probation officer and to

19   suggest that the Court consider other factors as well.

20         You should also understand that the sentence

21   imposed may be different from any estimate that your

22   attorney may have given you.  Matter of fact, let's talk

23   about this.

24         We have -- it's my understanding -- in fact,

25   indeed, it's -- it appears in the plea agreement that this

22

1  plea is pursuant to 11(c)(1)(C) of the Rules of Criminal

2  Procedure.  And what that means is if I accept the plea

3  agreement, I am being bound or I'm binding myself to impose

4  the sentence that the parties have agreed to, and in this

5  particular case, having looked at the -- the agreed upon

6  range of sentences that the parties have agreed upon in any

7  event, I am willing to tell you now that I agree with the --

8  the plea agreement and the -- the sentencing agreement that

9  the parties have stipulated to and that I agree to be bound

10  by that agreement in terms of the imposition of sentence in

11  this case.  So, that's off the table.

12          Has anyone made you any promises or

13  representations or guarantees of any kind other than what is

14  contained in the written plea agreement in order to get you

15  to enter a plea of guilty to either of these cases?

16          THE DEFENDANT:  No, your Honor.

17          THE COURT:  Has anyone told you that the Court

18  would impose any specific sentence in the event your guilty

19  pleas are accepted?

20      (Pause to confer.)

21          THE DEFENDANT:  Yes, between 48 and 72 months.

22          THE COURT:  Say that again?

23          THE DEFENDANT:  Whatever's written in the

24  agreement, 48 to 72 months.

25          THE COURT:  Oh, you're talking about the -- the

*Echo Reporting, Inc.*

23

1  potential sentencing range?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Okay.  Has anyone told you that the

4  Court would impose any specific sentence in the event your

5  guilty --

6          THE DEFENDANT:  No.

7          THE COURT:  -- plea is accepted?

8          THE DEFENDANT:  No, your Honor.

9          THE COURT:  Okay.  Has anyone attempted in any way

10 to threaten you, a family member or anyone close to you in

11 an effort to get you plead guilty in this case?

12         THE DEFENDANT:  No, your Honor.

13         THE COURT:  Are you pleading guilty voluntarily

14 and of your own free will?

15         THE DEFENDANT:  Yes, your Honor.

16         THE COURT:  All right.  Okay.  I want to talk

17 about your right of appeal, and this is somewhat disjointed

18 because it is.

19         These are the same in both cases.  So, I'll --

20 I'll just go over these now.  And the one that I'm going to

21 talk about deals with your waiver of your right to appeal

22 your conviction, and that is in paragraph 21 in both plea

23 agreements, and it's very short, but it actually contains

24 three separate provisions.

25         I'm going to just read the first sentence because

24

1    it is clear.

2                 "Defendant understands that with

3             the exception of an appeal based upon a

4             claim that Defendant's guilty pleas were

5             involuntary, by pleading guilty,

6             Defendant is waiving and giving up any

7             right to appeal Defendant's convictions

8             on the offenses to which he is pleading

9             guilty."

10                So that we understand what we were referring to by

11   convictions, toward the end of this hearing, I am going to

12   ask you how you plead to -- to Count 2 on Case Number 91 and

13   Counts 1, 5, and 8 of Case Number 702, and if -- solely by

14   way of example -- if you indicate that you are going to

15   plead guilty to any of those and if I accept your plea and

16   order that it be entered, then you will stand convicted on

17   that or those counts.  Okay.

18                All right.  So, what this is saying here is that

19   should you wish to challenge your conviction on appeal, the

20   one basis that you have reserved pursuant to the written

21   terms of this agreement, the one basis that you have

22   reserved upon which you can base an appeal is that your

23   guilty plea was involuntary.

24                You understand that?

25                THE DEFENDANT:  Yes, your Honor.

25

1          THE COURT:  All right.  I'll ask you again, are

2     you pleading guilty voluntarily and of your own free will?

3          THE DEFENDANT:  Yes, your Honor.

4          THE COURT:  Okay.  The next thing -- provision

5     that's contained in this one paragraph, you are giving up

6     your right to challenge that the statutes that you are

7     charged with having violated, you're giving up your right to

8     challenge that those statutes are unconstitutional.

9          Do you understand that?

10         THE DEFENDANT:  Yes, your Honor.

11         THE COURT:  Okay.  The last thing -- and this now

12    deals with a provision of the plea agreement itself.

13    There's a statement of facts contained in the plea

14    agreement.  And you are essentially acknowledging that the

15    statement -- well, let me put it this way.  You're giving up

16    your right to challenge the sufficiency of the statement of

17    facts to support a guilty plea.  You're not going to be able

18    to argue that there's something substantial or material

19    missing from the statement of facts that's set forth in the

20    plea agreement that it's insufficient to support a guilty

21    plea.  That's off the table, those three things.  Should you

22    wish to challenge your conviction on appeal, the only basis

23    open for you to do that, to assert that challenge, is that

24    your guilty plea was involuntary.

