DAVID C. WEISS
Special Counsel
LEO J. WISE
Principal Senior Assistant Special Counsel
DEREK E. HINES
Senior Assistant Special Counsel
SEAN F. MULRYNE
CHRISTOPHER M. RIGALI
Assistant Special Counsels
     950 Pennsylvania Avenue NW, Room B-200
     Washington, D.C. 20530
     Telephone:  (771) 217-6091
     E-mail:     LJW@usdoj.gov, DEH@usdoj.gov
     E-mail:     SFM@usdoj.gov; CMR@usdoj.gov

Attorneys for Plaintiff

UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>ALEXANDER SMIRNOV,<br><br>        Defendant. | No. 2:24-CR-00091-ODW<br><br>No. 2:24-CR-00702-ODW<br><br><u>GOVERNMENT'S SENTENCING MEMORANDUM</u> |

The United States of America, by and through its counsel of record, hereby files its sentencing memorandum consistent with the Court's order at the Defendant's guilty plea that sentencing memoranda be filed within one week of sentencing.  *See* Transcript of December 16, 2024 Guilty Plea, ECF 200 at 52:14-18 ("The sentencing position papers by the Government and by the Defendant should be on file with the Court two weeks in -- one week, one week in advance of the sentencing hearing.").

On December 16, 2024, the Defendant pled guilty to Count Two of the indictment in *United States v. Alexander Smirnov*, 2:24-CR-00091-ODW, which charges Defendant with causing the creation of a false and fictitious record in a federal investigation, in violation of 18 U.S.C. § 1519 (hereafter the "obstruction of justice indictment") and

Counts One, Five and Eight, of the indictment in *United States v Alexander Smirnov*,
2:24-CR-00702-ODW, which charges the Defendant with tax evasion for tax years 2020,
2021 and 2022, in violation of 26 U.S.C. § 7201 (hereafter the "tax evasion indictment").

The plea agreement entered by the parties that resolves both cases is pursuant to
Federal Rule of Criminal Procedure 11(c)(1)(C).  It provides for the following total
penalties:

> 19.    Defendant and the SCO-W agree that, taking into account the factors listed
> in 18 U.S.C. § 3553(a)(1)-(7) and the relevant sentencing guideline factors, an appropriate
> disposition of this case is that the Court impose a sentence of: **no less than 48 months
> and no greater than 72 months' imprisonment; 1 year supervised release with
> conditions to be fixed by the Court; $400 special assessment; $675,502 restitution and
> no fine.**  The parties also agree that the defendant is entitled to credit in both Cr. Nos. 24-
> 91 and 24-702 for the period of his pretrial detention since the day of his arrest and that
> credits that the Bureau of Prisons may allow under 18 U.S.C. § 3585(b)) may be credited
> against this stipulated sentence, including credit under Sentencing Guideline § 5G1.3.

Plea Agreement (Exhibit 1) ¶ 19.

In order to achieve the prompt resolution of this matter the parties agreed to a
sentencing hearing within 30 days of the entry of the Defendant's guilty plea.  As of the
filing of this sentencing memorandum, the Government has not received a presentence
report (PSR).  In this memorandum, the Government includes its position on the
calculation of the Defendant's advisory sentencing guidelines.  The Government reserves
the right to make arguments about the PSR's calculation of the Defendant's advisory
sentencing guidelines at the sentencing hearing on January 8, 2025, if necessary.

This sentencing memorandum is based on the attached memorandum of points and
authorities, the plea agreement (Exhibit 1), the obstruction of justice indictment (Exhibit
2), the tax evasion indictment (Exhibit 3), a report prepared calculating the amount of taxes

the Defendant owes the IRS (Exhibit 4), a press release from a member of the United States Senate releasing the FBI 1023 from 2020 that is the subject of the Defendant's prosecution in this case (Exhibit 5), a list of "Open Items for Completion by" FBI Pittsburgh (Exhibit 6), a statement released by FBI Director Christopher Wray concerning the FBI's work related to Congressional oversight and the 2020 1023 that is the subject of the Defendant's prosecution (Exhibit 7), a February 18, 2020 letter to The Honorable Jerrold Nadler (Exhibit 8), and the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: January 1, 2025

Respectfully submitted,

DAVID WEISS
Special Counsel

LEO J. WISE
Principal Senior Assistant Special Counsel

DEREK E. HINES
Senior Assistant Special Counsel

SEAN F. MULRYNE
CHRISTOPHER M. RIGALI
Assistant Special Counsels

**Table of Contents**

I.      SUMMARY ................................................................................................ 6

II.     THE OFFENSE CONDUCT ................................................................. 6

    A.    Defendant Lied to the FBI and Caused the Creation of a False FBI Form 1023 ................................................................................ 7

        1.   The Defendant was an FBI Confidential Human Source ................... 7

        2.   In 2017, the Defendant provided the FBI Handler with information that Burisma was interested in acquiring an American oil and gas company ........................................................ 8

        3.   Three years later, in May 2020, the Defendant sent the Handler a series of messages expressing bias against Public Official 1, who was then a candidate for President of the United States of America and the presumptive nominee of one of the two major political parties. ................................................................................ 9

        4.   One month later, and three years after first reporting on Burisma, the Defendant reported bribery allegations against Businessperson 1 and Public Official 1. ................................. 16

        5.   The Defendant was interviewed by FBI Investigators in September 2023, and repeated some of his false claims, changed his story as to other of his claims, and promoted a new false narrative after meeting with Russian officials. ....................... 17

    B.    The Defendant Committed Tax Evasion in 2020, 2021 and 2022 ......... 18

        1.   Sources of Income ................................................................. 19

        2.   Transfers to the Domestic Partner Wells Fargo Account ................. 20

        3.   Defendant Used His Unreported Income to Pay His and Domestic Partner's Personal Expenses ............................................... 20

        4.   False and Fictitious Tax Returns ................................................. 21

        5.   Tax Due and Owing ................................................................ 24

III.    SENTENCING GUIDELINES ................................................................ 25

    A.    Count Two of the Obstruction Indictment (Cr. No. 24-91) ................... 25

        1.   Base Offense Level is 14 ........................................................... 25

        2.   Three Level Increase for Unnecessary Expenditure of Substantial Governmental Resources ............................................ 25

        3.   Two Level Increase Because the 2020 1023 Was An "Especially Probative or Essential Record" ........................................ 29

4.    Three Level Increase Because of Official Victim .............................. 30

5.    Two Level Upward Adjustment for Exceptionally High Level Official .................................................................................................... 32

6.    Two Level Upward Adjustment for Abuse of a Position of Trust ....................................................................................................... 33

**B.    Counts One, Five and Eight of the Tax Evasion Indictment (Cr. No. 24-702)** ................................................................................................ 35

**C.    Multiple Counts** ........................................................................................ 35

**D.    Acceptance of Responsibility** ................................................................. 35

**E.    Criminal History** ..................................................................................... 36

**F.    Advisory Sentencing Guidelines Range** ................................................ 36

**IV.    RESTITUTION** ................................................................................................... 36

**V.    THE GOVERNMENT'S SENTENCING RECOMMENDATION** ............... 38

**A.    18 U.S.C. § 3553 (a)(1)** ............................................................................. 39

**B.    18 U.S.C. § 3553 (a)(2)** ............................................................................. 41

**VI.    CONCLUSION** .................................................................................................... 43

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    SUMMARY

The Defendant is a liar and a tax cheat. In committing his crimes he betrayed the United States, a country that showed him nothing but generosity, including conferring on him the greatest honor it can bestow, citizenship. He repaid the trust the United States placed in him to be a law-abiding naturalized citizen and, more specifically, that one of its premier law enforcement agencies placed in him to tell the truth as a confidential human source, by attempting to interfere in a Presidential election. And to add insult to injury he made millions of dollars in income and then evaded taxes on that income by filing multiple false income tax returns. Payment of taxes is one of the few burdens of citizenship all Americans bear. But not the Defendant, until now.

