1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4  UNITED STATES OF AMERICA,      ) Case No. LA CR 24-00091-ODW
                                  )            LA CR 24-00702-ODW
5              Plaintiff,         )
                                  ) Los Angeles, California
6  vs.                            )
                                  ) Wednesday, January 8, 2025
7  ALEXANDER SMIRNOV,             )
                                  ) (10:31 a.m. to 11:28 a.m.)
8              Defendant.         ) (11:40 a.m. to 12:21 p.m.)
   _____)

9

10                    TRANSCRIPT OF SENTENCING
            BEFORE THE HONORABLE OTIS D. WRIGHT, II
11                 UNITED STATES DISTRICT JUDGE

12

13  Appearances:                    See next page.

14  Court Reporter:                 Recorded; CourtSmart

15  Courtroom Deputy:               Sheila English

16  Transcribed by:                 Jordan Keilty
                                    Echo Reporting, Inc.
17                                  9711 Cactus Street, Suite B
                                    Lakeside, California 92040
18                                  (858) 453-7590

19

20

21

22

23

24

25  Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.

2

1  APPEARANCES:

2  For the Plaintiff:              LEO J. WISE, ESQ.
                                   DEREK E. HINES, ESQ.
3                                  United States Department of
                                      Justice
4                                  Office of Special Counsel
                                   950 Pennsylvania Avenue, NW
5                                  Room B-200
                                   Washington, D.C. 20530
6                                  (771) 217-6091

7  For the Defendant:             RICHARD A. SCHONFELD, ESQ.
                                   DAVID Z. CHESNOFF, ESQ.
8                                  Chesnoff & Schonfeld
                                   520 South 4th Street
9                                  Las Vegas, Nevada 89101
                                   (702) 384-5563
10
                                   MARK A. BYRNE, ESQ.
11                                 Byrne & Nixon, LLP
                                   700 North Brand Boulevard
12                                 Suite 1180
                                   Glendale, California 91203
13                                 (213) 620-8012

14                                 CHAD D. NARDIELLO, ESQ.
                                   1801 Century Park East
15                                 Suite 1050
                                   Century City, California 90067
16                                 (310) 201-0123

17                                 NASER J. KHOURY, ESQ.
                                   Naser J. Khoury Law Offices
18                                 14427 Sylvan Street
                                   Van Nuys, California 91401
19                                 (818) 654-0001

20

21

22

23

24

25

3

1  Los Angeles, California; Wednesday, January 8, 2025 10:31 am

2                          --o0o--

3                      (Call to Order)

4          THE CLERK:  Calling item one, CR 24-91 and CR 24-

5  702, United States of America versus Alexander Smirnov.

6          Counsel, may I have your appearances, please.

7          MR. WISE:  Good morning, your Honor.  Leo Wise and

8  Derek Hines for the United States.

9          THE COURT:  Mr. Wise.

10         MR. CHESNOFF:  May it please the Court, your

11  Honor, David Chesnoff, Richard Schonfeld, Naser Khoury,

12  Chard Nardiello and Mr. Byrne are present on behalf of Mr.

13  Smirnov.

14         THE COURT:  All right, Gentlemen.  Good morning.

15         ALL:  Good morning, your Honor.

16         THE COURT:  All right.  We're here for the

17  sentencing in this matter, this matter actually being --

18  matter of fact, these cases aren't consolidated.  I -- I

19  don't know what to call them.  But, anyway, both entitled

20  United States of America versus Alexander Smirnov, Case

21  Number 24-CR-00091 and 2 -- 24-CR-00702.

22         All right.  Because there have been objections to

23  the computation of the guidelines, I think it would probably

24  be best to start there, which isn't much of a deviation from

25  my normal practice of simply regurgitating the guidelines

4

1  calculations, asking if anyone has any objections, and then

2  going from there.  But we do have objections, and Mr.

3  Smirnov has objected to a couple of enhancements, one a

4  three-level enhancement because the offense caused a

5  substantial interference with the administrative --

6  administration of justice under Guideline Section

7  2J1.2(b)(2).  There is an objection to the use of that

8  particular provision to apply a three-level enhancement.

9       And a similar objection regarding specific offense

10 characteristics, that the offense involved destruction or

11 alteration of a substantial number of records and/or the

12 selection of especially probative records to alter.  And

13 this is 2J1.2(b)(3).  Again, this is a two-level

14 enhancement.

15       I guess the one that causes me the most concern is

16 the one dealing with the interference with the

17 administration of justice.  If I understand the objection, I

18 think the Defense is arguing that application of this

19 particular enhancement would constitute double counting,

20 that we were already applying an enhancement for

21 administration of justice and that this enhancement --

22 application of this enhancement would be double counting.

23 But I don't think that there has been a prior application

24 for interference with the administration of justice.  Maybe

25 I'm wrong.

5

1           Whichever one of you lawyers would like to address

2   this.

3           MR. SCHONFELD:  Thank you, your Honor.

4           As to that specific objection -- Richard Schonfeld

5   for the record.

6           THE COURT:  Um-hmm.

7           MR. SCHONFELD:  As to that specific objection, the

8   offense for which Mr. Smirnov pled guilty is effectively an

9   obstruction offense, and the guidelines that apply to the

10  offense in Count 2 in Case Number 91 are the obstruction of

11  justice guidelines.  And, therefore, we do believe it is

12  double counting because it's already included in the instant

13  offense.  For the Court to apply this particular

14  enhancement, there would have to be conduct separate and

15  apart from the underlying conduct that causes the

16  conviction, and there is no separate conduct in this case.

17          I would also note that the congressional hearings

18  for which the Government seeks to apply this enhancement

19  occurred many years after the false statement for which Mr.

20  Smirnov pled guilty, and in order to find this enhancement,

21  it would have to be the but for cause of the substantial

22  expenditure of resources, and that has not been established

23  by evidence in the record.

24          THE COURT:  But if -- if the manufacturing of this

25  particular tale or scenario is -- is what caused the

6

1  Government to -- to hire teams of investigators to -- to

2  investigate some of the claims that were made, seems to me

3  that's a but for, isn't it?

4           MR. SCHONFELD:  Well, your Honor, from a factual

5  standpoint, the investigation occurred and Mr. Smirnov's

6  false statement was brought into the investigation, but it

7  was not the but for cause of the investigation.

8           The Court may recall that special counsel was

9  actually appointed in the Hunter Biden case, and the

10 authority that they have, you know, pursued Mr. Smirnov

11 under was a derivation of the authority granted in that

12 case.

13          THE COURT:  But that's -- that --

14          MR. SCHONFELD:  So, it wasn't the cause.

15          THE COURT:  That's separate and apart from Mr.

16 Joseph accepting a $5 million bribe.

17          MR. SCHONFELD:  My point, your Honor, though, is

18 this wasn't the but for cause of the substantial government

19 resources being expended.

20          THE COURT:  Well, I guess reasonable minds can

21 differ.  Okay.

22          MR. SCHONFELD:  your Honor, may I address the

23 other enhancement?  I know your Honor --

24          THE COURT:  Yes.

25          MR. SCHONFELD:  Okay.  Your Honor, the other

7

1  enhancement under 2J1.2(b)(3) is for the alteration or

2  destruction of essential or especially probative record.  In

3  this case, the allegation in Count 2 of the indictment is

4  that Mr. Smirnov caused the creation of a false record as

5  opposed to the destruction or alteration of an essential or

6  probative record.  And, therefore, that enhancement does not

7  apply.

8           And there's one last note that is separate from

9  that that I would like to address, which is the Government's

10 pursuit of an upward departure, not variance but an upward

11 departure under the Guidelines under USSG 3A1.2 for

12 "exceptionally high level official victim".

13           THE COURT:  Um-hmm.

14           MR. SCHONFELD:  The commentary to those guidelines

15 expressly state that this applies where the individual is

16 the President or the Vice President.

17           In the indictment, the false statement that Mr.

18 Smirnov was charged with and pled guilty to was made in June

19 of 2020, at a time where current President Biden was not

20 either the vice president of the United Stated.  And,

21 therefore, by definition, that upward departure does not

22 apply.

23      (Pause.)

24           THE COURT:  And if I -- if I'm hearing you

25 correctly, are you conceding the -- the objection regarding

8

1 this conduct causing a substantial interference with the

2 administration of justice?

3          MR. SCHONFELD:  No, your Honor.  That was the

4 first argument that I made.  We don't believe that Mr.

5 Smirnov's conduct was the but for cause of those

6 expenditures and it's double counting.

7          THE COURT:  Oh, actually, I was -- I was asking

8 whether or not Mr. Wise is basically --

9          MR. SCHONFELD:  Oh.  Sorry, your Honor.

10          THE COURT:  -- conceding that point to you.

11          MR. WISE:  Thank you, your Honor.

12          No.  Your Honor is right, counsel is confusing

13 2J1.2, which is the obstruction of justice guideline in

14 Chapter 2, with 3C1.1, which is an adjustment for

15 obstruction of justice in Chapter 3.  And the case law they

16 cite shows this confusion.  They cite the Hahn (phonetic)

17 case and the Fries (phonetic) case.  Those are both cases

18 where the obstruction of justice enhancement was applied

19 under 3C1.1.

20          In this case, 3C1.1 was not applied in the PSR.

21 Within the -- within -- so, there is no double counting.

22 And your Honor I think picked up on that right from the

23 start, and I don't know if counsel's -- I don't know why

24 they -- they didn't.

25          2J1.2 specifically has a provision for an

9

1  additional enhancement where there is substantial

2  expenditure of government resources.  Counsel chose only to

3  address the congressional oversight piece, and they make

4  this but for causation argument.  But there's nothing in the

5  guidelines that say that that's a requirement.