25         Second, you're not going to be able to challenge

26

1   the constitutionality of the statutes that you are allegedly

2   -- charged with having allegedly violated, and you're not

3   going to be able to challenge the statement of facts that's

4   set forth in the plea agreement to argue that it is

5   insufficient to support a guilty plea.

6           Understood?

7           THE DEFENDANT:  Yes, your Honor.

8           THE COURT:  Any questions?

9           THE DEFENDANT:  No, your Honor.

10          THE COURT:  Okay.  The next thing I want to deal

11  with is the next paragraph which -- paragraph 22, which

12  appears under the heading "Limited Mutual Waiver of Appeal

13  of Sentence."

14          A few moments ago, when the prosecutor, Mr. Wise,

15  went over the various penalties that you face, we talked

16  about the -- the maximum term of imprisonment which could be

17  imposed, the maximum fine which could be levied against you.

18  There's also a provision dealing with supervised release,

19  which is that period of community supervision that follows

20  the completion of your term of imprisonment.

21          These things are -- some of these things are

22  controlled by statute.  For example, the fines, the fines

23  are controlled by statute.  The term of supervised release,

24  that is controlled by statute.  Some of the conditions of

25  supervised release, a few of those are controlled by

27

statute, but largely, they must bear some relationship to the crime of conviction.  There must be some relationship there.  Okay.  For example, there couldn't be a prohibition in your case.  There couldn't be a prohibition in there against you gambling.  It's got nothing to do with -- with the offenses here.

I'm trying to think of a situation here where this is -- could likely come up, but this isn't something that is normally -- it's not normally an issue that is raised in terms of challenging provisions of your sentence.

In this particular case, you are agreeing to a particular sentencing range.  The Court has indicated that it is willing to go along with the agreement that you have reached with the Government and impose a sentence that is within that range.

We have entered into what's colloquially referred to as a binding plea agreement.  I guess the only person that's being bound is me.  All right.  And I agree to be bound by the agreement that you all have reached.

Everything else is going to be controlled by statute.  I can't impose a fine that's just outrageously large.  I can't impose restitution that isn't supported by the evidence in this case.  Now we're talking about the tax case.

I don't -- I can't foresee of a situation where

28

1   this is likely to come up, but if it does, we got enough

2   lawyers in the room here that are apprised of the

3   circumstances that would certainly call it to the Court's

4   attention so that it would be corrected.  Okay.  I certainly

5   have no interest in imposing a sentence that is unlawful or

6   is in excess of what the parties have agreed to.  So, if

7   that should happen, it will get fixed, all right.  But I just

8   want you to know that you do retain the right to -- to raise

9   on appeal -- in fact, raise -- raise it before the appeal.

10  Raise it now so it can be fixed, but you have the -- the

11  opportunity to raise on appeal anything that you feel is

12  improper about the sentence, even though -- I call this one

13  of those absolute agreements, it's not contingent upon

14  anything.  It doesn't matter.  If you feel that you've been

15  sentenced improperly, raise it.  We'll deal with it.  All

16  right.  Okay.

17          Let's see.  Oh, that's right.  Mr. Smirnov, I

18  don't know if you happen to have a copy of the plea

19  agreements in front of you, but --

20          MR. CHESNOFF:  We do, your Honor.

21          THE COURT:  Okay.  Would you take a look pages 13

22  and 14.  My question is whether or not your signature

23  appears on those pages.

24          THE DEFENDANT:  Yeah.

25          THE COURT:  All right.  And you read this entire

29

1  agreement before you signed it, is that correct?

2          THE DEFENDANT:  Yes, your Honor.

3          THE COURT:  And you had an attorney available to

4  you to answer any questions you might have had at the time

5  you signed the agreement?

6          THE DEFENDANT:  Yes, your Honor, several

7  attorneys.

8          THE COURT:  Several attorneys.

9          THE DEFENDANT:  Yeah.

10          THE COURT:  You can never have too many attorneys.

11          All right.  And does the agreement -- the

12  agreement as it is written, as it stands before you, does it

13  represent the entire understanding between you and the

14  Government?

15          THE DEFENDANT:  Yes, your Honor.

16          THE COURT:  Okay.  Is there anything as far as you

17  can see that is missing from that agreement in terms of your

18  agreement with the Government?

19          THE DEFENDANT:  No, your Honor.

20          THE COURT:  Okay.  Okay.  All right.  Mr.

21  Chesnoff, same thing, could you take a look at pages 13 and

22  14 of the agreement.  Is that your signatures next to the

23  date December 10th?