**A sentence of 72 months, or 6 years,** is sufficient but not greater than necessary to achieve the goals of sentencing as set forth in Title 18 of the United States Code, Section 3553(a) for the reasons outlined below.

### II.    THE OFFENSE CONDUCT

As described in detail in the indictments returned by the grand jury, portions of which were included in the plea agreement, the Defendant broke the law in two serious ways, both of which warrants significant jail time that will send strong deterrent messages and promote respect for the law.

First, the Defendant lied to the FBI in 2020 when he was a trusted confidential human source, or "CHS," spinning a tale of international bribery and corruption targeting the presumptive nominee for President of one of the two major political parties in the United States. He did this after expressing bias against that candidate in a clear effort to influence the outcome of the Presidential election. In doing so, he exploited and abused the trust the FBI placed in him as a CHS. The bribery scheme he invented targeting Joseph R. Biden, then a candidate for President, was recorded in an official FBI record, on a "Form 1023," as part of an in-progress FBI investigation. It resurfaced three years later during a second presidential election and set off a firestorm in Congress, ultimately,

wasting significant public resources as it was pursued by both the executive and legislative branches, warping the important oversight role Congress plays in the process.

Second, the Defendant cheated the United States Treasury, and U.S. taxpayers, out of more than $675,000 in unpaid taxes on more than $2 million he made from 2020-2022. He committed tax evasion by filing false tax returns for himself, in the name of his domestic partner and in the name of an investment company he controlled.

**A. Defendant Lied to the FBI and Caused the Creation of a False FBI Form 1023**

1. <u>The Defendant was an FBI Confidential Human Source</u>

The Defendant was a CHS with the FBI for more than 10 years.  Plea Agreement Exhibit B (Exhibit 1) at 15.  As a CHS, Defendant was assigned a handling agent (hereafter "the Handler") who was a special agent on an FBI squad that investigated violations of federal criminal law.  *Id.*

As a CHS, the Defendant provided information to the Handler that was then used in various criminal investigations conducted by the FBI.  *Id.  The* Defendant knew that information he provided was used in criminal investigations because, among other reasons, the Handler advised him that he might have to testify in court based on the information he provided on multiple occasions, including, but not limited to: 10/1/2010, 5/17/2011, 11/28/2012, 04/12/2013, 8/29/2013, 7/10/2015, and 3/11/2020.  *Id.*  The Defendant also knew the information he provided was used in criminal investigations because the Defendant participated in a number of operations where he was authorized to engage in criminal activity as part of an ongoing criminal investigation.  *Id.*

The Defendant was admonished by the Handler that he must provide truthful information to the FBI when he first became a CHS in 2010 and on multiple occasions thereafter, including, but not limited to: 10/1/2010, 1/20/2011, 5/17/2011, 9/14/2011, 8/29/2012, 11/28/2012, 4/12/2013, 8/29/2013, 1/22/2014, 7/9/2014, 7/10/2015, 9/29/2016, 9/26/2017, 9/26/2018, 9/27/2019, 3/11/2020, 2/19/2021, 10/28/2021, 10/17/2022, and 9/29/2023.  *Id.*

In addition, when the Defendant was authorized to engage in illegal activity for

investigative purposes, he was further admonished that: "Under no circumstances may the CHS … Participate in an act that constitutes obstruction of justice (e.g., perjury, witness tampering, witness intimidation, entrapment, or fabrication, alteration, or destruction of evidence, unless such illegal activity has been authorized)." *Id*. at 16. When the Defendant was given this admonishment, he signed an FBI form that contained this statement, including on 10/8/2014, 1/18/2017, 10/8/2018, 1/10/2019, and 8/7/2020. *Id.*

Despite repeated admonishments that he must provide truthful information to the FBI and that he must not fabricate evidence, the Defendant provided false derogatory information to the FBI about Joseph R. Biden, identified in the indictment and plea agreement as "Public Official 1," the Vice President of the United States who left office in January 2017, and Hunter Biden, the son of Joseph R. Biden, identified in the indictment and plea agreement as "Businessperson 1," in 2020, after Joseph R. Biden became a candidate for President of the United States of America. *Id.*

2. <u>In 2017, the Defendant provided the FBI Handler with information that Burisma was interested in acquiring an American oil and gas company.</u>

In March 2017, the Defendant reported to the Handler that he had had a phone call with the owner of Ukrainian industrial conglomerate Burisma Holdings, Limited (hereafter "Burisma Official 1") concerning Burisma's interest in acquiring a U.S. company and making an initial public offering ("IPO") on a U.S.-based stock exchange. *Id.* In reporting that conversation to the Handler, the Defendant also noted that Businessperson 1, Public Official 1's son, was a member of Burisma's Board, a fact that was publicly known. *Id.* Notably, the Defendant did not report in 2017 that in the preceding two years, Burisma Official 1 admitted to the Defendant that he had paid Public Official 1 $5 million when Public Official 1 was still in office, as the Defendant later claimed. *Id.* That information was memorialized in an official record of the FBI on a Form 1023 (hereafter the "2017 1023"). *Id.*

3. <u>Three years later, in May 2020, the Defendant sent the Handler a series of messages expressing bias against Public Official 1, who was then a candidate for President of the United States of America and the presumptive nominee of one of the two major political parties</u>.

Three years later, in May 2020, the Defendant sent the Handler a series of messages expressing bias against Public Official 1, who was then a candidate for President of the United States of America and the presumptive nominee of one of the two major American political parties. *Id.* The messages, which are copied below, are contained in the indictment at paragraphs 8-21.

On May 19, 2020, the Defendant messaged the Handler the following:



On that day, May 19, 2020, it was publicly reported that:

A Ukrainian lawmaker who met with [] late last year released recordings of private phone calls several years ago between [Public Official 1] and [], then Ukraine's president, in a new broadside against the presumptive [] nominee for U.S. president that has raised questions about foreign interference in the 2020 election.

Approximately 20 minutes after his first message on May 19, 2020, the Defendant volunteered his view that:



One minute later, the Defendant opined:

To which the Handler responded:



??? Only if you believe that his request to get rid of [Prosecutor General] was only because of Burisma...which my all accounts it was not

5:58 PM ✓✓

The Defendant offered the following:



For sure yes   5:58 PM

I'll try to prove it for you bro
5:58 PM

To which the Handler responded:



Bride payment to [Public Official 1] Or are you talking about the aid withheld unless they fired [Prosecutor General]   5:59 PM ✓✓

The Defendant then further offered the following:

> I'll get those other recordings of [Public Official 1] son telling to Boriama that his dad will take care of [Prosecutor General]
>
> Bribe to [Public Official 1] and his son
>
> 5:59 PM



To which the Handler responded:

> That would be a game changer
>
> 5:59 PM ✔✔

The Defendant then stated:

> I'll meet with the guys as soon as I will be able to fly
>
> 5:59 PM



The Defendant did not indicate who "the guys" were.

[this space intentionally left blank]

The following day, May 20, 2020, the Defendant messaged the Handler a link to an article titled, "Senate Republicans issue first subpoena in [Public Official 1]-Burisma probe":



The Handler did not respond.

[this space intentionally left blank]

The next day, May 21, 2020, the Defendant messaged the Handler the following:



[this space intentionally left blank]

Less than thirty minutes later, the Defendant messaged the Handler the following:



Contrary to the Defendant's representation, this was not, in fact, a photograph of Public Official 1 and Businessperson 1 with the CEO of Burisma.