6          But, more importantly, they ignore -- and your

7  Honor also pointed this out -- that the FBI and the

8  Department of Justice expended substantial government

9  resources investigating the Defendant's false claims on not

10  one but two occasions.  They mentioned the more recent

11  investigation in 2023, but they ignore in 2020 that the FBI

12  in Pittsburgh and the Department of Justice out of the U.S.

13  Attorney's Office in the Western District of Pennsylvania

14  investigated the Defendant's specific claims, and we

15  submitted as Exhibit 5 to our sentencing memorandum a

16  document that was prepared at the time by the Department of

17  Justice, by the U.S. Attorney's Office that detailed the

18  steps that were taken to investigate the Defendant's claims.

19  So, there is evidence -- they make the argument there's no

20  evidence of substantial expenditure of resources.  Well,

21  that's just not true.  That document evidences substantial

22  expenditure of resources in 2020, and then obviously again

23  in 2023, after the 1023 became public, the FBI reexamined

24  it, and the Defendant has admitted to that, including the

25  interview he gave with a new team, a second team of FBI

*Echo Reporting, Inc.*

10

1    investigators and the prosecutors at that time from the U.S.

2    Attorney's Office in the District of Delaware that

3    ultimately became the special counsel's office. But all of

4    that was substantial expenditure of resources before you

5    even get to the congressional action which, as we provide in

6    our -- in our sentencing memo should be considered, and it

7    was extensive. It extensively involved the Director of the

8    FBI himself and other senior officials.

9         So, for all those reasons, we think that

10   enhancement is appropriate.

11        As to their second argument --

12        THE COURT: Before you leave that, was there a

13   separate investigation out of Wilmington that was

14   necessitated by the investigation or having to have an

15   investigation into some of these claims?

16        MR. WISE: There was. That's how -- that's how

17   this investigation began.

18        THE COURT: Okay.

19        MR. WISE: In the summer of 2023, the U.S.

20   Attorney's Office in Wilmington was asked to look at these

21   allegations because they involved Hunter Biden and obviously

22   Joseph Biden, and he was interviewed -- and -- and the

23   process began. He was interviewed in September of 2023. By

24   that point, the Attorney General had named the U.S. Attorney

25   in Delaware as the special counsel, and the Office of

11

1   Special Counsel was set up.

2          THE COURT:  Okay.

3          MR. WISE:  But, actually, as the indictment lays

4   out, the request came from the FBI in July of '23 to the

5   U.S. Attorney's Office in Delaware.  And, again, that was

6   separate and part from the work that the U.S. Attorney's

7   Office in Western Pennsylvania had done in 2020 and FBI

8   Pittsburgh had done in 2002.

9          THE COURT:  Okay.  All right.  Let's then go back

10  to the selection of or alteration of specific records, et

11  cetera.

12         MR. WISE:  Sure.  It would be nonsensical to say

13  that there's an enhancement for altering a record but not

14  for wholly creating one based on a fabricated story.  That's

15  just simply not linguistically defensible.  If -- if he had

16  altered an existing record, it would clearly -- it would

17  clearly qualify.  This is an especially probative record.

18  It is the -- the only place these allegations are

19  memorialized.  It's not like some other CHS made these

20  allegations and then he provided a little bit of color or

21  context or said, Oh, you know, I traveled at that time and

22  provided some record.  This was the heart -- this document

23  was the heart of the investigation into these claims.  So,

24  of course, it's an especially probative record, and -- and

25  the language -- you know, the language of the guidelines is

12

1  meant to be read practically.  And, so, if -- if -- I mean,

2  creating one out of whole cloth is certainly more serious

3  than simply altering an existing one.  And, so, we think

4  that guideline also applies.

5          THE COURT:  All right.

6          MR. CHESNOFF:  May I respond to that?

7          THE COURT:  Yes.

8          MR. CHESNOFF:  Your Honor, Mr. Wise and the

9  special prosecutor should take that up with the Sentencing

10 Commission.  Defendants are entitled to rely on the language

11 of both legislation statutes and the guidelines.  And the

12 guidelines do not include Mr. Wise's theory.  We understand

13 his argument, but it doesn't apply because it's not the

14 language that a defendant would know about.  And, therefore,

15 creating an argument out of whole cloth when the actual

16 language of the guidelines does not specify what he's

17 arguing for is -- is a violation of due process.

18         THE COURT:  Okay.  I understand you.

19         The interesting thing about all of this is I don't

20 think we're looking at a guideline sentence here.  So, this

21 -- the outcome of these two objections is going to be of no

22 moment actually.

23     (Pause.)

24         THE COURT:  Were there any other objections that

25 -- after the submission of your memo that have dawned on

13

1  you?

2          MR. CHESNOFF:  No, thank you, your Honor.

3          THE COURT:  Okay.

4          MR. WISE:  Your Honor, may --

5          THE COURT:  Um-hmm.

6          MR. WISE:  I have one --

7          THE COURT:  Sure.

8          MR. WISE:  -- after we received it.  So, the --

9  the PSR applies the zero point offender reduction.

10          THE COURT:  Yes.

11          MR. WISE:  And, respectfully, we don't believe it

12  applies in this case.  This is a -- a relatively new

13  guideline.

14          THE COURT:  Yes.

15          MR. WISE:  And it -- it doesn't address in the

16  commentary or application note a situation like the one we

17  have here were the Defendant is being sentenced on two

18  separate cases where the only common factor is the Defendant

19  himself.

20          And having cases -- the reason for the related

21  case rules is it promotes judicial efficiency and economy to

22  have a single judge hear the sentencing hearing because

23  obviously it's the same facts.  We have two -- you know, two

24  pre-sentence investigations that -- that accumulate the same

25  facts about his background and his finances and all that

14

1   stuff.  So, it makes -- it makes a lot of sense to have your

2   Honor hear both cases, but that shouldn't result in a

3   windfall for the Defendant.  And, so, if he were --

4           THE COURT:  If it were done one at a time, several

5   months apart, and the conviction in this case would result

6   in an offense level of whatever --

7           MR. WISE:  Exactly.

8           THE COURT:  -- and criminal -- and increase his

9   criminal history score, which it would be applied to the

10  subsequent case.

11          MR. WISE:  Exactly.

12          THE COURT:  You know, this isn't the first time

13  this has come up, and I continue to be frustrated by this.

14  I accept your argument.  I've made your argument.

15          At the end of the day, in a criminal case, unless

16  I am told specifically what I need to do in these cases, the

17  benefit of the doubt goes to -- so --

18          MR. WISE:  Understood, your Honor.

19          THE COURT:  That's where I end up there.

20          MR. WISE:  Thank you.

21          THE COURT:  And I think where we all are going to

22  end up is -- I think there's an assumption that we're going

23  to end up with an offense level of 21, yeah, and Criminal

24  History Category I, and the guidelines of 37 to 46, and then

25  we're going to go from there, unless someone suggests

15

1   something different.

2          MR. WISE:  And this is just -- just a lack of

3   familiarity with your Honor's practice.  I know in the

4   disclosure recommendation letter, which is ECF 34, Probation

5   recommended the additional two level upward departure that

6   we recommended for the exceptionally high official victim,

7   and counsel briefly addressed that.  I -- I can briefly

8   address that.

9          Obviously in --

10         THE COURT:  Wait.  Wait.  Wait.  Wait.  Let's make

11  sure we're both on --

12         MR. WISE:  Sure.

13         THE COURT:  You're talking about the disclosed

14  recommendation letter from Probation dated January 6th?

15         MR. WISE:  Yes, your Honor.  And at page seven,

16  this is where they -- they make the point most clearly.

17         THE COURT:  Okay.

18         MR. WISE:  Probation writes:

19             "Pursuant to application note five

20         to USSG 3A1.2" --

21         THE COURT:  Yes.

22         MR. WISE:  -- "if the official victim

23         is an exceptionally high level

24         official."

25         And, so, then in the middle of the paragraph:

16

1          "The undersigned agrees with this

2          assessment based on public official

3          one's status and recommends an upward

4          departure equivalent to two levels."

5          -- which would take us to a 23, which results in

6 an advisory guideline range of 46 to 57 months, and then

7 Probation recommends a high end sentence of 57 months.

8          THE COURT:  Fifty-seven.

9          MR. WISE:  Counsel briefly addressed the

10 exceptional high level official.  And, as we said in our

11 sentencing memorandum, while the Vice President was not in

12 office in 2020, when the Defendant repeated his lies in

13 2023, which is relevant conduct which he's admitted to, he

14 was obviously at that point the President of the United

15 States.  And, so, we think the upward level departure does

16 apply.  So, that would, again, take us to a 23 with a range

17 of 46 to 57 months.

18          MR. CHESNOFF:  Most respectfully, your Honor --

19          THE COURT:  Sure.

20          MR. CHESNOFF:  -- he may have been the President,

21 but that's not what he was charged with.  He was charged

22 with 2020, and all of Mr. Wise's --

23          THE COURT:  Wait a minute.  Charged with 2020?

24          MR. CHESNOFF:  Count 2.

25          THE COURT:  Yes.

17

1        MR. CHESNOFF:  The comments made in 2020, not

2  comments made in 2023.

3        THE COURT:  Okay.

4        MR. CHESNOFF:  So, all of the nuances that Mr.

5  Wise raises may be things that he wants to address in the

6  future with the Guideline Commission, but the actual wording

7  of the guidelines and the case law makes it clear that he

8  had to be the President at the time of the offense for which

9  he has pled guilty, not the relevant conduct argument that

10 Mr. Wise made.  That doesn't appear in any case law.  it

11 doesn't appear in the guidelines.  It's an argument by Mr.

12 Wise which can be addressed either with Congress or the

13 Sentencing Commission but certainly shouldn't be decided in

14 a courtroom when someone's being sentenced, again, another

15 due process problem, your Honor.