24          MR. CHESNOFF:  That's correct, your Honor.

25          THE COURT:  All right.  And you were available to

30

1 -- well, I don't want to assume, but did your client sign

2 the agreement in your presence?

3          MR. CHESNOFF:  I was present with him, your Honor.

4          THE COURT:  Okay.  So, you were available to him

5 to answer any questions he might have had at the time he

6 signed the agreement?

7          MR. CHESNOFF:  I was, and I did.

8          THE COURT:  All right.  Excellent.  And does this

9 agreement represent the entire understanding between your

10 client and the Government?

11          MR. CHESNOFF:  Yes, it does, your Honor.

12          THE COURT:  And did you review the facts of this

13 case and all of the discovery provided by the Government?

14          MR. CHESNOFF:  Yes, sir.

15          THE COURT:  Did you review -- did you review those

16 facts and discovery with your client?

17          MR. CHESNOFF:  Yes, your Honor.

18          THE COURT:  Have you pursued with your client the

19 potential defenses he might have?

20          MR. CHESNOFF:  Yes, your Honor.

21          THE COURT:  And have you advised your client

22 concerning the legality or admissibility of any statements

23 or confessions or other evidence that the Government has

24 against him?

25          MR. CHESNOFF:  Yes, we did, your Honor.

31

1          THE COURT:  To the best of your knowledge, is your

2   client pleading guilty because of any illegally obtained

3   evidence in the possession of the Government?

4          MR. CHESNOFF:  No, your Honor.

5          THE COURT:  And did you and your client agree that

6   it was in his best interest to enter this plea?

7          MR. CHESNOFF:  Yes, your Honor.

8          THE COURT:  And do you believe that your client is

9   entering into this plea freely and voluntarily, with full

10  knowledge of the charges against him and the consequences of

11  his plea?

12         MR. CHESNOFF:  Yes, I do, your Honor.

13         THE COURT:  Okay.  Now, I want it to be thoroughly

14  understood that everything that we're doing pertains to --

15  to both cases, both 91 and 702.

16         MR. CHESNOFF:  I understand that, your Honor.

17         THE COURT:  All right.  And have there been any

18  promises, representations or guarantees made either to you

19  or to your client other than what is contained in the

20  written plea agreements and anything that may have been

21  stated here in open court?

22         MR. CHESNOFF:  No, your Honor.

23         THE COURT:  Other than a general discussion of the

24  guideline sentencing range and other sentencing

25  considerations, have you given any indication of what

32

1   specific sentence the Court would impose or convey to your

2   client any promise of a particular sentence in the event the

3   Court accepts his pleas of guilty?  This is to be

4   distinguished from the range which the Court has already

5   indicated that it will stay within.

6          MR. CHESNOFF:  No, your Honor.  I've told him that

7   the Court would, if agreed to accept the plea, would

8   sentence him on both cases for a total amount of time

9   between 48 and 72 months, that there was a joint

10  recommendation of one year of supervision and there was a

11  recommendation of no fine, and he understands he has to pay

12  his taxes.

13         THE COURT:  Thank you.

14         Do you -- have you come to any other

15  understanding, Mr. Smirnov?

16         THE DEFENDANT:  No, just those.

17         THE COURT:  Okay.

18         MR. CHESNOFF:  There was one additional thing,

19  your Honor.

20         THE COURT:  Sure.

21         MR. CHESNOFF:  The agreement notes that he gets

22  credit for time served on both cases from the date of his

23  arrest, your Honor.  And we believe that the Bureau of

24  Prisons would acknowledge and honor that, your Honor.

25         THE COURT:  Absolutely.  That's -- yeah.  They are

33

1  going to take care of that.  Okay.

2          MR. CHESNOFF:  Thank you.

3          THE COURT:  Considering everything that's been

4  discussed so far, do you know of any reason why the Court

5  should not accept your client's pleas on both cases?

6          MR. CHESNOFF:  I have no reason, your Honor.

7          THE COURT:  Okay.

8          MR. CHESNOFF:  Your Honor, may I have a moment

9  with my client?

10         THE COURT:  Sure.  Of course.

11     (Pause to confer.)

12         MR. CHESNOFF:  No -- no -- most respectfully, your

13  Honor, please proceed.

14         THE COURT:  All right.  Mr. Wise, other than

15  stated here in open court and other than what is stated in

16  the written plea agreement, has the Government made any

17  promises, representations or guarantees either to the

18  Defendant or defense counsel?

19         MR. WISE:  No, your Honor.

20         THE COURT:  Does the Government waive jury trial?

21         MR. WISE:  Yes, your Honor.

22         THE COURT:  Thank you, sir.

23         Mr. Smirnov, are you satisfied with the

24  representation your lawyers have provided you so far?