4. <u>One month later, and three years after first reporting on Burisma, the Defendant
reported bribery allegations against Businessperson 1 and Public Official 1.</u>

In June 2020, the Handler reached out to the Defendant concerning the 2017 1023.
Obstruction of Justice Indictment (Exhibit 2) ¶ 22.  This was done at the request of the
FBI's Pittsburgh Field Office (hereafter "FBI Pittsburgh").  *Id.*  In the first half of 2020,
the United States Attorney's Office for the Western District of Pennsylvania (hereafter
"USAO WDPA") had been tasked by the Deputy Attorney General of the United States to
assist in the "receipt, processing, and preliminary analysis of new information provided
by the public that may be relevant to matters relating to Ukraine."  *Id.*; *see also* February
18, 2020 Letter to The Honorable Jerrold Nadler (Exhibit 8). As part of that process, FBI
Pittsburgh opened an assessment, 58A-PG-3250958, and in the course of that assessment
identified the 2017 1023 in FBI holdings and shared it with USAO WDPA.  *Id.*  USAO
WDPA then asked FBI Pittsburgh to reach out to the Handler to ask for any further
information about the reference in his 2017 1023 that stated, "During this call, there was
a brief, non-relevant discussion about former [Public Official1]'s son, [Businessperson 1],
who is currently on the Board of Directors for Burisma Holdings [No Further
Information]".  *Id.*

On or about June 26, 2020, FBI Pittsburgh contacted the Handler regarding the 2017
1023.  *Id.*  That same day, the Handler spoke with the Defendant, who was in Los Angeles,
by telephone.  *Id.*  The information the Defendant provided the Handler was memorialized
on a Form 1023 (hereafter the "2020 1023"), an official record of the FBI, which was
finalized on June 30, 2020.  *Id.*

In the 2020 1023, the Defendant reported, for the first time, two meetings in 2015
and/or 2016, during the Obama-Biden Administration, in which he claimed executives
associated with Burisma, including Burisma Official 1, admitted to him that they hired
Businessperson 1 to "protect us, through his dad, from all kinds of problems," and later
that they had specifically paid $5 million each to Public Official 1 and Businessperson 1,
when Public Official 1 was still in office, so that "[Businessperson 1] will take care of all

those issues through his dad," referring to a criminal investigation being conducted by the then-Ukrainian Prosecutor General into Burisma and to "deal with [the then-Ukrainian Prosecutor General]."  Plea Agreement Exhibit B (Exhibit 1) at 17. The Defendant was in Los Angeles, California, at the time he made these statements to the Handler.

The Defendant also reported in June 2020 two purported phone calls between himself and Burisma Official 1 wherein Burisma Official 1 stated that he had been forced to pay Public Official 1 and Businessperson 1 and that it would take investigators 10 years to find records of illicit payments to Public Official 1.  *Id.*

The events the Defendant first reported to the Handler in June 2020 were fabrications.  *Id.*  In truth and fact, the Defendant had contact with executives from Burisma in 2017, after the end of the Obama-Biden Administration and after the then-Ukrainian Prosecutor General had been fired in February 2016 — in other words, when Public Official 1 could not engage in any official act to influence U.S. policy and when the Prosecutor General was no longer in office.  *Id.*  The Defendant transformed his routine and unextraordinary business contacts with Burisma in 2017 and later into bribery allegations against Public Official 1, the presumptive nominee of one of the two major political parties for President, after expressing bias against Public Official 1 and his candidacy.

By August 2020, FBI Pittsburgh concluded that all reasonable steps had been completed regarding the Defendant's allegations and that their assessment, 58A-PG-3250958, should be closed.  Obstruction of Justice Indictment (Exhibit 2) ¶ 40.  On August 12, 2020, FBI Pittsburgh was informed that the then-FBI Deputy Director and then-Principal Associate Deputy Attorney General of the United States concurred that it should be closed.  *Id*.

5. <u>The Defendant was interviewed by FBI Investigators in September 2023, and repeated some of his false claims, changed his story as to other of his claims, and promoted a new false narrative after meeting with Russian officials</u>.

In July 2023, the FBI requested that the U.S. Attorney's Office for the District of

17

Delaware assist the FBI in an investigation of allegations related to the 2020 1023. Obstruction of Justice Indictment (Exhibit 2) ¶ 41.  At that time, the United States Attorney's Office for the District of Delaware was handling an investigation and prosecution of Businessperson 1.  *Id.*

Also in July 2023, a member of the United States Senate posted the 2020 1023 on his official website, making the Defendant's false allegations against Public Official 1 public.      https://www.grassley.senate.gov/news/news-releases/grassley-obtains-and-releases-fbi-record-alleging-vp-biden-foreign-bribery-scheme (Exhibit 5).

On August 11, 2023, the Attorney General appointed David C. Weiss, the United States Attorney for the District of Delaware, as Special Counsel.  Obstruction of Justice Indictment (Exhibit 2) ¶ at 42.  The Special Counsel was authorized to conduct the investigation and prosecution of Businessperson 1, as well as "any matters that arose from that investigation, may arise from the Special Counsel's investigation, or that are within the scope of 28 C.F.R. § 600.4(a)." *Id.*

On August 29, 2023, FBI investigators spoke with the Handler in reference to the 2020 1023.  *Id.* at ¶ 43.  During that conversation, the Handler indicated that he and the Defendant had reviewed the 2020 1023 following its public release by members of Congress in July 2023, and the Defendant reaffirmed the accuracy of the statements contained in it.  *Id.*

When he was interviewed by FBI agents in September 2023, the Defendant repeated some of his false claims, changed his story as to other of his claims, and promoted a new false narrative about the son of Public Official 1 after he met with Russian intelligence officials.  Plea Agreement Exhibit B (Exhibit 1) at 17.

**B. The Defendant Committed Tax Evasion in 2020, 2021 and 2022**

The Defendant received more than two million dollars in income from multiple sources in 2020, 2021 and 2022.  *Id*. at 18.  He used these funds to pay personal expenses for himself and his Domestic Partner, a woman that he has referred to as his girlfriend and at other times his wife, although they are not married.  *Id.*  These expenditures included a

18

$1.4 million Las Vegas condominium, a Bentley, and hundreds of thousands of dollars of clothes, jewelry and accessories for himself and Domestic Partner purchased at high-end retailers in Los Angeles and Las Vegas. *Id.* The Defendant directed the payors to wire the money to:

a. a Bank of America (hereafter "BoA") account ending in 3928 held in the name of Avalon Group Inc. (hereafter" Avalon Account"), which the Defendant controlled;

b. a Wells Fargo account ending in 1356 held in the name of Domestic Partner, ("Domestic Partner Account") which the Defendant controlled and into which the Defendant also transferred approximately $1.8 million from the Avalon Account; and

c. a Wells Fargo account ending in 1299 held in the name of Goldman Investments Group, which the Defendant controlled and into which he also transferred $150,000 from the Avalon Account.

*Id.* Avalon Group Inc. ("Avalon") is the Defendant's alter ego. *Id.* Avalon was incorporated in the State of Delaware on January 22, 2020. *Id.* The Defendant identified himself in a State of Delaware Annual Franchise Tax Report as the CEO of Avalon and its only officer and director. According to bank account applications, the Defendant identified himself as the president of Avalon. *Id.* On a business credit card application dated June 18, 2022, the Defendant listed $60,000 in total annual income and $250,000 in gross business income, identified investment income as the source of his income, and listed his current position as real estate. *Id.* Despite having an IRS tax filing requirement, Avalon never filed a U.S. Corporation Income Tax Return on Form 1120. *Id.* at 19.