16        MR. WISE:  I mean, that's clearly not the case.

17 Relevant conduct is used to apply guidelines in sentencings

18 all the time, and -- and to say that relevant conduct

19 somehow doesn't apply here simply ignores all of that.

20     (Pause.)

21        THE COURT:  What do you think of the relevant

22 conduct point?

23        MR. CHESNOFF:  That was just stated, your Honor,

24 what do I think of it?  I think that if he said something

25 today, Mr. Wise would argue that it's relevant conduct.  The

18

1  fact is that the conduct that he was convicted of, your

2  Honor, is for statements made in 2020.  And nowhere in our

3  agreement have we agreed or stipulated that what was said in

4  '23 was relevant conduct.

5          THE COURT:  Some of these statements were made

6  again.  I don't know how you make a distinction.  It's the

7  same subject matter, same -- same claim.

8          MR. WISE:  And -- and the parties agreed that both

9  sides could argue for enhancements.  We agreed on the base

10  offense level, but counsel says we didn't stipulate to that.

11  We don't have to stipulate that it's relevant conduct.  It

12  clearly is.  And, just like they've made objections and

13  arguments about enhancements, so can we, and we think this

14  one clearly applies.

15      (Pause.)

16          THE COURT:  Wouldn't it be faster if counsel just

17  made his points to the Court?

18          MR. SCHONFELD:  Your Honor, I would just like to

19  bring up what is really an inconsistency.  So, on the one

20  hand, the Government's arguing expenditure of substantial

21  government resources through the congressional hearings and

22  things of that nature, which occurred before the alleged --

23          THE COURT:  Oh, it wasn't just the hearings.  It

24  was the investigations --

25          MR. SCHONFELD:  Right.

19

1        THE COURT:  -- by the FBI.

2        MR. SCHONFELD:  Those occurred before the second

3   false statement or relevant conduct.  The indictment itself

4   expressly states in Count 2, which is only I believe, off

5   the top of my head, two paragraphs, that in June of 2020,

6   Mr. Smirnov made the false statement which created the FD

7   1023.  That's what he's pled guilty to.  But now the

8   Government wants to expand it even further to say, Oh, well,

9   he repeated the false statement in 2023 after all of this is

10  already being accounted for.  So, let's just hit him with

11  another enhancement on top of that.  But, if you look at

12  what is actually expressly stated in the indictment and you

13  look at the guidelines where it specifically says definition

14  of high level victim or official victim is Vice President or

15  President --

16       THE COURT:  Right.

17       MR. SCHONFELD:  -- at the time that the false

18  statement for which Mr. Smirnov was indicted for and for

19  which he pled guilty to was made, it doesn't meet the

20  definition of high level official victim.

21       MR. WISE:  In the plea agreement, the Defendant

22  specifically admitted he made the false statement in 2023 as

23  well.  That's part of the factual statement.  It's also in

24  the indictment.  It's also in --

25       THE COURT:  It's in the indictment.

20

1          MR. WISE:  And it's also in paragraph 27 of the

2     PSR which they haven't objected to.  So, it is -- they've

3     admitted he made the false statement.  The legal question of

4     whether it's relevant conduct we think is -- is clear, and

5     the President was -- Joe Biden was the President in 2023

6     when he repeated, as your Honor has pointed out, the false

7     claims he had made earlier in 2020.

8          And the last thing counsel just said, there's no

9     inconsistency.  The reason we were interviewing him in 2023

10    was because substantial government resources were being

11    expended in the second investigation of his false claims.

12    It was right at the -- right in the middle of that.

13         MR. CHESNOFF:  Which would not have occurred if

14    the deal with Hunter Biden hadn't blown up.

15         MR. WISE:  That's ridiculous.  It's completely

16    ridiculous.  You know, when they lose on the facts and the

17    law, they do the old trick of attacking the prosecutors.

18    That's -- that's the -- the last play in the play book, and

19    I'm not even going to dignify it by responding to it.

20        (Pause.)

21         THE COURT:  Well, while I enjoy this tremendously,

22    this two points that we're arguing over, we're talking about

23    a difference of guidelines of 37 to 46 versus 46 to 57, and

24    I am not contemplating a sentence anywhere near either of

25    those ranges.  So, like I say, this is an interesting point,

21

1    but it isn't going to affect the outcome here, okay.  And I

2    can say that with some confidence.

3            Whether I like it or not, whether I like being

4    constrained by the parties' agreements or not, I have agreed

5    to be constrained by the parties' agreement, and that's what

6    I intend to do, and the resolution of this particular

7    argument that we're having now is not going to affect that

8    at all because you all agreed to a range, and I held my

9    nose, and I agreed to accept that deal and apply the top end

10   of that range.

11           So -- so, would anyone else like to say anything

12   on the record before we get to providing Mr. Smirnov with an

13   opportunity to address the Court on the issue of his

14   sentence?

15           MR. CHESNOFF:  Court's indulgence, please.

16       (Pause.)

17           MR. CHESNOFF:  Your Honor, I just had a --

18           THE COURT:  Yes.

19           MR. CHESNOFF:  I was going to make some comments

20   in mitigation, if the Court would permit me.

21           THE COURT:  I imagine it's going to be a

22   repetition of those, what is it, eight or so letters that

23   I've seen.

24           MR. CHESNOFF:  Well, I would hope not, your Honor,

25   because --

22

1          THE COURT:  What -- I'm sure it's not going to be

2   something that --

3          MR. CHESNOFF:  It was really mostly --

4          THE COURT:  -- we're just --

5          MR. CHESNOFF:  -- about the 12 years of service to

6   the United States that Mr. Smirnov performed.

7          THE COURT:  I wouldn't -- well, okay.  You can do

8   whatever you want.

9          MR. CHESNOFF:  Your Honor, the Government, before

10  we began, agreed that I could address some of the things

11  that were covered by the protective order.  So, I want to

12  have that on the record, and I will make some comments if I

13  may, your Honor.  Thanks.

14          THE COURT:  Sure.

15          MR. CHESNOFF:  May it please the Court, it's

16  difficult to argue for mitigation when you kind of have an

17  idea of the position the Court's taken.  The only thing I

18  would ask you in listening to me, your Honor, is that you

19  consider a sentence below the 72 months that's at the top.

20          THE COURT:  Um-hmm.

21          MR. CHESNOFF:  The reason we gave a range was that

22  we had an argument in our minds for the 48 months, which is

23  more consistent with the findings of the Probation Office in

24  the PSR than the 72 months which the Government will ask you

25  for.

23

1          Mr. Smirnov, born in Ukraine, grew up in Israel,

2   served in the military.  From the military, he worked for

3   another agency within the Israeli government.  He came to

4   the United States.  He was involved with someone from Health

5   and Human Services, a special agent, in helping to uncover

6   healthcare fraud.  So, he worked as a informant on behalf of

7   this agent and successfully.  He did that out of a -- a

8   desire to serve and also, quite candidly, because some of

9   the people that he was providing information about had --

10  had wronged him.

11         From that point in time, your Honor, he became a

12  CHS for the FBI.  Most of my experience, your Honor, has

13  been cross examining people who are confidential informants,

14  but in this case I learned a lot.  I learned that someone

15  could be a confidential source that did it for the reasons

16  that were reflected year after year after year after year by

17  the FBI agent who was his handler, that Mr. Smirnov did it

18  for reasons of patriotism and public service.

19         There are 12 years of reports from the handler who

20  dealt with Mr. Smirnov which every year validate every level

21  of veracity, truthfulness, hard work, and effort on behalf

22  of -- by Mr. Smirnov on behalf of the United States

23  Government.

24         Most handlers only handle a confidential human

25  source for five years.  This FBI agent, because of the

24

1  success that he had with Mr. Smirnov, kept him for 12 years.
2  Most FBI agents who get reassigned to another office, field
3  office, don't take their CHS with them.  In this case, the
4  FBI agent took Mr. Smirnov with him, contrary to the normal
5  policy of the FBI.
6            THE COURT:  And why was this?
7            MR. CHESNOFF:  Excuse me, your Honor?
8            THE COURT:  Why?
9            MR. CHESNOFF:  Because of the effectiveness of Mr.
10 Smirnov.
11           THE COURT:  And that's what the handler said?
12           MR. CHESNOFF:  Yes.
13           THE COURT:  That that's why he took him along with
14 him and that's why he --
15           MR. CHESNOFF:  Yes.
16           THE COURT:  -- hung onto him for --
17           MR. CHESNOFF:  Yes.
18           THE COURT:  -- over five years?
19           MR. CHESNOFF:  Yes.
20           THE COURT:  Okay.
21           MR. CHESNOFF:  And he developed a personal
22 relationship with him.  they socialized together.  He went
23 to Mr. Smirnov's house.  He met his family.  He met his
24 relatives, which is kind of peculiar and a little bit
25 contrary to FBI policy, but because of the relationship that

25

1  the handler developed with Mr. Smirnov, that's the

2  relationship they developed.

3          THE COURT:  I'm beginning now to question this

4  handler.

5          MR. CHESNOFF:  Well, if he had testified, we

6  probably would have been questioning him too, your Honor.

7          THE COURT:  Okay.

8          MR. CHESNOFF:  Most importantly, your Honor, he

9  was involved with information for multiple field offices of

10 the FBI throughout the United States.  He was involved in at

11 least 50 to 100 investigations.  He was given permission at

12 risk to himself to wear recording devices in order to

13 infiltrate organized crime, money laundering organizations,

14 major fraud organizations, and he did all of this at the

15 direction and with the assistance of the handler who year

16 after year wrote reports to his superiors about Mr. Smirnov

17 and his effectiveness.  And those people then would sign off

18 on Mr. Smirnov, and then those above them would sign off on

19 Mr. Smirnov.  At no time during the 12 years, other than as

20 a result of what occurred in this case, did anybody ever

21 question Mr. Smirnov's honesty or veracity.