25         THE DEFENDANT:  Can you please repeat?

34

1          THE COURT:  Did you ask me to repeat that?

2          MR. CHESNOFF:  Yes.

3          THE COURT:  Okay.  Are you satisfied --

4          THE DEFENDANT:  Yes.  I'm sorry.

5          THE COURT:  -- with the representation your

6   lawyers have provided to you so far?

7          THE DEFENDANT:  Yes, your Honor.

8          THE COURT:  Okay.  And have you told your lawyers

9   everything you know about your case, especially about any

10  statements or confessions or other evidence that you know

11  about that the Government has against you?

12         THE DEFENDANT:  Yes, your Honor.

13         THE COURT:  Do you believe that your lawyers have

14  fully considered any reasonable defense you may have to the

15  charges?

16         THE DEFENDANT:  Yes, your Honor.

17         THE COURT:  Do you believe your lawyers have fully

18  advised you concerning this matter?

19         THE DEFENDANT:  Yes, your Honor.

20         THE COURT:  Do you believe you've had enough time

21  to discuss this matter with your lawyers?

22         THE DEFENDANT:  Yes, your Honor.

23         THE COURT:  Do you believe you understand the

24  consequences to you of this decision to plead guilty?

25         THE DEFENDANT:  Yes, your Honor.

35

1          THE COURT:  Do you know of any reason why the

2   Court should not accept your pleas of guilty?

3          THE DEFENDANT:  No, I don't, your Honor.

4          THE COURT:  Do you understand then that all that

5   is left in your case if I accept your pleas of guilty is the

6   imposition of sentence, which will include imprisonment?  Do

7   you understand that?

8          THE DEFENDANT:  Yes, your Honor.

9          THE COURT:  Mr. Smirnov, having in mind all that

10  we have discussed regarding your pleas of guilty, the rights

11  that you will be giving up and the maximum sentence -- the

12  maximum sentence you could receive, is it still your desire

13  to plead guilty?

14          THE DEFENDANT:  Yes to both cases.

15          THE COURT:  You did say yes to both cases.

16  Excellent.  Thank you, sir.

17          All right, sir.  I want you to listen carefully.

18  I'm going to ask Mr. Wise to state the facts that the

19  Government would be prepared to prove at trial, and then I'm

20  going to ask you some questions about what he is about to

21  say.  I assume we're going to read from the statement of

22  facts.

23          MR. WISE:  Yes, your Honor.

24          THE COURT:  Okay.  Great.  Thank you.

25          MR. WISE:  And this is at Exhibit B to both plea

36

1  agreements, the Statement of Facts in Support of Plea

2  Agreement for Defendant Alexander Smirnov.

3           Defendant, Alexander Smirnov, was a resident of

4  Los Angeles, California and a self-described consultant.

5           Defendant was born in the USSR and was naturalized

6  as a U.S. citizen on July 21st, 2015.

7           The following are specific facts as to United

8  States versus Alexander Smirnov, Criminal Number 2:24-CR-

9  00091-ODW.

10          Defendant was a confidential human source or CHS

11 with the Federal Bureau of Investigation or FBI.  As a CHS,

12 Defendant was assigned a handling agent, hereafter the

13 handler, who was a special agent on an FBI squad that

14 investigated violations of federal criminal law.

15          As a CHS, Defendant provided information to the

16 handler that was then used in various criminal

17 investigations conducted by the FBI.  Defendant knew that

18 information he provided was used in criminal investigations

19 because, among other reasons, the handler advised him that

20 he might have to testify in court based on the information

21 he provided on multiple occasions, including but not limited

22 to October 1st, 2010, May 17th, 2011, November 28th, 2012,

23 April 12th, 2013, August 29th, 2013, July 10th, 2015, and

24 March 11th, 2010.

25          Defendant also knew the information he provided

37

1  was used in criminal investigations because Defendant

2  participated in a number of operations where he was

3  authorized to engage in criminal activity as part of an

4  ongoing criminal investigation.

5         Defendant was admonished by the handler that he

6  must provide truthful information to the FBI when he first

7  became a CHS in 2010 and on multiple occasions thereafter,

8  including but not limited to, and then there is a series of

9  dates between 2010 and 2013 which, if I may, I'll -- 2023, I

10 apologize -- which, if I may, I won't read into the record

11 but are contained in -- on paragraph 15.

12        In addition, when Defendant was authorized to

13 engage in illegal activity for investigative purposes, he

14 was further admonished that:

15             "Under no circumstances may the CHS

16             participate in an act that constitutes

17             obstruction of justice, for example,

18             perjury, witness tampering, witness

19             intimidation, entrapment or fabrication,

20             alteration or destruction of evidence,

21             unless such illegal activity has been

22             authorized."

23        When Defendant was given this admonishment, he

24 signed an FBI form that contained this statement, including

25 on dates in 2014, 2017, 2018, 2019 and 2020.