1. <u>Sources of Income</u>

   (a) *Company 1*

   In 2020, 2021 and 2022, the Defendant received into the Avalon Account, $1,534,000 from Company 1.

| DATE | PAYOR | AMOUNT |
|---|---|---|
| 9/22/2020 | Wire – Company 1 | $600,000 |
| 12/14/2020 | Wire – Company 1 | $750,000 |
| 8/31/2021 | Wire – Company 1 | $60,000 |
| 9/29/2021 | Wire – Company 1 | $60,000 |
| 10/27/2021 | Wire – Company 1 | $64,000 |
| | TOTAL | $1,534,000 |

*Id.*

(b) *BCG, LLC and Payor 1*

In 2021 and 2022, the Defendant received into the Avalon Account, $800,000 from Payor 1 and BCG, LLC ("BCG"), an entity owned and controlled by Payor 1, including the payments listed below.

| DATE | PAYOR | AMOUNT |
|---|---|---|
| 12/1/2021 | Wire – BCG | $500,000 |
| 3/30/2022 | Wire – Payor 1 | $250,000 |
| 8/29/2022 | Wire – BCG | $50,000 |
| | TOTAL | $800,000 |

*Id.*

2. Transfers to the Domestic Partner Wells Fargo Account

In 2020, 2021 and 2022, the Defendant transferred more than $1.8 million from the Avalon Account to the Domestic Partner Account. *Id.*

The Defendant co-mingled these funds with other funds in the Domestic Partner Account. *Id.*

3. Defendant Used His Unreported Income to Pay His and Domestic Partner's Personal Expenses

The Defendant used unreported income he received in the Avalon Account and the Domestic Partner Account to pay various personal expenses for the Defendant and for Domestic Partner. *Id.* at 20.

The largest personal expense was the purchase of a million-dollar condominium where he and Domestic Partner lived in Las Vegas in 2022.  *Id.*

The second largest single expense occurred on October 11, 2022, when the Defendant leased a Bentley using $122,360 in funds from the Domestic Partner Account. The Defendant signed the check made out to Bentley Financial Services for the lease.  *Id.*

From 2021 to 2024, more than $400,000 in personal credit card debt on the Defendant's Citi credit card was paid off in funds from the Domestic Partner Account.  *Id.*

4. <u>False and Fictitious Tax Returns</u>

In order to conceal the millions of dollars he received in income in 2020, 2021 and 2022, the Defendant created and filed false Forms 1040, U.S. Individual Income Tax Returns, for himself and in Domestic Partner's name that included false and fictitious income and expenses.  *Id.*  The Defendant used a professional tax return preparer to create these returns.  *Id.*  The professional tax return preparer, who worked in Los Angeles, used a tax preparation software to create returns for the Defendant.  *Id.*  The Defendant provided the professional tax return preparer with the income and expense figures included in the returns filed on his own behalf and the ones filed in Domestic Partner's name.  *Id.*  The Defendant did not provide any documents that substantiated any of these figures.  *Id.*  As a result, the professional tax return preparer refused to sign the returns.  *Id.*  The Defendant told the professional tax return preparer that he would not disclose how he earned any income and that the professional tax return preparer should not inquire about how he earned his income.  *Id.*  The Defendant also instructed the tax return preparer to delete any emails or messages with the Defendant, which the professional tax return preparer did.  *Id.* The professional tax return preparer advised the Defendant that the Schedule C to an U.S. Individual Income Tax Return was the most audited part of a tax return because it was often used to cheat on taxes and that, as a result, the Defendant should collect and maintain records that supported all the income and expenses he instructed the professional tax return preparer to include on Schedule C.  *Id.* at 20-21.  The Defendant provided income and expense numbers to the professional tax return preparer both for his Form 1040 and the

Form 1040 that he submitted in Domestic Partner's name. *Id.* The professional tax return preparer never spoke to or interacted with Domestic Partner in 2020, 2021 or 2022. *Id.*

In addition, on or about March 19, 2021, the Defendant prepared and filed a false Form 1120-S, U.S. Income Tax Return for an S Corporation, for Goldman Investments Group in 2020. *Id.* This return included false and fictious income and expenses for Goldman Investments Group. *Id.* The Defendant did not use the services of the professional tax return preparer in the creation of this return. *Id.*

(a) *Alexander Smirnov Forms 1040*

The Defendant filed false Forms 1040, U.S. Individual Income Tax Returns, for himself where he falsely claimed on the Schedules C attached to each return that he received:

    a. $40,000, in gross receipts for "consulting" in 2020,

    b. $40,000 in gross receipts for "consulting" in 2021, and

    c. $50,000 in gross receipts for "consulting" in 2022.

*Id.*

The Defendant did not pay taxes on this fictitious income. Instead, on those Schedules C, he claimed fictitious expenses in the following amounts in the following tax years:

    a. In 2020, $31,980;

    b. In 2021, $39,878; and

    c. In 2022, $26,768.

*Id.*

As a result, the Defendant falsely self-assessed owing the U.S. Treasury:

    a. In 2020, only $1,133 in taxes; Defendant further reduced his tax obligations by falsely claimed a $600 COVID-19 pandemic rebate for persons who earned $75,000 or less, and $538 in earned income credit (EIC) which he falsely claimed entitled him to a refund of $5;

    b. In 2021, $0 in taxes; the Defendant again further reduced his tax obligations by

falsely claiming a $1,400 COVID-19 pandemic rebate for persons who earned less than $80,000, and $19 in EIC, which he then claimed entitled him to a refund in the amount of $1,419; and

    c.  In 2022, only $4,136 in taxes.

*Id.* at 21-22

    (b) *Domestic Partner Forms 1040*

To further conceal the millions of dollars in income he received and used to pay his and Domestic Partner's personal expenses, including income deposited into the Domestic Partner Account from which his personal expenses were paid, the Defendant also prepared and filed false Forms 1040 in the name of Domestic Partner in 2020, 2021 and 2022 where he falsely claimed on the Schedules C attached to each return that Domestic Partner received:

    a.  $40,000, in gross receipts for "consulting" in 2020;

    b.  $40,000 in gross receipts for "consulting" in 2021; and

    c.  $60,000 in gross receipts for "consulting" in 2022.

*Id.* at 22

Like his own Form 1040, the Defendant claimed on those Schedules C similar fictitious expenses in the following amounts in the following tax years:

    a.  In 2020, $31,314;

    b.  In 2021, $36,689; and

    c.  In 2022, $31,553.

*Id.*

As a result, the Defendant falsely assessed that Domestic Partner owed the U.S. Treasury:

    a.  In 2020, $1,228 in taxes; the Defendant further reduced any tax obligations by falsely claiming that Domestic Partner was entitled to a $538 EIC which he claimed resulted in Domestic Partner owing the U.S. Treasury only $690;

    b.  In 2021, $468 in taxes; the Defendant again further reduced any tax

obligations by falsely claiming that Domestic Partner was entitled to $470 EIC, which he then claimed entitled her to a refund in the amount of $2; and

c. In 2022, $5,933 in taxes.

*Id*. at 22-23.

(c) *Goldman Investments Group Forms 1120*

To further conceal the millions of dollars in income he received into a bank account held in the name of Goldman Investments Group, the Defendant filed a Form 1120-S, U.S. Income Tax Return for an S Corporation, in the name of Goldman Investments Group in 2021. *Id.* at 23. The Defendant falsely reported that Goldman had $89,282 in gross sales and $92,300 in total deductions. *Id.*

(d) *Defendant Signed the False Returns*

In 2021, the Defendant signed his own false return and the false returns he prepared in the name of Domestic Partner and Goldman Investments Group for tax year 2020. *Id.*

In 2022, the Defendant signed his own false Form 1040 and signed the false Form 1040 that he prepared for Domestic Partner for tax year 2021. *Id.*

In 2023, the Defendant prepared a false and fictious Form 1040 for Domestic Partner and while he signed his own false and fictitious Form 1040, his signature did not appear on Domestic Partner's return for tax year 2022. *Id.*

5. <u>Tax Due and Owing</u>

As part of the plea agreement, the Defendant admitted that he received unreported income in the amounts of $1,350,000 for tax year 2020, $500,000 for tax year 2021 and $300,000 for tax year 2022. Plea Agreement (Exhibit 1) ¶ 4.