22          Another interesting thing, your Honor, is in the

23 indictment it talks about Mr. Smirnov having an animus

24 towards the President.  Interestingly, in the materials that

25 we've reviewed, we have reviewed text messages from the

26

handler to Mr. Smirnov, which, unlike Mr. Smirnov's about

perhaps Mr. Biden, the handler would regularly ridicule

President Trump.  So, that's the kind of relationship they

had, and that's what went on during their relationship.  So,

this wasn't a one way street, your Honor.

You've seen the letters.  The letter from his

sister is a beautiful letter.  He took care of his stepson

who was a -- a Marine who now works for the U.S. Government.

He cared for him, as a father would, even though he was not

his real father.

Your Honor also knows about the terrible eye

condition that he suffers from.  And I remember in the

beginning the Court made the comment to me that you would

not want to see him suffer.  He has.  They've done what they

can short of surgery while in the custody of the Marshals,

but the fact is he is now legally blind, and that's been

defined by the doctor who's treated him for years who

reviewed the records that have occurred since he's been in

custody, and he's -- he's now legally blind.

What I want to tell you about that is this, your

Honor.  I've had a lot of clients over the years.  Mr.

Smirnov has never once been what I would describe as a

whiner or a complainer or even get angry.  He understood the

circumstances he was in and ultimately made a decision to

accept responsibility for the one transgression that

27

1  occurred in all these years that he was serving the country.

2          Normally, your Honor, when you're doing a

3  sentencing of someone who's been in a confidential

4  informant, the Government is asking for a departure, a 5K.

5  This is a de facto request for a 5K from us.  This is a de

6  facto request for us to say to you, your Honor, if somebody

7  does what he did over all this period of time, regardless of

8  the fact that ultimately he did something that the

9  Government finds offensive and which people find offensive

10 in terms of President Biden, the fact is, your Honor,

11 nothing was done about his improper statement for three

12 years after it was allegedly made, and they all worked with

13 him for three more years.

14         Now, the Government's going to say they didn't

15 know about it.  They had every opportunity to investigate

16 him in 2020 when the statement was made.  Why it wasn't

17 done?  Perhaps the handler, perhaps his supervisors didn't

18 think it was as consequential as it ultimately became.  But

19 it's an irony, your Honor, kind of a sad irony that the

20 whole investigation would not have occurred but for the

21 investigation of Hunter Biden who now has been pardoned,

22 faces no punishment, and Mr. Smirnov is the one facing a

23 punishment even though he is a tangential part of that

24 investigation.  So, again, your Honor, we're asking you to

25 mitigate based on the entire circumstances here, and that

28

 1  will tell the American people that if your dad isn't the

 2  President, you still may get some relief in the justice

 3  system.  But right now, the President's son gets away with

 4  it, and Mr. Smirnov is sitting here facing 48 to 72 months.

 5          THE COURT:  Okay.  Are you saying Hunter Biden lie

 6  to the FBI regarding bribes?

 7          MR. CHESNOFF:  No.  He lied to the ATF about his

 8  drug use and purchasing a weapon.  So, he's a liar.

 9          THE COURT:  That's a separate deal, isn't it,

10  besides what we're talking about, the circumstances --

11          MR. CHESNOFF:  It is, your Honor.  And I'm not

12  saying --

13          THE COURT:  Well, don't --

14          MR. CHESNOFF:  -- that --

15          THE COURT:  -- don't start conflating things,

16  because I'm trying to follow your argument.  I'm trying to

17  follow the rationale within your argument.

18          MR. CHESNOFF:  Okay.  I'm just trying to tell you

19  that it doesn't seem very fair to the general public that

20  one guy gets away with it and he gets left holding the bag.

21  That's all I'm trying to say.

22          THE COURT:  There's something I want to say, but

23  something tells me just leave it alone.

24          MR. CHESNOFF:  All right.

25          THE COURT:  Talk about disparate treatment.  Okay.

29

1          MR. CHESNOFF:  All right.  That's fine.

2          THE COURT:  All right.

3          MR. CHESNOFF:  Your Honor, the guidelines are

4 advisory, but the --

5          THE COURT:  Yes.

6          MR. CHESNOFF:  -- 3553 factors aren't.

7          THE COURT:  Yes.

8          MR. CHESNOFF:  You must consider those.

9          THE COURT:  Yes.

10          MR. CHESNOFF:  No prior criminal record, service

11 to the -- the country, paid now in full the tax bill that he

12 had as a result of the second case.

13          THE COURT:  Okay.

14          MR. CHESNOFF:  So, he's done things to mitigate,

15 and he's done things to show the Court that he is accepting

16 responsibility for his conduct.

17          THE COURT:  You said he was in the military.  What

18 -- whose military was he in?

19          MR. CHESNOFF:  IDF, Israeli Defense --

20          THE COURT:  Israeli?

21          MR. CHESNOFF:  Yes.

22          THE COURT:  For how long was he in the IDF?

23          MR. CHESNOFF:  Short period of time when he was

24 recruited to do something else for the Israeli government.

25          THE COURT:  What short period of time?  What does

30

1  that mean?

2          MR. CHESNOFF:  I don't know the exact amount, but

3  I don't think it was more than months.

4          THE COURT:  And then he was recruited to --

5          MR. CHESNOFF:  Perform other --

6          THE COURT:  -- assist Israel in another function?

7          MR. CHESNOFF:  Right.

8          THE COURT:  Okay.

9          MR. CHESNOFF:  Which is secret.

10         THE COURT:  Okay.  Fine.

11         MR. CHESNOFF:  Your Honor, he assisted 10 field

12 offices of the FBI during those 12 years.  He helped with

13 the apprehension of institutional, international

14 transnational money launderers.  He was responsible for

15 multiple convictions.  He was involved in fighting against

16 organized crime at the direction of his handler.  All of

17 those things are the kind of things that if we were here on

18 a 5K, an Article III judge like yourself would say,

19 Absolutely require me to reduce and mitigate the punishment.

20 So --

21         THE COURT:  You know what?  But the thing is in

22 such a case, there'd be a defense attorney like you that

23 would be arguing against believing anything that this

24 Defendant said because he's a -- he's an out and out career

25 crook.  And then my response is, How do you expect to ever

31

1  get embedded into some of these criminal organizations

2  without being a crook?  I can't present myself to one of

3  these organizations and -- and claim to be -- and try to be

4  a party to that -- their enterprise.  I can't.  I don't have

5  the pedigree.  So --

6          MR. CHESNOFF:  He did it at the direction of the

7  FBI, your Honor.

8          THE COURT:  It doesn't matter.

9          MR. CHESNOFF:  He didn't --

10         THE COURT:  I -- I -- the FBI can direct me to

11 infiltrate, I don't know, MS-13, right.

12         MR. CHESNOFF:  He didn't.

13         THE COURT:  I can't.

14         MR. CHESNOFF:  But, your Honor --

15         THE COURT:  I don't have the wherewithal.

16         MR. CHESNOFF:  -- their responsibility was to

17 determine whether he was breaking the law doing what he was

18 doing for them, and at no time in the 12 years did the FBI

19 ever determine that he did anything that was illegal.

20         He wasn't working off the case, your Honor.  He

21 did this voluntarily at the request of his handler and the

22 FBI.  He was a vital source of assistance to the FBI.  He's

23 multilingual.  He's a very charismatic person and he was

24 able to make connections that the FBI could not have made

25 without him, but he wasn't doing it to work off a case.  He

32

1  was doing it because he was serving the country.

2          THE COURT:  Hmm.

3          MR. CHESNOFF:  Well, it's the fact, your Honor.

4          THE COURT:  Okay.  All right.

5          MR. CHESNOFF:  Okay.  In any event, your Honor, I

6  would ask you in considering his contributions and

7  considering his lack of violent history and considering his

8  contributions as a CHS, to mitigate the sentence and not to

9  give him the 72 months.

10          THE COURT:  Okay.  We don't have to talk about and

11  you don't -- you know --

12          MR. CHESNOFF:  Okay.

13          THE COURT:  No one has talked about it.  No one's

14  brought it up, about the falsehoods to the Court when he was

15  initially arrested and everyone is making arguments for

16  release on -- on bond or bail, and everyone's saying, I

17  don't know, he's only got like $1500.  So -- --

18          MR. CHESNOFF:  Well, you need to understand the

19  context of that, your Honor.

20          THE COURT:  Yeah, the context was --

21          MR. CHESNOFF:  He -- he didn't lie.

22          THE COURT:   -- we were looking for some basis

23  upon which to assure his appearance in court, and, you know,

24  a pretty hefty bail might do that, might provide that

25  incentive, and he says, "Well, I've only got" -- you know,

33

 1  it was a little over a thousand dollars.  And that was the

 2  representation to the Court, correct?

 3          MR. CHESNOFF:  The question was, "What do you

 4  personally have," and he represented what he personally had.

 5  he did not represent what companies had that he had a

 6  position in.

 7          THE COURT:  Okay.

 8          MR. CHESNOFF:  But that was because this was done

 9  immediately upon his arrest, and at no time did anybody ever

10  say to him, Please describe to me what LLCs you may be a

11  part of, and it happened at the moment.

12          But you got to remember this too, your Honor.  He

13  was out for two days.  He didn't go anywhere.  All he did

14  was come to our office to go to work.  So, the idea that

15  somehow he was a flight risk, he disproved that.  So, I

16  understand the Court's concern, but I don't really believe

17  he lied to the Court.