38

1          Despite repeated admonishments that he must

2    provide truthful information to the FBI and that he must not

3    fabricate evidence, Defendant provided false derogatory

4    information to the FBI about Public Official 1, an elected

5    official in the Obama/Biden administration who left office

6    in January 2017 and Business Person 1, the son of Public

7    Official 1, in 2020, after Public Official 1 became a

8    candidate for President of the United States of America.

9          In March 2017, Defendant reported to the handler

10   that he had a phone call with the owner of Ukranian

11   Industrial Conglomerate Burisma Holdings, Limited, hereafter

12   Burisma Official 1, concerning Burisma's interests in

13   acquiring a U.S. company and making an initial public

14   offering or IPO on a U.S. based stock exchange.

15          In reporting that conversation to the handler,

16   Defendant also noted that Business Person 1, Public Official

17   1's son, was a member of Burisma's board, a fact that was

18   publicly known.  Notably, Defendant did not report in 2017

19   that in the preceding two years, Burisma Official 1 admitted

20   to Defendant that he had paid Public Official 1 $5 million

21   when Public Official 1 was still in office as Defendant

22   later claimed.  That information was memorialized in an --

23   in an official record of the FBI on a Form 1023, which is

24   referred to hereafter as the 2017 1023.

25          Three years later, in May 2020, Defendant sent the

39

handler a series of messages expressing bias against Public Official 1 who was then a candidate for President of the United States of America and the presumptive nominee of one of the two major American political parties.

One month later, in June 2020, Defendant reported for the first time two meetings in 2015 and/or 2016 during the Obama/Biden administration in which he claimed executives associated with Burisma, including Burisma Official 1, admitted to him that they hired Business Person 1 to "protect us through his dad from all kinds of problems" and later that they had specifically paid $5 million each to Public Official 1 and Business Person 1 when Public Official 1 was still in office so that "Business Person 1 will take care of all those issues through his dad," referring to a criminal investigation being conducted by the then Ukranian Prosecutor General into Burisma and to "deal with the then Ukranian Prosecutor General".

Defendant was in Los Angeles, California at the time he made these statements to the handler.

Defendant also reported in June 2020 two purported phone calls between himself and Burisma Official 1 wherein Burisma Official 1 stated that he had been forced to pay Public Official 1 and Business Person 1 and that it would take investigators 10 years to find records of illicit payments to Public Official 1.

40

1          The information Defendant provided the handler was

2    memorialized on a Form 1023 which is hereafter referred to

3    as the 2020 1023, an official record of the FBI, which was

4    finalized on June 30th, 2020.

5          The events Defendant first reported to the handler

6    in June 2020 were fabrications.  In truth and fact,

7    Defendant had contact with executives from Burisma in 2017

8    after the end of the Obama/Biden administration and after

9    the then Ukranian Prosecutor General had been fired in

10   February of 2016, in other words, when Public Official 1

11   could not engage in any official act to influence U.S.

12   policy and when the Prosecutor General was no longer in

13   office.

14         Defendant transformed his routine and

15   unextraordinary business contacts with Burisma in 2017 and

16   later into bribery allegations against Public Official 1,

17   the presumptive nominee of one of the two major political

18   parties for President, after expressing bias against Public

19   Official 1 and his candidacy.

20         When he was interviewed by FBI agents in September

21   2023, Defendant repeated some of his false claims, changed

22   his story as to other of his claims, and promoted a new

23   false narrative about the son of Public Official 1 after he

24   had met with Russian intelligence officials.

25         The following are the facts that relate to United

41

1  States versus Alexander Smirnov Number 2:24-CR-00702-ODW.

2          Defendant received more than $2 million in income

3  from multiple sources in 2020, 2021, and 2022.  he used

4  these funds to pay personal expenses for himself and his

5  domestic partner, a woman that he had referred to as his

6  girlfriend and at other times his wife, although they are

7  not married.  These expenditures included a $1.4 million Las

8  Vegas condominium, a Bentley, and hundreds of thousands of

9  dollars of clothes, jewelry and accessories for himself and

10 domestic partner purchased a high-end retailers in Los

11 Angeles and Las Vegas.

12          Defendant directed the payors to wire the money to

13 (a) a Bank of America, hereafter BOA, account ending in

14 3928, held in the name of Avalon Group, hereafter referred

15 to as the Avalon account, which the Defendant controlled,

16 (b) a Wells Fargo account ending in 1356, held in the name

17 of domestic partner referred to hereafter as the domestic

18 partner account, which the Defendant controlled and into

19 which the Defendant also transferred approximately $1.8

20 million from the Avalon account and (c) a Wells Fargo

21 account ending in 1299 held in the name of Goldman

22 Investments Group, which the Defendant controlled and into

23 which he also transferred $150,000 from the Avalon account.