The Government disclosed to the Defendant an IRS report that calculated the amount of tax he owes on his unreported income and because of his tax evasion. A copy of that report is attached. Exhibit 4. The report calculates that the Defendant owes the IRS $458,744 in outstanding tax for 2020, $145,171 in outstanding tax for 2021 and $71,587 in outstanding tax for 2022, for a total of $675,502. The Defendant has agreed that that is the tax loss in this case, *see* Plea Agreement (Exhibit 1) ¶ 18, and that he owes

24

that amount to the IRS in restitution, *see* Plea Agreement (Exhibit 1) ¶ 19.

## III.    SENTENCING GUIDELINES

### A. Count Two of the Obstruction Indictment (Cr. No. 24-91)

#### 1. Base Offense Level is 14

The parties agree that the base offense level for Count Two in the obstruction indictment is 14, pursuant to U.S.S.G. § 2J1.2(a)(2).  Plea Agreement (Exhibit 1) ¶ 18.

#### 2. Three Level Increase for Unnecessary Expenditure of Substantial Governmental Resources

A three-level increase applies because substantial government resources were expended as a result of the Defendant causing the creation of the false and fictitious 2020 1023.  *See* U.S.S.G. § 2J1.2(b)(2) ("[i]f the offense resulted in substantial interference with the administration of justice, increase by 3 levels.").

The Commentary defines "substantial interference with the administration of justice" to include ". . . the unnecessary expenditure of substantial governmental or court resources."

In 2020, the FBI, through the Pittsburgh Field Office, and the U.S. Department of Justice, through the U.S. Attorney's Office for the Western District of Pennsylvania, assigned investigators and prosecutors to pursue the false allegations that the Defendant made that were memorialized in the 2020 1023.  For example, the document titled "Open Items for Completion by PG" shows various investigative steps that FBI Pittsburgh and FBI Seattle, where the Defendant's Handler was located, took in an attempt to assess the credibility of the allegations the Defendant first reported in 2020 that were memorialized in the 2020 1023.  Exhibit 6.

In 2023, the FBI assigned a second team of investigators, through the FBI's Wilmington RA and the U.S. Department of Justice, through the U.S. Attorney's Office for the District of Delaware and later the Special Counsel's Office, to investigate the Defendant's allegations.  This second group of FBI agents and prosecutors took investigative steps that caused them to conclude that the Defendant was lying and that he

should be prosecuted himself for these lies.

In any event, significant Justice Department resources were expended determining that the Defendant's false allegations were lies.

In addition, the 1023 caused the substantial expenditure of government resources by the U.S. Congress and the FBI and Department of Justice in the Congressional oversight process. The following is a summary by FBI Director Wray of the actions taken by the Congress and the FBI and Justice Department specifically related to the 2020 1023:

On May 3, 2023, the U.S. House of Representatives Committee on Oversight and Accountability issued a subpoena to the FBI requesting an "unclassified FD-1023 form." On May 10, [the Office of Congressional Affairs or "OCA"] responded in writing to the committee, assuring them of the FBI's commitment to working with them to provide information necessary for their legitimate oversight interest while also protecting CHS information. OCA staff followed up with an in-person meeting with committee staff on May 15 to learn more about their legislative interests and specific informational needs.

Subsequently, on May 22, a deputy assistant director (DAD) of the FBI's Directorate of Intelligence briefed committee staff. That briefing:

- Included a detailed discussion of the Attorney General's Guidelines regarding the Use of FBI Confidential Human Sources policy — which strictly limits when and how CHS information can be provided outside of the FBI — as well as the reasons behind the policy.

- Emphasized the importance of the FBI protecting not only the identity of a specific CHS but also information that would tend to identify the source, such as contextual material found in many of the kinds of investigative materials requested by the committee, such as FD-1023s.

- Explained the importance of closely protecting source information to

26

preserve sources and methods and maintain investigative integrity, to prevent a potential decline in the FBI's recruitment of sources and their candor in reporting, and to protect sources and individuals associated with them from being physically harmed or even killed. The briefing highlighted that the FBI's obligation to protect CHS information extends at least for the life of the source.

- Presented an overview of the various levels of approval that go into reviewing FD-1023s, as well as the policies that govern how FD-1023s are routed internally. The DAD outlined how the FBI analyzes the veracity of source reporting and the internal oversight mechanisms designed to weigh reporting against other information known or developed by the FBI, and cautioned that raw, unverified source reporting may lack that important context.

On May 30, OCA communicated with the committee to inform them that we had identified responsive information that we were prepared to offer the committee as an extraordinary accommodation, and that a previously scheduled call between Director Wray and the chairman would still take place the following day.

On May 31, Director Wray had separate calls with the chairman and ranking member. The Director discussed the good faith efforts the FBI has taken to accommodate the committee's request. He also conveyed that the FBI had identified an FD-1023 that the FBI believes is responsive to the subpoena [the 2020 1023 the Defendant caused the creation of]. The Director further offered to produce that document with limited redactions for review at their earliest convenience, along with an important briefing to provide context to the document.

[On] June 5, the FBI produced to the chairman, ranking member, and limited staff members an FD-1023 containing minimal redactions that was

responsive to the committee's subpoena. The minimally redacted document was produced on a read-and-return basis, which means the document was not left with the committee at the conclusion of the briefing. In addition, two FBI senior executives provided a contextual briefing on the document, the importance of protecting the safety of CHSs, and the integrity and effectiveness of the FBI's CHS program. The safeguards the FBI placed on the production of this information are important, not only for the integrity of FBI investigations but also the protection and safety of our sources. Moreover, these safeguards are routinely employed in response to congressional requests and in court proceedings.

Throughout this entire process, both OCA and OPA have communicated that this is an extraordinary accommodation given the sensitivities surrounding FBI FD-1023s. Over the past three-plus weeks, OPA has released six public statements about this matter, including the following:

"Director Wray has offered to produce the requested document, with limited redactions to protect the confidentiality and safety of sources, by bringing it to a secure location in the U.S. Capitol for the chair and ranking member to review. The FBI has continually demonstrated its commitment to working with the committee to accommodate its request, from scheduling briefings and calls to now allowing the chair and ranking member to review information in person. By offering to provide access to the requested document in combination with a briefing to offer context, the FBI has agreed in good faith to give the committee all of the information it originally asked for and more. The commonsense protections the FBI has requested to maintain the confidentiality of that sensitive information are routinely employed both in response to congressional requests and in court in criminal proceedings to protect the physical safety of sources and the

integrity of investigations. The FBI remains committed to cooperating with the committee in good faith."

https://socxfbi.org/SFSA/SFSA/Featured-Articles/Message-from-the-FBI-on-the-FD-1023-Request-from-Congress.aspx  (Exhibit 7).

3. Two Level Increase Because the 2020 1023 Was An "Especially Probative or Essential Record"

A two-level increase applies because the 2020 1023 was an especially probative or essential record.  *See* Section 2J1.2(b)(3) ("If the offense . . . involved the selection of any *essential or especially probative record*, document, or tangible object, to destroy or alter increase by 2 levels.").  (emphasis added)

The 2020 1023 was an "essential or especially probative record" or document.  It was the sole record of an interview of the Defendant where he made serious allegations of bribery against the former Vice President of the United States.  It was generated in the course of the Pittsburgh assessment in 2020 and then was the source of a separate investigation in 2023 when the FBI again investigated its claims.  The 2020 1023 was a four-page single spaced report that described two in-person meetings and two phone calls in detail.  It described the participants in those meetings and phone calls, the locations where they occurred and a high degree of detail about what was said and by whom, including specific quotes.