18          THE COURT:  Okay.

19          MR. CHESNOFF:  And, with that, I thank you.

20          THE COURT:  Thank you, sir.

21          MR. CHESNOFF:  When do you want Mr. Smirnov to

22  allocute, your Honor?

23          THE COURT:  Trust me, I'll be able to make that

24  invitation as I do every sentencing.

25          MR. CHESNOFF:  Okay.  He asked me.  That's why I

34

1    asked, your Honor.

2              THE COURT:  Who asked who?

3              MR. CHESNOFF:  Mr. Smirnov asked me.

4              THE COURT:  Oh, tell him to sit tight.  It's

5    coming.

6              MR. WISE:  So, just picking up on your Honor's --

7    on the last point, you know, we -- what the tax case

8    revealed was that he was using these other accounts as his

9    personal piggy bank.  So the idea that he's asked what kind

10   of resources do you have access to and he says a thousand

11   dollars when he's got $6 million in these various accounts

12   was a lie.  And we've maintained that from the beginning,

13   and it was why we, among other factors, believed he was a

14   flight risk.

15             I'll briefly address some of what counsel has

16   said, and obviously I'm not going to repeat what's in our

17   sentencing memorandum.  I don't want to waste the Court's

18   time, but I'll -- I'll put on the record our position.

19             You know, the -- the question this case raises is

20   how did the Defendant repay the United States for the

21   generosity it showed him.  And the way he repaid it was by

22   lying to it.  Now, the -- the United States welcomed the

23   Defendant many years ago and had offered him security and

24   prosperity and freedom, and in 2015, it bestowed on him one

25   of the most precious gifts our government can give, and

35

1  that's citizenship.  And in the case of the Defendant, the

2  security America afforded him was real, and we know that

3  given that the two countries in which he's lived are at

4  ward.  And the prosperity that America afforded him was also

5  real and has -- as the Government learned, he made more than

6  $2 million in 2020 and 2021 and 2022 alone.

7           Now, our country imposes very few positive

8  obligations on its citizens.  In many countries, military

9  service is compulsory but not here.  In many countries,

10 voting is compulsory, but not here.

11          So, what are the obligations that are imposed on

12 citizens?  Well, jury service, the important work that goes

13 on in these courtrooms, and really taxes.  And, so, how did

14 the Defendant meet his obligations?  He didn't.  And this is

15 something that was completely absent from counsel's

16 argument.  He said one transgression, one transgression.

17 Well, he lied and cheated on his taxes for years.  He filed

18 -- he lied about the millions of dollars he made.  He filed

19 false tax returns.  He even claimed credits for poor people

20 and people struggling to make ends meet, for instance, the

21 Earned Income Tax Credit and Pandemic Rebate, all the while

22 living in luxury in California and Las Vegas, driving a

23 Bentley, spending hundreds of thousands of dollars on

24 clothes and accessories for himself and his longtime

25 girlfriend.

1        The Defendant stands before your Honor today not

2   because of a single transgression, a single bad decision, a

3   mistake or a momentary lapse in judgment.  He's here because

4   he engaged in multiple crimes and different crimes over a

5   period of years, and it's those crimes that reflect his

6   character.

7        And the common theme that runs through these

8   crimes is lies.  He lied on his taxes to evade his

9   responsibility to pay his fair share, and -- and, most

10  importantly, he lied to the FBI about the most important

11  thing he ever told them, that the former Vice President of

12  the United States who was then a candidate for President and

13  the presumptive nominee of one of the two major parties had

14  taken bribes, and he did this to influence the outcome of

15  the presidential election of that year, as evidenced by the

16  messages he sent to his FBI handler that are included in the

17  indictment and in our sentencing memo.  That's how he repaid

18  the generosity of the United States, by lying to the federal

19  -- by lying to federal law enforcement in an attempt to

20  influence a presidential election.

21        And, so, counsel's main argument at the podium

22  here and then in their sentencing memorandum for why he

23  deserves a sentence at the low end of the range, a four-year

24  sentence, as opposed to a sentence at the high end, the six

25  years, which is what the Government believes is appropriate,

37

1   is to point to his work as an informant and to

2   mischaracterize that works as service to the FBI, and they

3   say this again -- again and again in their -- in their

4   memorandum.  In the very first sentence, the write:

5               "The Defendant effectively and

6               faithfully served the FBI for over a

7               decade."

8          But, of course, that's not true because in 2020,

9   he lied to them.  And, to be clear, informants don't serve

10  the FBI.  They're paid for the information they provide.

11  Counsel said he did this voluntarily.  He got $300,000 for

12  this.  And much of the information that informants provide

13  is not useful.  Some of it is, and that was certainly the

14  case here.

15         In sum and substance, he had a transactional

16  relationship with the FBI.  He's not like a cooperator in a

17  case working off time.  He was paid for his time and his

18  information.

19         And informants are, as your Honor pointed out, by

20  definition, people who are involved in crime or have

21  relationships with people who are involved in crime.  They

22  are not and this Defendant is not people of good character.

23         And in support of their inaccurate claim -- and

24  this is in their -- this is in their sentencing memo -- that

25  the Defendant effectively and faithfully served the FBI for

38

1    over a decade, they write -- and this is a quote:

2             "His FBI handling agent also

3         documented Mr. Smirnov's reporting was

4         honest and forthright."

5         That's on page 12 of their memorandum.  But they

6    omit -- they omit what comes next in the report that they

7    quote, and what comes next is -- and this is -- first, this

8    is the part they quote:

9             "Generally -- generally, the

10        handling agent believes reporting to be

11        honest and forthright.  However, the

12        handling agent notes that the Defendant

13        has shown some reluctance to provide

14        specifics concerning friends and family

15        residing in Israel and Russia who are

16        providing various -- with various

17        subsource reporting.  The Defendant also

18        has close friends in the U.S. who are

19        engaged in various criminal activities,

20        has reported some of these activities,

21        but the handling agent expressed that

22        they may have been minimized."

23        So, even their central claim that he was honest

24    and forthright is qualified.  But then they double down on

25    this, and they go on to say:

39

    1            "Mr. Smirnov's reporting accuracy

    2         and honesty was never once questioned by

    3         his government handlers."

    4        Well, that again is not true based on what I just

    5 read, but it's also not true based on the last report that

    6 they quote, the last validation report that covers him where

    7 there's various concerns expressed.  In fact, the ultimate

    8 conclusion the FBI recommended, their validation unit

    9 recommended, was that the Defendant should not be continued

  10 for operations.  They recommended that FBI Seattle take

  11 steps to determine whether the Defendant is involved in any

  12 criminal activity such as money laundering, bribery or

  13 impersonating an FBI agent.  And if they determined that he

  14 did, the FBI should consult with the highest level of FBI's

  15 leadership.  The validation unit recommended that FBI

  16 Seattle suspend operations and taskings for the Defendant

  17 until completing additional vetting measures to ascertain

  18 whether Defendant is fully under FBI Seattle's control, and

  19 all of this was before he was charged.  So, it is not the

  20 case -- it is not the case that no one ever questioned him.

  21       But the hyperbole ramps up even further, and in

  22 addressing the 3553(a) factors, they write that:

  23         "The public (that is, the grateful

  24        United States citizens who Mr. Smirnov

  25        helped by serving as their effective

40

1            CHS) will not need to be protected."

2            Grateful United States citizens.  You mean the

3  people that paid their taxes when the Defendant cheated on

4  his and the voters who would have been manipulated if the

5  Defendant's lies had become public in 2020 or when they did

6  become public in 2023?  And while the Defendant wasn't

7  paying his taxes, he was getting $300,000 worth of taxpayer

8  money for the information he was providing.  And, so, at the

9  end of the day, the American public doesn't owe this man

10 anything.

11           As we lay out in our memorandum, your Honor, the

12 3553(a) factors support a 72-month sentence.

13           As to the 3553(a)(1) factors, the nature and

14 circumstances of Count 1 of the obstruction indictment, the

15 Defendant decided in 2020 to exploit the position of trust

16 he enjoyed with the FBI in order to provide false

17 information about one of the candidates for President of the

18 United States in an attempt to influence the outcome of the

19 election.  The information he provided which was

20 memorialized in a 2020 1023 was detailed and specific and

21 was clearly designed to deceive the FBI into pursuing a

22 public investigation into the then candidate, and the FBI

23 did investigate the Defendant's allegations but closed the

24 investigation without it becoming public.  And the false

25 2020 1023 ultimately did become public in the summer of 2023

41

1  and again threatened to influence a U.S. Presidential

2  election when the FBI chose to reexamine it.  And it's the

3  indictment in this case that resulted from that second

4  investigation.  Thus, his false statements in 2020 which

5  caused the creation of that document threatened the

6  integrity of not one but two U.S. Presidential elections.

7          As to the nature and circumstances of the tax

8  offenses, those are described in detail.  He earned a

9  substantial amount of money.  Instead of paying taxes he

10 owed as an American citizen, he instead filed multiple false

11 returns over a three-year period in his name, in another

12 person's name, and in the name of a business.

13         As to the history and characteristics of the

14 Defendant, the Defendant may have provided information to

15 the FBI that was not false in connection with other

16 investigations, but that is not a mitigating factor.  It led

17 -- it directly contributed to the crime he committed.  It

18 led to the position of trust that he exploited in 2020.  Put

19 another way, the FBI investigated the allegations leveled by

20 the Defendant in the 2020 1023 in 2020 and again in 2023

21 precisely because they trusted him, and they trusted him

22 because some of the information the Defendant had previously

23 provided had proven to be accurate.

24         Now, in various pretrial filings in this case,

25 defense counsel has again claimed that Defendant served the

42

Government.  And, again, he didn't.  He was paid for his
information, and that was the extent of his relationship.