24          Avalon Group, Incorporated or Avalon is the

25 Defendant's alter ego.  Avalon was incorporated in the State

42

of Delaware on January 22nd, 2020.  The Defendant identified
himself in a State of Delaware annual Franchise Tax Report
as the CEO of Avalon and its only officer and director.
According to bank account applications, the Defendant
identified himself as the President of Avalon.  On a
business credit card application dated June 18th, 2022,
Smirnov listed $60,000 in total annual income and $250,000
in gross business income, identified investment income as
the source of his income and listed his current position as
real estate.

Despite having an IRS tax filing requirement,
Avalon never filed a U.S. Corporate Income Tax Return on
From 1120.

In 2020, 2021, and 2022, Defendant received into
the Avalon account $1,534,000 from Company 1 and on page 19
of the plea agreements is a table that identifies the date
and the amount of wires from Company 1.

In 2021 and 2022, Defendant received into the
Avalon account $800,000 from Payor 1 and BCG, LLC, an entity
owned and controlled by Payor 1, including the payments
listed below, and a second table appears with payments from
BCG and Payor 1.

In 2020, 2021 and 2022, the Defendant transferred
more than $1.8 million from the Avalon account to the
domestic partner account.  The Defendant commingled these

43

1   funds with other funds in the domestic partner account.

2          The Defendant used unreported income he received

3   in the Avalon account and the domestic partner account to

4   pay various personal expenses for the Defendant and for

5   domestic partner.  The largest personal expense was the

6   purchase of a $1 million condominium where he and domestic

7   partner lived in Las Vegas in 2022.  The second largest

8   single expense occurred on October the 11th, 2022 when the

9   Defendant leased a Bentley using $122,360 in funds from the

10  domestic partner account.  The Defendant signed the check

11  made out to Bentley Financial Services for the lease.

12         From 2021 to 2024, more than $400,000 in personal

13  credit card debt on the Defendant's City credit card was

14  paid off from funds -- paid off from funds from the domestic

15  partner account.

16         In order to conceal the millions of dollars he

17  received in income in 2020, 2021, and 2022, the Defendant

18  created and filed false Forms 1040, U.S. Individual Income

19  Tax Returns for himself and in domestic partner's name and

20  included false and fictitious income and expenses.  The

21  Defendant used a professional tax return preparer to create

22  these returns.  The professional tax return preparer who

23  worked in Los Angeles used a tax preparation software to

24  create returns for the Defendant.  The Defendant provided

25  the professional tax return preparer with the income and

44

expense figures included in the returns filed on his own

behalf and the ones filed in domestic partner's name.  The

Defendant did not provide any documents that substantiated

any of these figures.  As a result, the professional tax

return preparer refused to sign the returns.  The Defendant

told the professional tax return preparer that he would not

disclose how he earned any income and that the professional

tax return preparer should not inquire about how he earned

his income.

The Defendant also instructed the tax return

preparer to delete any emails or messages with the

Defendant, which the professional tax return preparer did.

The professional tax return preparer advised the Defendant

that the Schedule C to a U.S. Individual Tax Return was the

most audited part of a tax return because it was often used

to cheat on taxes and that, as a result, the Defendant

should collect and maintain records that supported all the

income and expenses he instructed the professional tax

return preparer to include on Schedule C.

The Defendant provided income and expense numbers

to the professional tax return preparer both for his Form

1040 and the Form 1040 that he submitted in domestic

partner's name.  The professional tax return preparer never

spoke to or interacted with domestic partner in 2020, 2021

or 2022.

45

1          In addition, on or about March 19th, 2021, the

2   Defendant prepared and filed a false Form 1120S, U.S. Income

3   Tax Return for an S Corporation for Goldman Investments

4   Group in 2020.  This return included false and fictitious

5   income and expenses for Goldman Investments Group.  The

6   Defendant did not use the services of the professional tax

7   return preparer in the creation of this return.

8          Defendant filed false Forms 1040 U.S. Individual

9   Income Tax Returns for himself where he falsely claimed on

10  the Schedules C attached to each return that he received (a)

11  $40,000 in gross receipts for consulting in 2020, (b)

12  $40,000 in gross receipts for consulting in 2021, and (c)

13  $50,000 in gross receipts for consulting in 2022.  The

14  Defendant did not pay taxes on this -- on this fictitious

15  income.  Instead, on those schedules, he claimed factitious

16  expenses in the following amounts in the following tax

17  years, in 2020, $31,980, in 2021, $39,878, and in 2022,

18  $26,768.  As a result, the Defendant's -- the Defendant

19  falsely self-assessed owing the U.S. Treasury in 2020 only

20  $1,133 in taxes.