By contrast an incidental record would have been something like a false document that purported to corroborate some minor fact in a 1023 that otherwise contained truthful information.

Adding to its special probity is the fact that when it was created in 2020, Joseph R. Biden was the presumptive nominee of the Democratic Party for President and when it was investigated again in 2023 Joseph R. Biden was the President of the United States and the presumptive nominee of the Democratic Party in the 2024 election.

In addition, it was an especially probative document in Congressional oversight of the U.S. Department of Justice, as described above.

4. <u>Three Level Increase Because of Official Victim</u>

A three-level upward adjustment applies because the target of the allegations, Joseph R. Biden, identified as Public Official 1 in the indictment and plea agreement, was an official victim.  Section 3A1.2(a), provides:

> Official Victim   If (1) the victim was (A) a government officer or employee; (B) a former government officer or employee; . . . and (2) the offense of conviction was motivated by such status, increase by 3 levels.

In 2020, Joseph R. Biden was a former government officer, namely, the former Vice President of the United States.  The Defendant's text exchanges with his handler and others also evidence that he was motivated by Joseph R. Biden's status as the former Vice President of the United States.  The Defendant's false statements all involved conduct that occurred when Joseph R. Biden was Vice President of the United States and the Obama Biden Administration lead on Ukraine policy.

Application Note 1 provides that "[t]his guideline applies when specified individuals are victims of the offense.  This guideline does not apply when the only victim is an organization, agency, or the government."  Courts have found that when false information is provided to an investigating agency the individuals against whom accusations are made are the victims, not the agency that received the information.  For example, in *United States v. Hildebrandt*, the Defendant was convicted of two counts of 18 U.S.C. § 1001.  961 F.2d 116, 117 (8th Cir. 1992).  "The charges were based on Hildebrandt's sending to the IRS false forms claiming that he had paid various individuals large sums of money."  *Id*.  At sentencing, the district court applied the official victim adjustment and on appeal the Defendant challenged that finding.  *Id*.  The Eighth Circuit described his claims, which it rejected, as follows:

> Finally, Hildebrandt argues that the district court improperly imposed a three-level enhancement under United States Sentencing Guideline § 3A1.2 (1990) on the basis that the victims of his crime were "official victims" within the meaning of that guideline. Because he was convicted only for his

actions against the IRS-which, under section 3A1.2, cannot be considered an individual victim-he argues that the district court erred by basing the enhancement on the fact that many of the recipients of the 1099 forms were "officials" within the meaning of section 3A1.2.

Hildebrandt's argument ignores the fact that the government prosecuted him for statements made to the IRS claiming that these individuals had received substantial amounts of non-wage income when, in fact, they had not. Because the IRS investigates any discrepancy between the amounts reported on 1099 forms and an individual's tax returns, Hildebrandt's sending of the forms to the IRS certainly had the effect of making these individuals his victims. We thus conclude that the district court properly interpreted the scope of the guideline and did not err by imposing the three-level enhancement.

*Id.* at 119 (8th Cir. 1992); *see also United States v. Citrowske*, 951 F.2d 899, 900 (8th Cir. 1991) (official victim adjustment applied where defendant was convicted of one count of violating 18 U.S.C. § 1001 for filing more than fifty 1099 tax return forms falsely reporting over $20 million of miscellaneous income to a judge, lawyers, bankers, sheriff's department officers, county commissions and other government employees who had various roles in the foreclosure and liquidation of the defendant's property). Similarly, in *United States v. Hunter*, the district court's application of the official victim adjustment was upheld by the D.C. Circuit in a case where the defendant made false complaints to the Treasury Inspector General for Tax Administration falsely accusing IRS employees of misconduct. 554 F. App'x 5, 10 (D.C. Cir. 2014). The same reasoning applies here.

This adjustment has also been applied in cases where a Defendant makes threats against the President. *See, e.g.*, *United States v. Bier*, 238 Fed.Appx. 228, 230 (9th Cir. 2007); *United States v. McAninch*, 994 F.2d 1380, 1385 n. 6 (9th Cir. 1993); *United States v. Hines*, 26 F.3d 1469, 1473, 1476 (9th Cir.1994) (approving both a six-level

enhancement for a threat directed against the President, coupled with conduct evidencing an intent to carry out the threat and a six-level upward departure pursuant to an earlier version of  U.S.S.G. § 3A1.2, Application Note 2); *United States v. Cole*, 135 F.3d 114 (2nd Cir. 1998) (approving application of three-level enhancement to Defendant who threatened President's life); *United States v. Fann,* 41 F.3d 1218, 1218 (8th Cir.1994) (same).  However, the guideline adjustment by its plain language does not limit its application to cases involving threats of physical harm.

The fact that then Vice President Biden was likely unaware of the Defendant's false accusations against him is irrelevant.  *Bier*, 238 Fed.Appx. 228, 230 (President can be the official victim for purposes of U.S.S.G. § 3A1.2 even if unaware of the existence of the threat); *Hines*, 26 F.3d at 1476; *United States v. Drapeau*, 188 F.3d 987, 991 (8th Cir. 1999) ("an individual need not be harmed, or even knowledgeable of the crime, to be a victim"); *United States v. Polk,* 118 F.3d 286, 298 (5th Cir.) (holding a § 3A1.2(a) enhancement applicable to solicitation and attempt to blow up an IRS building although the plan was never carried out); *United States v. McCaleb,* 908 F.2d 176, 179 (7th Cir.1990) ( "Nothing in the ... guidelines requires that the victim be harmed or made aware of the threat.").

5.  Two Level Upward Adjustment for Exceptionally High-Level Official

In addition to a three-level upward adjustment for official victim, an additional two-level upward adjustment should apply because the official victim, Joseph R. Biden, was an exceptionally high-level official.  Application Note 5 to U.S.S.G. § 3A1.2(a) provides for the following upward departure:

> Upward Departure Provision. —If the official victim is an exceptionally high-level official, such as the President or the Vice President of the United States, an upward departure may be warranted due to the potential disruption of the governmental function.

The upward departure contemplated in Application Note 5 differs from Section 3A1.2 in two important ways.   First, it uses the present tense "if the official victim *is an*

exceptionally high-level official …" (emphasis added). When the Defendant was interviewed in September 2023 and repeated his false accusations against Joseph R. Biden, which is described in the indictment and is relevant conduct, Joseph R. Biden was the President of the United States. So that requirement is met. Second, the last phrase in the application note refers to "potential disruption of the governmental function," which is an additional requirement that must be met to justify an additional upward departure. Congressional oversight is a "governmental function." At the time the Defendant repeated his false accusations in September 2023, the Congress was actively involved in examining the Defendant's false claims in the 2020 1023. The 2020 1023 was released publicly in July and, as described above, the Congress and the Executive Branch had taken numerous steps to address its claims. The Defendant's choice to repeat his false claims when he was interviewed by the FBI in September 2023 had the potential to further disrupt the oversight process, which is a governmental function.

Further, at the time the Defendant was interviewed President Biden was a candidate for re-election. The Supreme Court has long recognized a state's compelling interest in regulating elections, i.e. in securing the right to vote freely and effectively. *Burson v. Freeman,* 504 U.S. 191 (1992); *see also Mills v. Alabama,* 384 U.S. 214 (1966); *Oregon v. Mitchell,* 400 U.S. 112 (1970). The Defendant's false statements had the potential to disrupt the conduct of federal elections by spreading misinformation about the presumptive nominee of one of the two major American political parties in the 2024 elections.