He was a sophisticated -- he is a sophisticated
individual, sophisticated enough to generate more than $2
million in income but also to know to file all of these
false returns in order to cover his tracks.

And, finally, these crimes were not, again, an
aberration, a single bad decision.  They were -- they were
carried out over -- over years.

As to the factors under 3553(a)(2), those -- that
portion of the statute requires the Court to consider the
need for a sentence to reflect the seriousness of the
offense, to promote respect for the law, to provide just
punishment, and to afford adequate deterrence and to protect
the public.  And, again, we -- we submit a sentence of 72
months is sufficient but not greater than necessary to meet
those factors.

As we cite in our sentencing memorandum, tax
crimes are indisputably serious.  That's the Tomco case.
And the guidelines themselves talk about how tax crimes such
as this one with significant hidden income is more serious
and should be treated as such.

As to the -- as to causing the creation of the
false 2020 1023, interfering in a U.S. Presidential election
by falsely accusing a candidate of one of the two major

43

parties of corruption is among the most serious kinds of
election interference one can imagine, and the fact that the
Defendant's false accusations were investigated not one but
during two successive presidential elections effectively
doubled the severity of his crime.  In each election cycle,
America's adversaries attempt and in some cases successfully
spread misinformation.  And sentencing the Defendant to 72
months of incarceration will deter messengers like him of
such misinformation by demonstrating that if they are
caught, they will be punished.

Finally, the -- the public must be protected from
activities designed to distort our elections through the
introduction of misinformation, a further reason for a
sentence of 72 months.

With that, I'll end, your Honor, unless the Court
has any questions, and thank you for your time and
consideration.

THE COURT:  Thank you, sir.

Does any other defense counsel wish to make any
remarks?

MR. CHESNOFF:  No, thank you, your Honor.

THE COURT:  All right.  Mr. Smirnov, by statute,
you are permitted to address the Court at this time on the
subject of your sentencing.  Now is the time.  I'll say
this.  It's not necessarily a part of this proceeding, but

44

1  it happens to be my practice that I cannot make a decision

2  with respect to sentencing until I have heard from the

3  Defendant because up until this point, I hear from everyone

4  but the Defendant, and I know very little about the

5  Defendant, and I don't feel comfortable imposing any kind of

6  punitive outcome on someone that I just don't know at all.

7          I would like to hear from you.  I would like to

8  get to know as much about you as I possibly can.  Otherwise,

9  I'm pretty much left to dealing with you as a number.  I

10 wouldn't want that.  I'm sure you don't want it.  I don't

11 want to be a party to that.  So, I hope you will take

12 advantage of this opportunity to -- to address the Court.

13         Now, you've heard a number of questions being

14 raised.  You can choose to address these questions or not.

15 That's completely up to you.  Okay.

16         MR. CHESNOFF:  Your Honor, may we -- may we -- not

17 knowing that that's how you proceed, may we have a short

18 recess to talk to Mr. Smirnov?

19         THE COURT:  Sure.

20         MR. CHESNOFF:  Thank you.

21         THE COURT:  All right.  Ten minutes.

22     (Proceedings recessed briefly.)

23         THE COURT:  All right.  Let's go back on the

24 record, which will reflect that all counsel and the

25 Defendant are present.

45

1        All right.  We had just reached the part where the

2  Defendant was invited to allocute if he so desired.

3        MR. CHESNOFF:  And, your Honor, based on your

4  comment that you wanted to get to know him, Mr. Smirnov

5  offered to do that in a CIPA setting so that he could really

6  talk to you about what he's done and where he comes from,

7  and I believe that that  was relayed to you as a request,

8  and I'm assuming -- based on what I understand, the Court

9  did not want to do that.

10        THE COURT:  No, I don't.  We've had -- well, the

11  Court's been exposed to confidential information.  We've had

12  our hearings, in camera hearings, including this morning,

13  and I've taken all of these things into consideration, and I

14  can understand why Mr. Smirnov would like to say the same

15  thing but in his own words, make sure that his audience

16  understands, you know, his point of view, and I think I've

17  got a grasp of his position on this and his position as to

18  the value of his -- his service as a confidential human

19  source.  I -- I think I've got it, and this is not my --

20  well, okay, maybe it's my second case involving informants

21  and how that mechanism works and what those folks are like

22  and what their bona fides generally are and have to be

23  demonstrated.  I think I understand.  And defense counsel

24  has done superb job of characterizing their client and their

25  client's role, and I think I've got it.  I can't imagine

46

1  that I'm going to learn anything new.

2          MR. CHESNOFF:  He -- he just didn't want you to

3  continue with the perception that somehow all of his

4  involvement was because he was some kind of a crook or a

5  criminal, and he wanted to talk to you privately with the

6  Government present to express to you the history of his

7  involvement with them and to explain that, despite the

8  Government saying that 12 years of service is somehow

9  disrespectful to the American public, he wanted to tell you

10 the real relationship that he had with the FBI handler and

11 how he did this out of patriotism.

12         THE COURT:  Oh, oh.  That's going to be a hard

13 sell, okay.

14         MR. CHESNOFF:  That's why he wanted to --

15         THE COURT:  That's a hard sell because I -- I've

16 never seen a case where someone working in that undercover

17 capacity, working in the underworld goes to work every day

18 waving the flag.  Okay.  What they're actually waving is a

19 get out of jail free card or a -- some credits, hoping that

20 a prosecutor will step in and make some recommendations with

21 the sentencing court, but it -- it is not out of patriotism.

22 It is not altruism.  It is not charity, not by a long shot.

23         MR. CHESNOFF:  Your Honor, he wasn't working --

24         THE COURT:  It's about self-interest.

25         MR. CHESNOFF:  -- off the case.

47

1          THE COURT:  Pardon me?

2          MR. CHESNOFF:  He was never working off a case.

3          THE COURT:  I know that's what you said.

4          MR. CHESNOFF:  Well, it's true.

5          THE COURT:  Okay.

6          MR. CHESNOFF:  That's a fact.

7          THE COURT:  Okay.

8          MR. CHESNOFF:  And, so, the Court's con --

9          THE COURT:  I've got I believe another set of

10 facts.

11         MR. CHESNOFF:  Well, I understand, but they're not

12 based in facts.  They're based in a perception that you

13 have.

14         THE COURT:  I know.

15         MR. CHESNOFF:  Which is an inaccurate on.

16         THE COURT:  I know, and you would not mislead the

17 Court.  Okay.

18         Now, what I --

19         MR. CHESNOFF:  No, I would not, your Honor.

20         THE COURT:  -- need to know at this point -- what

21 I need to know at this point is whether or not your client

22 desires to allocute or should we just move on.

23         MR. CHESNOFF:  He has something he'd like to read

24 to you, your Honor.

25         THE COURT:  Did he write it?

48

1          MR. CHESNOFF:   With my assistance.

2          THE COURT:  That's what I thought.

3          MR. CHESNOFF:  Well, your Honor --

4          THE COURT:  Go ahead.

5          MR. CHESNOFF:  -- that is not uncommon for a

6   criminal defense lawyer to assist his client in structuring

7   what to say to an Article III judge.

8          THE COURT:  Okay.  Go ahead.  It's just -- all I'm

9   saying is it tends to be more effective when it comes from

10  the Defendant.

11         MR. CHESNOFF:  And that's why he wanted to talk to

12  you privately.

13         THE COURT:  Let's go.

14         THE INTERPRETER:  He's not going to read anything,

15  your Honor.

16     (Pause.)

17         THE COURT:  Go ahead, sir.

18         MR. SCHONFELD:  Your Honor, our client has changed

19  his mind.  He's going to --

20         THE COURT:  I'm not surprised.  All right.  Any

21  reason the Court cannot now proceed with the imposition of

22  sentence?

23         MR. WISE:  Not from the United States, your Honor,

24  no.

25         MR. CHESNOFF:  No, your Honor.

49

1          THE COURT:  And no cause to the contrary appearing

2    to the Court and having considered the sentencing factors

3    enumerated at 18 U.S.C. Section 3553(a), including the

4    advisory guidelines range which I have just changed --

5          (Pause.)

6          THE COURT:  -- advisory guidelines range of 46 to

7    57 months based on an offense level of 23 and a Criminal

8    History Category I, it is ordered that the Defendant shall

9    pay to the United States a special assessment of $400, which

10   is due immediately.  Any unpaid balance shall be due during

11   the period of imprisonment at the rate of not less than $25

12   per quarter and pursuant to the Bureau of Prisons Inmate

13   Financial Responsibility program.

14         It is ordered that the Defendant shall pay

15   restitution in a total amount of $675,502 pursuant to 18

16   U.S.C. Section 3663 in Docket Number 24-CR-00702.

17         The amount of restitution ordered shall be paid to

18   the victim, Internal Revenue Service, and it shall be paid

19   in full immediately.

20         Defendant shall comply with the Second Amended

21   General Order 20-04.  Pursuant to guideline Section

22   5E1.2(a), all fines are waived as the Court finds that the

23   Defendant has established an inability to pay a fine.

24         Pursuant to the Sentencing Reform Act of 1984, it

25   is the judgment of the Court that Defendant, Alexander

50

1  Smirnov, is hereby committed on Count 2 of the indictment in

2  Case Number 24-CR-00091 and Counts 1, 5 and 8 of the

3  indictment in Case Number 24-CR-00702 to the custody of the

4  Bureau of Prisons for a term of 72 months.  This term

5  consists of 72 months on each of Count 2 of indictment 91

6  and Counts 1, 5 and 8 of indictment 702 to be served

7  concurrently.

8          The Court also recommends that the Defendant be

9  considered for participation in the Bureau of Prisons

10 Residential Drug Abuse Program.  That's PRDAP.  Upon his

11 release from imprisonment, he shall be placed on supervised

12 release for a term of two years.  This term consists of two

13 years on each --

14         MR. CHESNOFF:  Excuse me, your Honor.  The

15 stipulation in the plea agreement was for one year of

16 supervision.  That was part of the Rule 11 plea.