21          Defendant further reduced his tax obligations by

22  falsely claiming a $600 COVID 19 Pandemic Rebate for persons

23  who earned $75,000 or less and $538 in Earned Income Credit

24  or EIC, which he falsely claimed -- which he falsely claimed

25  entitled him to a refund of $5.

46

1          In 2021, zero in taxes.  Defendant again further

2     reduced his tax obligations by falsely claiming a $1,400

3     COVID 19 Pandemic Rebate for persons who earned less than

4     $80,000 and $19 in EIC, which he then claimed entitled him

5     to a refund in the amount of $1,419, and in 2022, only

6     $4,136 in taxes.

7          To further conceal the millions of dollars in

8     income he received and used to pay his and domestic

9     partner's personal expenses, including income deposited into

10    the domestic partner account from which his personal

11    expenses were paid, Defendant also prepared and filed false

12    Forms 1040 in the name of domestic partner in 2020, 2021 and

13    2022 where he falsely claimed on the Schedules C attached to

14    each return that domestic partner received (a) $40,000 in

15    gross receipts for consulting in 2020, (b) $40,000 in gross

16    receipts for consulting in 2021, and (c) $60,000 in gross

17    receipts for consulting in 2022.

18         Like his own Form 1040, Defendant claimed on those

19    Schedules C similar fictitious expenses in the following

20    amounts in the following tax years, in 2020, $31,314, in

21    2021, $36,689, and in 2022, $31,553.

22         As a result, the Defendant falsely assessed that

23    domestic partner owed the U.S. Treasury in 2020 $1,228.  The

24    Defendant further reduced any tax obligations by falsely

25    claiming that domestic partner was entitled to a $538 EIC

47

1  which he claimed resulted in domestic partner owing the U.S.

2  Treasury only $690, in 2021, $468 in taxes.  The Defendant

3  again further reduced any tax obligations by falsely

4  claiming that domestic partners was entitled to $470 in EIC,

5  which he then claimed entitled her to a refund in the amount

6  of $2, and in 2022, $5,933 in taxes.

7          To further conceal the millions of dollars in

8  income he received into a bank account held in the name of

9  Goldman Investments Group, the Defendant filed a Form 1120S

10  U.S. Income Tax Return for an S Corporation in the name of

11  Goldman Investments Group in 2020.  The Defendant falsely

12  reported that Goldman had $89,282 in gross sales and $92,300

13  in total deductions.

14          In 2020, the Defendant signed his own -- in 2021,

15  I apologize.  In 2021, the Defendant signed his own false

16  return and the false returns he prepared in the name of

17  domestic partner and Goldman Investments Group for tax year

18  2020.

19          In 2022, the Defendant signed his own false Form

20  1040 and signed the false Form 1040 that he prepared for

21  domestic partner for tax year 2021.

22          Finally, in 2023, the Defendant prepared and filed

23  -- prepared a false and fictitious Form 1040 for domestic

24  partner, and while he signed his own false and fictitious

25  Form 1040, his signature did not appear on domestic

48

1  partner's return for tax year 2022.

2          THE COURT:  Mr. Smirnov, did you understand

3  everything that the -- that Mr. Wise just said?

4          THE DEFENDANT:  Yes, your Honor.

5          THE COURT:  Is everything he said about you and

6  your conduct in this matter true and correct?

7          THE DEFENDANT:  Yes, your Honor.

8          THE COURT:  Are you pleading guilty to the

9  allegations in indictment 91, as well as indictment 702

10 because they are indeed and in fact true and correct?

11         THE DEFENDANT:  Yes, your Honor.

12         THE COURT:  Are you pleading guilty because you

13 are guilty, sir?

14         THE DEFENDANT:  Yes, your Honor.

15         THE COURT:  Does either counsel wish the Court to

16 make any further inquiry in terms of compliance with the

17 requirements of Rule 11(b)?

18         MR. WISE:  Not from the United States, your Honor.

19 Thank you.

20         MR. CHESNOFF:  No thank you, your Honor.

21         THE COURT:  All right.  Thank you, gentlemen.  In

22 case I didn't mention it before, the plea agreements and

23 Exhibit B are incorporated into and made a part of this

24 proceeding.

25         All right, sir.  I'm going to go through each of

49

1  these four.  In connection with indictment 91, Count 2, how

2  do you plead to a violation of 18 U.S.C. Section 1519,

3  creating a false and fictitious record?  How do you plead,

4  sir?

5        (Pause to confer.)

6            THE DEFENDANT:  Guilty, your Honor.  I didn't

7  hear.

8            THE COURT:  That's what this --

9            MR. CHESNOFF:  He couldn't hear it, your Honor.

10            THE COURT:  I thought maybe he changed his mind.

11  Okay.  All right.

12            How do you plead, sir, with respect to indictment

13  702?