6. <u>Two Level Upward Adjustment for Abuse of a Position of Trust</u>

A two-level upward adjustment applies because the Defendant abused a position of trust. *See* U.S.S.G. § 3B1.3 ("If the Defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels.") Application Note 1 defines "public or private trust" this way:

"Public or private trust" refers to a position of public or private trust

characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference).  Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.  For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the Defendant's responsibility for the offense more difficult).

The key phrase is "the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense." That was certainly the case here.  The Defendant was a long-term trusted CHS who had been in a formal relationship with the FBI for 10 years before his criminal conduct.  He wasn't someone who came into an FBI field office or called the FBI and made a tip, which may or may not have been considered and followed up on.  It was precisely because of his status with the FBI that his allegations were investigated, which reflects the position of trust he occupied with the FBI.

Courts have applied the abuse of position of trust adjustment to informants who commit crimes related to their status as informants.  *See, e.g. United States v. Nava*, 957 F.3d 581, 589 (5th Cir. 2020) ("The district court found that [defendant] abused his position of trust as a government informant by misleading the DEA about [co-conspirator's] route to Denver."); *United States v. Young*, 932 F.2d 1035, 1036–37 (2d Cir. 1991)  ("[Defendant] obtained the Customs i.d. because the Customs Service reposed sufficient trust in him to work as an informant, and his display of the i.d., in connection with his claim to be selling confiscated Government property, significantly facilitated the offense.").

**B. Counts One, Five and Eight of the Tax Evasion Indictment (Cr. No. 24-702)**

The parties agree that the base offense level for Counts One, Five and Eight in the tax evasion indictment is 20, pursuant to U.S.S.G. § 2T4.1(H).  Plea Agreement (Exhibit 1) ¶ 18.

The Defendant's total offense level should be increased by two levels because he employed sophisticated means in the commission of his tax offenses.  U.S.S.G. §2T1.1(b)(2) ("if the offense involved sophisticated means, increase by 2 levels.").  Application Note 5 indicates that "sophisticated means" is especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means.

The Defendant didn't simply underreport his income.  He created false Schedule Cs that included both revenue and expenses in a variety of categories.  He not only did this for himself, but he also generated false returns in the name of Domestic Partner and similarly created false Schedule Cs for her return that also contained bogus revenue and expenses across a number of categories.

**C. Multiple Counts**

Applying the rules in U.S.S.G. §3D1.2, Count Two of the obstruction of justice indictment forms one group (Group 1) and Counts One, Five and Eight of the tax evasion indictment form a second group (Group 2) of closely related counts.

Applying the rules in U.S.S.G. §3D1.3, the total offense level for Group 1 is 26 and the total offense level for Group 2 is 22.

Pursuant to U.S.S.G. §3D1.4, the total offense level for Group 1 is increased by 2 levels because there are two units, for a total offense level of 28.

**D. Acceptance of Responsibility**

The Defendant's total offense level of 28 is decreased by three levels for timely acceptance of responsibility.  *See* U.S.S.G. § §3E1.1(a). and §3E1.1(b).

### E. Criminal History

The government does not believe that the Defendant has a prior criminal history, and therefore his criminal history is a category I.

### F. Advisory Sentencing Guidelines Range

Accordingly, the Defendant's total offense level is 25 and his advisory sentencing guidelines range is 57-71 months of incarceration.

## IV. RESTITUTION

With respect to restitution due, the Government requests that the Court order the Defendant:

1. To pay restitution to the Internal Revenue Service ("IRS") **in the amount of $675,502**, pursuant to 18 U.S.C. § 3663(a)(3). The Defendant has agreed to pay restitution in this amount as part of the plea agreement. *See* Plea Agreement (Exhibit 1) ¶¶ 12 & 19. This is the total amount of restitution that results from the Defendant's fraudulent conduct. The Defendant must pay Title 26 interest on whatever amount of restitution the Court determines; interest runs from the last date prescribed for payment of the relevant tax liability until the IRS receives payment in full.

2. That all restitution is due and payable immediately after the judgment is entered and is subject to immediate enforcement, in full, by the United States. If the Court imposes a schedule of payments, the schedule of payments is a schedule of the minimum payment due, and that the payment schedule does not prohibit or limit the methods by which the United States may immediately enforce the judgment in full. The IRS will use the amount of restitution ordered as the basis for a civil assessment under 26 U.S.C. § 6201(a)(4). The Defendant does not have the right to challenge the amount of this restitution-based assessment. *See* 26 U.S.C. § 6201(a)(4)(C). Neither the existence of a restitution payment schedule nor the Defendant's timely payment of restitution according to that schedule will preclude the IRS from immediately collecting the full amount of the restitution-based assessment. The

Defendant has agreed to these provisions as part of the plea agreement.  *See* Plea Agreement (Exhibit 1) ¶¶ 13 & 14.

3. If full payment cannot be made immediately, the Defendant must make a complete and accurate financial disclosure to the IRS on forms prescribed by the IRS (including, but not limited to, IRS Form 433-A and Form 433-B, as appropriate); and to disclose to the IRS any and all additional financial information and financial statements provided by the United States Probation Office.  The Defendant also agrees to provide the above-described information to the Probation Office.

4. If the Defendant makes a payment of the restitution agreed to in paragraph 1 prior to sentencing, the payment will be applied as a credit against the restitution ordered pursuant to paragraph 1.

5. Payments may be made to the Clerk, United States District Court, Fiscal Department, 255 East Temple Street, 11th Floor, Los Angeles, California 90012.

6. With each payment to the Clerk of the Court made pursuant to the District Court's restitution order, the Defendant will provide the following information:

   a. the Defendant's name and Social Security number;

   b. The District Court and the docket number assigned to this case;

   c. That the payment is for tax year 2020, 2021 or 2022;

   d. A statement that the payment is being submitted pursuant to the District Court's restitution order.

7. To include a request that the Clerk of the Court send the information, along with the Defendant's payments, to the IRS address below:

IRS – RACS

Attn: Mail Stop 6261.  Restitution

333 W. Pershing Avenue

Kansas City, MO 64108

8. To Send a notice of any payments made pursuant to this agreement, including the information listed in the previous paragraph, to the IRS address below:

IRS – RACS

Attn: Mail Stop 6261.  Restitution

333 W. Pershing Avenue

Kansas City, MO 64108

## V.    THE GOVERNMENT'S SENTENCING RECOMMENDATION

**The Government recommends that defendant be imprisoned for a term of 72 months, taking into account Section 3553(a) factors, as discussed below.**

The Government's recommended sentence of 72 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals of sentencing. A 72-month term of imprisonment is a lengthy and serious sentence that accounts for the egregiousness of defendant's crimes, sends important deterrent messages both to informants who lie to law enforcement and, more broadly, to all Americans who owe taxes, promotes respect for the law, and provides just punishment. At the same time, the recommended sentence appropriately accounts for mitigating facts and circumstances in defendant's personal history and characteristics.

While not definitive, the Guidelines range provides the starting point for finding a reasonable sentence and must then be considered with the factors set forth in 18 U.S.C. § 3553 (a).  *See United States v. Cantrell*, 433 F.3d 1269, 1279 (9th Cir. 2006). "To comply with the requirements of *Booker*, the district court must have sufficiently considered the Guidelines as well as the other factors listed in § 3553(a). This requirement does not necessitate a specific articulation of each factor separately, but rather a showing that the district court considered the statutorily-designated factors in imposing a sentence." *United States v. Nichols*, 464 F.3d 1117, 1125 (9th Cir. 2006) (*quoting United States v. Knows His Gun*, 438 F.3d 913, 918 (9th Cir. 2006)). The Section 3553(a) factors are as follows:

1) The nature and circumstances of the offense and the history and characteristics of the defendant;

2) The need for the sentence imposed –

(A) To reflect the seriousness of the offense, to promote respect for the law, and

to provide just punishment for the offense;

(B) To afford adequate deterrence to criminal conduct;

(C) To protect the public from further crimes of the defendant; and

(D) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3) The kinds of sentences available;

4) The kinds of sentence and the sentencing range established for the offense and the defendant as set forth in the Sentencing Guidelines;

5) Any pertinent policy statement issued by the Sentencing Commission;

6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7) The need to provide restitution to any victims of the offense.