17         THE COURT:  Okay.  And if I don't do that and I

18 impose an additional year of supervised release, the deal's

19 off?

20         MR. CHESNOFF:  He would be permitted to withdraw

21 his plea.

22         THE COURT:  I know what he's permitted to do.

23         MR. CHESNOFF:  Okay.

24         THE COURT:  I'm asking you is he going to exercise

25 that.

51

1          MR. CHESNOFF:  We'd have to talk to our client

2  because we're surprised that that's happened.

3      (Pause.)

4          MR. CHESNOFF:  May we talk to our client?

5          THE COURT:  Yeah.

6      (Pause to confer.)

7          MR. CHESNOFF:  Your Honor, may the Government and

8  I approach you at sidebar?

9          THE COURT:  Yes.

10     (Sidebar discussion off the record.)

11     (Pause to confer.)

12         THE COURT:  All right.  Okay.

13     (Pause.)

14         THE COURT:  All right.  Let me pick up where I

15 left off, and then I'm going to go back and discuss the --

16 the sentence.  Let me -- I left off with the supervised

17 release, and I am imposing one year of supervised release on

18 each count.  That's one year on Count 2 of indictment 91 and

19 one year on Counts 1, 5, and 8 of indictment 702,

20 concurrently, and the supervised release with respect to

21 Counts 1, 5 and 8 of indictment 702 shall be served

22 concurrently with the one year supervised release on

23 indictment 91.

24         All right.  Now, back to the -- to the -- the

25 Counts -- Count 2 of indictment 91, the sentence on Count 2

52

1  is 72 months.

2          With respect to indictment 702, Count 1 of that

3  indictment is a sentence of 60 months.  Count 5 of

4  indictment 702 is also a term of imprisonment of 60 months,

5  concurrently with the term of 60 months on Count 1.  Count 8

6  on indictment 702 is 12 months, and that will be consecutive

7  to the terms imposed on Counts 1 and 5 of indictment 702.

8  And the terms imposed on indictment 702 are to run

9  concurrently with the terms of imprisonment imposed in 91.

10          In the final analysis, the total term of

11  imprisonment on both indictments, all four counts, is 72

12  months.

13          Now, with respect to supervised release and the

14  various conditions of supervised release, Defendant shall

15  comply with the rules and regulations of the United States

16  Probation and Pretrial Services Office and Second Amended

17  General Order 20-04, including the condition of probation

18  and supervised release as set forth in Section 3 of that

19  general order.

20          Two, Defendant shall refrain from any unlawful use

21  of a controlled substance.  Defendant shall submit to one

22  drug test within 15 days of release from custody and at

23  least two periodic drug tests thereafter, not to exceed a

24  test per month as directed by the Probation Officer.

25          Three, Defendant shall participate in an

53

outpatient substance abuse treatment and counseling program

that includes urinalysis, breath or sweat patch testing as

directed by the Probation Officer.

Defendant shall abstain from using alcohol and

using illicit drugs and from abusing prescription

medications during the period of supervision.

Four, as directed by the Probation Officer,

Defendant shall pay all or part of the cost of the court-

ordered treatment to the aftercare contractors during the

period of community supervision.  Defendant shall provide

payment and proof of payment as directed by the Probation

Officer.

Five, during the period of community supervision,

Defendant shall pay the special assessment and restitution

in accordance with this judgment's orders pertaining to such

payment.

Six, Defendant shall cooperate in the collection

of a DNA sample from himself.

Seven, Defendant shall apply all moneys received

from income tax refunds, lottery winnings, inheritance,

judgments and any other expected or unexpected financial

gains to the court-ordered financial obligations.

Eight, Defendant shall truthfully and timely file

and pay taxes owed for the years of conviction and shall

truthfully and timely file and pay taxes during the period

54

1  of community supervision.

2         Further, Defendant shall show proof to the

3  Probation Officer of compliance with this order.

4         Nine, Defendant shall not be self-employed nor be

5  employed in a position that does not provide regular pay

6  stubs with the appropriate deductions for taxes unless

7  approved by the Probation Officer.

8         Ten, Defendant shall comply with the Internal

9  Revenue Service's reporting requirements as they pertain to

10 virtual currencies and shall provide proof of having done so

11 to the Probation Officer.

12        Eleven, as directed by the Probation Officer,

13 Defendant shall provide to the Probation Officer, one, a

14 signed release authorizing credit report inquiries, two,

15 Federal and State Income Tax Returns and a signed release

16 authorizing their disclosure, and, three, an accurate

17 financial statement with supporting documentation as to all

18 assets, income, expenses and liabilities of the Defendant.

19        Twelve, Defendant shall submit his person,

20 property, house, residence, vehicle, papers, computers, cell

21 phones, other electronic communications or data storage

22 devices or media, email accounts, social media accounts,

23 Cloud storage accounts or other areas under Defendant's

24 control to a search conducted by a United States Probation

25 Officer or a law enforcement officer.  Failure to submit to

55

1  a search may be grounds for revocation.  Defendant shall

2  warn any other occupants that the premises may be subject to

3  searches pursuant to this condition.  Any search pursuant to

4  this condition will be conducted at a reasonable time and in

5  a reasonable manner upon reasonable suspicion that Defendant

6  has violated a condition of his supervision and that the

7  areas to be searched contain evidence of this violation.

8          The Court authorizes the Probation and Pretrial

9  Services Office to disclose the Presentence Report to the

10  substance abuse treatment provider in order to facilitate

11  Defendant's treatment for narcotic addition or drug

12  dependency.  Further redisclosure of the Presentence Report

13  by the treatment provider is prohibited without the consent

14  of this Court.

15          Now, pursuant to 18 U.S.C. Section 3553(a), the

16  Court is obligated to impose a sentence that is sufficient

17  but not greater than necessary to comply with the purposes

18  of 3553(a)(2).  The Court in determining the particular

19  sentence to be imposed has considered the nature and

20  circumstances of the offense and the history and

21  characteristics of the Defendant.  The Court has recognized

22  the need for the sentence imposed to reflect the seriousness

23  of the offense, that it should promote respect for the law

24  and provide just punishment for the offense.  It should

25  afford adequate deterrence to future criminal conduct and

56

1   protect the public from further crimes of the Defendant and

2   provide the Defendant with needed correctional treatment in

3   the most effective manner.

4        The Court has considered the various kinds of

5   sentences available and the guideline sentencing range.  The

6   Court also has recognized the need to avoid unwarranted

7   sentence disparities among defendants with similar records

8   who have been found guilty of similar conduct, and the Court

9   also recognizes the need to provide restitution to the

10  victims of the offense.

11       Before the Court is Alexander Smirnov, a 44-year-

12  old Defendant who pleaded guilty to two separate dockets.

13  In one docket he pleaded guilty to one count charging

14  falsification of records in a federal investigation -- and

15  that's Docket 91 -- while in the other docket, he pleaded

16  guilty to three counts charging tax evasion.  That's Docket

17  702.

18       Regarding the falsification of records charge, Mr.

19  Smirnov was a confidential human source with the Federal

20  Bureau of Investigation where he provided information to the

21  FBI and was admonished about being truthful on many

22  occasions.  However, Smirnov provided false statements

23  regarding Public Official 1 in 2020 who was the former Vice

24  President of the United States and a candidate for President

25  of the United States, now the current President of the

57

1  United States.

2       These statements were memorialized by the FBI and

3  were fabrications.  When interviewed by the FBI, Smirnov

4  repeated some of the false claims and promoted a new

5  falsehood about the son of Public Official 1.  According to

6  information provided by the Government, the FBI and the

7  United States Department of Justice assigned investigators

8  to assess the truth of the allegations made by Smirnov and

9  included a congressional oversight process.

10      Also in 2020, Smirnov sent his handler a series of

11 messages that expressed bias against Public Official 1.

12 These messages were sent electronically via messaging

13 platforms or applications.

14      Regarding the tax evasion charges from 2020 to

15 2022, Smirnov received income from multiple sources that he

16 used to pay for personal expenses related to himself and his

17 domestic partner.  He concealed these earnings by filing

18 false tax forms for himself and his domestic partner as well

19 as the business Goldman Investment Group.  According to the

20 Government, Smirnov owes the Internal Revenue Service a

21 total outstanding tax of $675,502, which is broken down as

22 follows for the following tax years:

23      $458,744 for the year 2020, $145,171 for the tax

24 year 2021, and $71,587 for the tax year 2022.

25      Aside from the instant dockets, Smirnov has no

58

1  prior convictions.  He was assessed with zero criminal

2  history points and placed into Criminal History Category I.

3  Under the current Sentencing Guidelines Manual, Smirnov

4  appears to be eligible for the zero point offender

5  reduction.

6         The advisory guidelines have accounted for the

7  facts of the case, including the counts of conviction, the

8  substantial interference with the administration of justice,

9  the especially probative document involved, the victim being

10 a former government officer at the time of the offense, the

11 abuse of a position of trust, the amount of tax lost, the

12 sophisticated means used for the tax evasion, the multiple

13 count adjustment, Smirnov's acceptance of responsibility and

14 the zero point offender reduction.

15         By pleading guilty, Smirnov has accepted

16 responsibility.  By participating in an interview, Smirnov

17 has complied with the Probation Officer.

18         He was raised by his mother and stepfather.  He

19 was raised by them in the Soviet Union until he was 11 years

20 old when he moved to Israel.  Smirnov's basic necessities

21 were met as a child.  He suffered from no financial

22 hardships.  He was close to his family and spent time with

23 his family by traveling and going to the movies.