14            THE DEFENDANT:  Guilty, your Honor.

15            THE COURT:  Well, hang on.

16        (Pause to confer with clerk.)

17            THE COURT:  Okay.  If there's a -- let me go over

18  this again in case there's a lack of clarity.  First we did

19  91, okay.  And the question is how do you plead to Count 2

20  of that indictment charging a violation of 18 U.S.C. Section

21  1519, creation of a false and fictitious record?

22            THE DEFENDANT:  Guilty, your Honor.

23            THE COURT:  All right.  Now let's move on to

24  indictment 702, and I'll begin with Count 1, then I'll go to

25  Count 5 and then Count 8.  They're all the same.

50

1          All right.  Count 1 charges an evasion of an

2   assessment or filing a false return, in violation of Title

3   26 United States Code Section 7201, 7201.  How do you plead?

4          THE DEFENDANT:  Guilty, your Honor.

5          THE COURT:  How do you plead to that same charge

6   as alleged in Count 5 of indictment 702?

7          THE DEFENDANT:  Guilty, your Honor.

8          THE COURT:  Same charge as alleged in Count 8 of

9   the indictment 702, how do you plead?

10          THE DEFENDANT:  Guilty, your Honor.

11          THE COURT:  All right, sir.  I'm going to make

12   certain findings.  If you don't understand what I say or if

13   you disagree with what I say, please interrupt me right way

14   or ask one of your attorneys to -- to interrupt me.

15          In the matter of the United States of America

16   versus Alexander Smirnov, the Court, having questioned the

17   Defendant and his counsel on his offers of pleas of guilty

18   to Count 2 of the 91 indictment, a felony, and Counts 1, 5

19   and 8 of the 702 indictment, also all felonies, Defendant

20   and his counsel having advised the Court that they have

21   conferred concerning the offered pleas of guilty and all

22   aspects of the charges against him, as well as any defenses

23   he may have.

24      (Pause.)

25          THE COURT:  And the Court having observed the

51

1  Defendant's intelligence, demeanor and attitude while

2  answering questions, and the Court having observed that the

3  Defendant does not appear to be under the influence of any

4  medicine, drug or other substance or factor that might

5  affect his actions or judgment in any matter, the Court

6  finds that the Defendant is fully competent and capable of

7  entering an informed plea, that he is aware of the nature of

8  the charges and the consequences of his plea.

9        The Court further finds that the pleas of guilty

10  are knowingly, voluntarily, and intelligently made with a

11  full understanding of the nature of those charges, the

12  consequences of his plea, his constitutional rights.

13        The Court further finds that the plea is supported

14  by an independent factual basis containing each of the

15  essential elements of the offenses.  The Court, therefore,

16  accepts the pleas and orders that they be entered.

17      (Pause.)

18        THE COURT:  Have we waived entirely Presentence

19  Reports?

20        MR. CHESNOFF:  My understanding, your Honor, is

21  that we were going to ask them to expedite --

22        THE COURT:  Oh, okay.  Expedited?

23        MR. CHESNOFF:  Yes.

24        THE COURT:  Thank you.  All right.

25        A written Presentence Report will be prepared by

52

1  the Probation Office, and we will ask that that report --

2  the preparation of that report be expedited.

3          You, sir, will be asked to provide information for

4  that report, and your attorney may be present if you wish.

5  You and your attorney will be able to read the report and

6  file objections, if you have any, before the sentencing

7  hearing.  You and your attorney will be able to speak on

8  your behalf at that hearing, and I urge you to consult with

9  him throughout the process so that he may answer any

10 questions that you may have.

11         I will leave it to counsel to schedule the -- the

12 interview with the Probation officer for the preparation of

13 that report.

14         As it stands right now, sentencing is set for

15 January 8th of 2025 at 10:30 a.m. in this courtroom.  The

16 sentencing position papers by the Government and by the

17 Defendant should be on file with the Court two weeks in --

18 one week, on week in advance of the sentencing hearing.

19         Sir, you will remain where you are until the date

20 of sentencing.

21         Anything further from the Government?

22         MR. WISE:  No, your Honor.  Thank you.

23         MR. CHESNOFF:  No, your Honor.  Thank you.

24         THE COURT:  Okay.  All right, Gentlemen.  We will

25 see you in January.

53

1          MR. CHESNOFF:  I thank the Government, your Honor,

2  for their professionalism.

3          THE COURT:  Well, if nothing else, they are always

4  professional.

5          THE CLERK:  Court is now in recess.

6      (Proceedings concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

54

1          I certify that the foregoing is a correct

2    transcript from the electronic sound recording of the

3    proceedings in the above-entitled matter.

4

5    /s/Jordan Keilty                        12/19/2024
     Transcriber                            Date
6
     FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
7

8
     /s/L.L. Francisco
9    L.L. Francisco, President
     Echo Reporting, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25