*See* 18 U.S.C. § 3553(a).

## A. 18 U.S.C. § 3553 (a)(1)

Section 3553 (a)(1) of Title 18 requires the Court to consider the nature and circumstances of the offense and the history and characteristics of defendant. These factors militate in favor of a sentence of 72 months.

As to the nature and circumstances of Count One of the obstruction of justice indictment, the Defendant decided in 2020 to exploit the position of trust he enjoyed with the FBI in order to provide false information about one of the candidates for President of the United States in an attempt to influence the outcome of the election.  The information he provided, which was memorialized in the 2020 1023, was detailed and specific and was clearly designed to deceive the FBI into pursuing a public investigation into then candidate Joseph R. Biden.  And the FBI did investigate the Defendant's allegations but closed the investigation without it becoming public because there was little, if any, corroboration for what the Defendant told them.

The false 2020 1023 ultimately became public in the summer of 2023 and again threatened to influence a U.S. presidential election when the FBI chose to re-examine it.

The indictment in the obstruction of justice case resulted from this second FBI investigation. Thus, the 2020 1023 which the Defendant caused the creation of threatened the integrity of not one but two U.S. presidential elections.

As to the nature and circumstances of his tax offenses, Counts One, Five and Eight of the tax evasion indictment, the Defendant earned more than $2 million of dollars in income in 2020, 2021 and 2022. Instead of paying the taxes he owed as an American citizen, he instead filed multiple false returns over a three-year period—in his name, the name of his domestic partner and the name of an investment company—to evade paying taxes on that income. In short, he repaid the generosity of the country that welcomed him as an immigrant by cheating his fellow citizens out of his contribution to the U.S. Treasury. And its not like he used the money he *didn't* pay in taxes for some noble purpose. Instead, he spent it on an extravagant lifestyle including a million-dollar Las Vegas condo, a Bentley, and hundreds of thousands of dollars of clothes, jewelry and other personal items for him and his domestic partner.

As to the history and characteristics of the Defendant, the fact that the Defendant may have provided information to the FBI that was not false in connection with other investigations is not a mitigating factor. It led to the position of trust that the Defendant exploited in 2020. Put another way, the FBI investigated the allegations leveled by the Defendant in the 2020 1023 in 2020 and again in 2023 precisely because they trusted him, and they trusted him because some of the information the Defendant had previously provided was true.

In various pretrial filings in this case, defense counsel has claimed that the Defendant served the United States or was loyal to the United States. To be clear, the Defendant wasn't in public service. He was an informant and he was paid almost $300,000 for the information he provided. The transactional relationships between law enforcement and informants is not based on the virtue of the latter. Just the opposite. Informants, including the Defendant, are people who are involved in crimes themselves or who are involved with other people who are involved in crimes themselves. Informants are often

liars and cheats, as the Defendant has proven to be.  They are seldom people of good character and the Defendant is no exception.

The Defendant was sophisticated enough to generate more than $2 million in income from various sources and then, instead of paying taxes on that income, he executed a scheme to evade taxes by filing false returns in his own name, the name of his Domestic Partner and the name of an investment company he controlled.

It has been said that the true test of character is what you do when no one is watching. Indeed, the U.S. tax system is based on principles of self-assessment and voluntary reporting. To work properly, it requires that taxpayers like the Defendant account for their income, file accurate tax returns, and pay their fair share of taxes.  The Defendant did none of those things and that reflects his character, not mistakes or any misunderstanding about the tax laws.

Finally, the Defendant's tax crime was not an aberration or the result of a momentary lapse in judgment. Defendant engaged in a deliberate and multi-year course of conduct designed to avoid reporting millions of dollars in income to the government. The scope and gravity of the Defendant's tax offenses necessitates a significant term of incarceration.

## B. 18 U.S.C. § 3553 (a)(2)

Section 3553(a)(2) requires the Court to consider the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of defendant, and to provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. The government respectfully submits that a sentence of 72 months (1) will appropriately reflect the seriousness of the offense and promote respect for the law; (2) will deter future criminal conduct from both the Defendant and others without being greater punishment than necessary; and (3) will serve to protect the community.

As to causing the creation of the false 2020 1023, interfering in a U.S. Presidential

election by falsely accusing a candidate of one of the two major political parties of corruption is among the most serious kinds of election interference one can imagine. The fact that the Defendant's false accusations were investigated in not one, but two successive presidential elections effectively doubled the severity of his crime. In each election cycle America's adversaries attempt and, in some cases, successfully spread misinformation. Sentencing the Defendant to 72 months of incarceration will deter messengers of such misinformation by demonstrating that if they are caught, they will be punished. Finally, the public must be protected from activities designed to distort our elections through the introduction of misinformation, a further reason for a sentence of 72 months.

Tax related crimes are "indisputably serious" offenses. *United States v. Tomko*, 562 F.3d 558, 586 (3d Cir. 2009); *see also Mei v. Ashcroft*, 393 F.3d 737, 740 (7th Cir. 2004) ("large-scale tax fraud is a serious crime"); USSG Ch. 1, Pt. A., p.s. 4(d) (characterizing tax evasion as a "serious" crime). The Supreme Court has long recognized that "[t]he United States has relied for the collection of its income tax largely upon the taxpayer's own disclosures rather than upon a system of withholding the tax from him by those from whom income may be received." *Spies v. United States*, 317 U.S. 492, 495 (1943). A functioning government relies on its citizens and residents to report timely, completely, and honestly all taxes they owe, which is why Congress has made it a criminal offense to file false returns or evade income taxes. Indeed, as Justice Oliver Wendell Holmes stated, "[t]axes are what we pay for a civilized society ...." *Compania General de Tabacos de Filipinas v. Collector of Internal Revenue*, 275 U.S. 87, 100 (1927) (Holmes, J., dissenting). During a three-year period, defendant filed seven federal income tax returns understating his taxable income by more than $2 million and caused tax losses to the government of more than $675,000. Tax offenses with greater losses, such as the offense committed by the Defendant, are "obviously more harmful to the treasury and more serious than a smaller one with otherwise similar characteristics." USSG § 2T1.1, comment.

"[G]eneral deterrence is an important factor in white-collar cases, where the motivation is greed. . ... we have set aside sentences of little or no imprisonment because

they do not constitute just punishment for the offense, do not promote respect for the law, and will not do much to deter similar criminal activity by others." *United States v. Hayes*, 762 F.3d 1300, 1308 (11th Cir. 2014). In addition, because "fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014).

This logic applies here where defendant made repeated and deliberate choices to engage in tax fraud. See S.Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259 ("[A] purpose of sentencing is to deter others from committing the offense. This is particularly important in the area of white collar crime.").

## VI.    CONCLUSION

Based on the foregoing reasons, the Government respectfully requests that the Court:

1) find that defendant's advisory guidelines offense level is 25, resulting in a sentencing guidelines range of 57-71 months of incarceration;

2) impose a sentence of 72 months in custody, consistent with the advisory guidelines range; and

3) order payment: to the IRS of restitution of $675,502; and (b) a $400 special assessment for the counts of conviction.