24         He notes having a normal upbringing.  He maintains

25 relationships with his mother, stepfather, and sister who

1  are supportive of him.  Smirnov maintains a minimal contact

2  with his father and has contact with him only once yearly.

3         Regarding his physical health, Smirnov reports

4  that he has glaucoma in both of his eyes and has had many

5  surgeries that he cannot recall the number of.  He currently

6  legally -- he is currently legally blind in both eyes.

7  Smirnov reports that he has to take medications and several

8  eye drops to prevent further deterioration of his eyesight.

9         Smirnov further reports that he has had tetanus in

10  his heart for the past few weeks while he has been in

11  custody and was transported to a hospital.  He has been

12  referred to a cardiologist which is currently pending.

13         Regarding his mental health, Smirnov reports that

14  he has no history of mental or emotional health problems and

15  no history of treatment for such problems.  He also reports

16  the he has no gambling problems.

17         Regarding his substance abuse, he reports that he

18  has used alcohol, marijuana, opiates and cocaine during his

19  lifetime.  His preferred substances are marijuana and

20  cocaine.  He indicates that both of these substances have

21  caused him the most problems.

22         Smirnov was not under the influence of illicit

23  substances or alcohol during the offense, and these

24  substances did not contribute to the commission of the

25  offense.  Smirnov has no history of substance abuse

60

1  treatment but is interested in receiving it.

2         Regarding his education, Smirnov reports that he

3  received his high school diploma in Israel.  He also reports

4  that he served in the Israeli Defense Force or IDF in June

5  of 1998 for four days but was recruited into other

6  government service for four years.  He declined to discuss

7  further details regarding this service due to

8  confidentiality issues.

9         Smirnov reports that his usual occupation is as a

10 confidential human source or CHS for the FBI.  Smirnov also

11 reports owning and having employment history related to two

12 companies, Avalon Group, Inc., a cryptocurrency company, and

13 Goldman, an investment company.  In the future, Smirnov

14 desires to attend college and obtain a degree in history.

15     (Pause.)

16         THE COURT:  All right, sir, you have the right to

17 appeal your conviction if you believe that your guilty plea

18 was somehow unlawful or involuntary or if there was some

19 other fundamental defect in the proceedings that was not

20 waived.

21         MR. CHESNOFF:  Excuse me -- excuse me, your Honor.

22 Before you get to that, you -- would you please state on the

23 record that he gets credit for time served on both cases

24 from February 14th, 2024 as was agreed in the agreement and

25 as permitted so that --

61

1          THE COURT:  Let's save your -- no.  This will be

2    determined by the Bureau of Prisons.  I do not get involved

3    in that.  Okay.

4          MR. CHESNOFF:  But it's -- it's part of the --

5          THE COURT:  I don't care about what kind of an

6    understanding you have with these gentlemen sitting over

7    here.

8          MR. CHESNOFF:  You accept --

9          THE COURT:  Calculation or computation of credits

10   is up to the Bureau of Prisons.

11         MR. CHESNOFF:  Your Honor, you --

12         THE COURT:  I'm not getting involved in that.

13         MR. CHESNOFF:  Your Honor, you accepted the

14   conditional plea, and that's part of the conditional plea.

15         THE COURT:  I'm not saying I reject the plea.  I'm

16   saying I'm not getting involved in the computation of his

17   credits.

18         MR. CHESNOFF:  I'm not asking you to compute it.

19   I'm asking you to state for the record, most respectfully,

20   your Honor, that he gets concurrent time on both cases

21   beginning on February 14th, 2024 as that is part of the

22   binding plea agreement that the Court accepted.

23         THE COURT:  Is it necessary for me to repeat

24   myself?

25         MR. CHESNOFF:  No, your Honor, but --

62

1          THE COURT:  Good.  Let's move on.

2          MR. CHESNOFF:  I would like to make a record then

3   so that if I have to get a transcript to provide to --

4          THE COURT:  Go ahead.  Make -- make your record so

5   I can conclude the --

6          MR. CHESNOFF:  The plea -- the plea agreement

7   requires the Court to order that.  That's my record.

8          THE COURT:  You also have the right to appeal your

9   sentence under some circumstances, particularly if you

10  believe your sentence is contrary to the law.  However, a

11  defendant may waive those rights as part of a plea

12  agreement, and you've entered into a plea agreement that

13  waives some or all of your right to appeal the sentence

14  itself.  Such waivers are generally enforceable.

15          If you believe your waiver is unenforceable, you

16  may present that theory to the Court of Appeals.  With few

17  exceptions, a notice of appeal must be filed within 14 days

18  of judgment being entered.

19          Do you understand that, sir?

20          THE DEFENDANT:  Yes, your Honor.

21          THE COURT:  If you are unable to afford a

22  transcript of the record in this case, one will be provided

23  at Government expense.  If you are unable to pay the cost of

24  an appeal or the filing fee, you may apply within 14 days

25  for a waiver.  If you do not have counsel to act on your

63

1  behalf and if you request it, the clerk of the court will

2  prepare and file a notice of appeal on your behalf.  But,

3  again, you must make the request within 14 days.

4          The notice of appeal must designate the judgment

5  or order appealed from and the fact that you are appealing

6  to the Court of Appeals.  It should also designate the

7  portion of the proceedings not already on file that you deem

8  necessary for the reporter to include.

9          Also in its consideration, the Court has evaluated

10 the sentencing guidelines as required by 18 U.S.C. Section

11 3553(a)(4) and finds the calculations of suggested sentence

12 therein for this Defendant under the present circumstances

13 to be reasonable.  The Court, therefore, sentences the

14 Defendant as previously stated, which is in accordance with

15 the binding plea agreement entered into by the parties under

16 Federal Rules of Criminal Procedure 11(c)(1)(C).

17         Per request of the Defendant, the Court will also

18 make the recommendation to the Bureau of Prisons that he be

19 assigned to or at least evaluated for inclusion in the

20 Bureau of Prisons Residential Drug Abuse Program.

21         MR. CHESNOFF:  Also --

22         THE COURT:  Is there anything else?  Was there

23 anything else?

24         MR. CHESNOFF:  Yeah, Terminal Island, your Honor.

25         THE COURT:  Yes, Terminal Island, right.  Anything

64

1  else?

2          MR. CHESNOFF:  Will you -- you'll recommend that

3  the Bureau of Prison place him at Terminal Island?

4          THE COURT:  Yes.

5          MR. CHESNOFF:  Okay.

6          MR. SCHONFELD:  Your Honor, the Government needs

7  to move to dismiss the remaining counts.

8          MR. WISE:  Yes, your Honor.  We were just getting

9  prepared to do that.

10          THE COURT:  I know.

11          MR. WISE:  The United States moves to dismiss

12  Count 1 in indictment 91 and Counts 2 through 4, 6 and 7 and

13  9 and 10 in indictment 702.

14          THE COURT:  All right.  Count 1 of indictment 91

15  is dismissed in the interest of justice, and Counts 2, 3, 4,

16  6, 7, 9 and 10 of 702 are also dismissed on motion of the

17  Government in the interest of justice.

18          All right.  Anything else we need to deal with?

19          MR. CHESNOFF:  Court's indulgence.

20          MR. WISE:  Not from the United States, your Honor.

21      (Pause.)

22          THE COURT:  Whatever it is you guys are talking

23  about, does that involve the U.S. Marshals?

24          MR. CHESNOFF:  Yes.

25          MR. SCHONFELD:  yes.

65

1      (Pause for counsel to confer.)

2            UNIDENTIFIED SPEAKER:  Your Honor, can we have a

3   sidebar?

4            THE COURT:  We're done.  Sidebar for what?

5            MR. CHESNOFF:  We'll explain it with the Court's

6   permission.

7      (Sidebar discussion off the record.)

8            THE COURT:  All right.  Back on the record.

9            MR. CHESNOFF:  Thanks, your Honor.  Your Honor, on

10  behalf of Mr. Smirnov and in pursuit of my responsibilities

11  to render effective assistance of counsel under the Sixth

12  Amendment, I would ask the Court to state on the record that

13  which is stated in the binding plea agreement which the

14  Court accepted, that the parties agree that the Defendant is

15  entitled to credit in both Criminal Number 24-91 and 24-702

16  for the period of his pretrial detention since the day of

17  his arrest and that credits that the Bureau of Prisons may

18  allow under 18 U.S.C. 3585(b) may be credited against the

19  stipulated sentence including credit under Sentencing

20  Guideline Section 5G1.3.

21            I would at least ask the Court to affirm that.

22            THE COURT:  I think the -- the agreement speaks

23  for itself.  I am not going to calculate anything, and I'm

24  not going to certify that he has been in custody for any

25  particular period of time beginning on any particular date.

66

1   Now, that's the last time I'm going to --

2          MR. CHESNOFF:  Will --

3          THE COURT:  -- discuss that.

4          MR. CHESNOFF:  Will you at least say, your Honor,

5   that he's entitled to credit on both cases?

6          THE COURT:  He is entitled to credits as earned.

7          MR. CHESNOFF:  On both --

8          THE COURT:  As determined by the Bureau of

9   Prisons.

10         MR. CHESNOFF:  On both cases since the day he was

11  arrested.

12         THE COURT:  On any case.

13         MR. CHESNOFF:  All right.  Thank you, your Honor.

14     (Proceedings concluded.)

15

16

17

18

19

20

21

22

23

24

25

67

1          I certify that the foregoing is a correct

2    transcript from the electronic sound recording of the

3    proceedings in the above-entitled matter.

4

5    /s/Jordan Keilty                    1/09/2025
     Transcriber                         Date
6
     FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
7

8
     /s/L.L. Francisco
9    L.L. Francisco, President
     Echo Reporting, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*